UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DEVON CURRIE,

    Plaintiff,

vs.

ANTOINETTE PATTERSON, DELISIA GREEN, MICHELLE McKINNIE, ERIC A. HEFFNER, and JAMES WINTERBURN, individually,

    Defendants.

Case No. 5:23-cv-00183-TKW/MJF

### SECOND AMENDED COMPLAINT FOR DAMAGES

PLAINTIFF sues DEFENDANTS, and alleges:

### Jurisdiction and Venue

1. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1343.

2. Plaintiff's federal claims are predicated upon 42 U.S.C. §§ 1983 and 1988.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c).

4. All conditions precedent to this action have been performed or waived.

### Parties

5. At all times material hereto, Plaintiff DEVON CURRIE was an inmate at Apalachee Correctional Institution East Unit ("Apalachee East").

6. At all times material hereto, Defendant SGT. ANTOINETTE PATTERSON was a Corrections Sergeant at Apalachee East and is sued individually.

7. At all times material hereto, Defendant C.O. DELISIA GREEN was a

1

Corrections Officer at Apalachee East and is sued individually.

8. At all times material hereto, Defendant SGT. MICHELLE McKINNIE was a Corrections Sergeant at Apalachee East and is sued individually.

9. At all times material hereto, Defendant ERIC A. HEFFNER was a Corrections Captain leading a Rapid Response Team (RRT) at Apalachee East and is sued individually.

10. At all times material hereto, Defendant JAMES WINTERBURN was a Corrections Inspector in the Office of Inspector General and is sued individually.

11. All the above Defendants acted under color of law.

## Common Allegations of Fact

12. On July 20, 2022, as of approximately 10:00 p.m., Sgt. Patterson and C.O. Delisia Green were assigned to Dorm P, Apalachee East, an "open bay" dormitory, meaning that the bunks were arranged in rows in a common room.

13. Plaintiff herein was a gay inmate, housed with a number of open gang members, with a provision in their gang rules that they may not be housed with gay inmates and must use violence, if necessary, to drive them out.

14. Patterson and Green were preparing for Master Roster Count (final count) and Sgt. Michelle McKinnie, from M Dorm, assisted with the Master Roster Count.

15. During this time, Plaintiff Devon Currie was in the bathroom of Dorm P, Wing 2, brushing his teeth in the sink area before Master Count began.

16. During Master Roster Count, inmates are required to sit on their bunks with

their i.d. badges so a dorm officer can match his face to his badge to their roster.

17. Currie was taking advantage of his last chance to do his evening hygiene before Master Roster Count required him to stay on his bunk.

**A. Attack One**

18. As Currie brushed his teeth, three known gang members approached him loudly shouting threats demanding he get out of the Dorm and brutally attacking him with wooden broom and mop handles, drawing blood with their assault.

19. The area where the attack took place was within the direct view of the large windows of the Officer's Station that provide a 360-degree view of the Wings.

20. The attack continued for a sustained period and was accompanied by loud shouting by the initial attackers, additional gang members who joined with verbal abuse, and other inmates who saw the attack and shouted to alert the officers.

21. The Defendants in the officers' station were trained to be observant of threats of harm to the inmates that were in their "care, custody, and control," and, in fact, protecting inmates was one key reason for their being hired and trained.

22. Master Roster Count was one of the closest inspections of inmates in the course of a shift, when dorm officers are one-on-one with each inmate in the Dorm.

23. There is a subculture among corrections staff that will often not call backup or intervene for a significant period when physical violence breaks out among inmates, but wait to see if the violence resolves on its own before calling backup.

24. This is particularly true when the attackers are predatory inmates and the

victims are disfavored inmates, such as inmates who are perceived to be gay.

25. It is also particularly true when attackers are members of powerful gangs, referred to as Strategic Threat Groups ("STG"), who can make life more difficult for understaffed corrections employees but sometimes also carry out "tasks" for them.

26. As the chaos unfolded in Wing 2, the Defendants failed to call backup after the first attack, waiting to see if the situation would resolve without intervention.

27. While the Defendants in the Officer's Station, Patterson and Green, joined by another corrections staff member, identified as Sgt. Michelle McKinnie, of M Dorm, were aware of the incident, they did nothing to stop, defuse, or control the attack.

28. As the Defendants in the officers' station waited, the attack let up and Plaintiff Currie stumbled from the bathroom, his clothing ripped and covered with blood.

29. Although the violence had temporarily ceased, the threats continued, with gang members shouting that all homosexual inmates had to leave the dorm.

30. Plaintiff Currie began packing his property, hoping to be allowed by the dorm officers to move to protective housing. This is known as "checking in."

31. While all this was going on, Defendant Green came out of the officers' station and announced "Master Roster Count," a methodical count of each inmate.

32. During this Count, all inmates should have been seated quietly on their bunk with their inmate i.d. badges out to be displayed so officers can identify each one.

33. However, the threats were still being made and the predatory inmates were refusing to sit quietly on their bunks, which would have been impossible to ignore.

34. As Defendant Green approached Plaintiff Currie's bunk, Currie, in torn and blood-stained clothing, pleaded with her to let him check in to protective custody.

35. Officers at Apalachee C.I. tended to be resistant to letting inmates "check in" (seek protection) because it was extra work and sometimes offended gang members.

36. Although Plaintiff pled with Green to be moved and Defendant Green could clearly see Currie's distress, and that he had torn clothing and bleeding injuries, Green responded, "I ain't doing no paperwork," and moved on.

37. According to FDC rules, one dorm officer has to remain in the officers' station at all times and since Dorm P only had two staff, Sgt. Patterson had to stay there but given the chaos, she would have been keenly aware of the danger to Currie.

38. At minimum, Patterson, McKinnie, or Green, or all three, should have called backup during the first attack, and more so after a bleeding Currie pled to be moved.

**B. Attack Two**

39. As C.O. Green and Sgt. McKinnie conducted count, gang members continued to threaten Currie, including the original attackers and several other gang members.

40. The loud threats were that he and any other gay inmates in the wing had to pack their property and "get off the compound" (go into confinement).

41. As Master Roster Count continued, one of the gang members very loudly shouted out, "Ya'll faggots gotta get up outta here".

42. Once this threat was made, two other inmates, Charles Gaddis and Brandon Williams, both perceived as gay, tried to defuse the situation with reason.

43. But Gaddis and Williams themselves were instantly attacked by six or more gang members and immediately received serious stab wounds.

44. Gaddis was stabbed in the face requiring 142 stitches in the face. Facial scarring is a way of "marking" an inmate as a future target for attack.

45. Williams was stabbed twice in the back as he tried to escape attackers.

46. Plaintiff Currie was stabbed a total of six times including the neck, chest, both shoulders, side and another stab wound which punctured Currie's left lung.

47. From start to finish, the two attacks went on for up to 20 minutes.

48. During that time, the loud sound and frenetic movement would have alerted anyone in Dorm P or in the officers' station that a violent attack was going on.

49. By the time help finally came, long after the attacks began, Plaintiff Currie had already bled out and was unconscious and non-responsive.

50. All the attack victims were rushed for emergency medical care. Plaintiff Currie told medical providers that he couldn't breathe and it was later found that a stab would had penetrated his lung which was filling up with blood.

51. Plaintiff Currie was rushed to surgery at Tallahassee Memorial Hospital, where he was told that he had "flat-lined" twice on the operating table.

52. Plaintiff Currie was kept in the hospital for five days until all the blood was drained from his lung. He still suffers pain, shortness of breath, neck and chest pains, low energy, nausea, light-headedness, nightmares, humiliation and great continuing physical pain, which has not been abated.

53. Inmate Gaddis was also rushed to a hospital with life-threatening wounds, and inmate Williams was sent to a hospital with serious wounds.

54. Officer in Charge (OIC) Capt. Eric Heffner, who came to the scene while the attack was still going on, failed to record and preserve evidence, falsely alleged that the event was a "fight" rather than a physical assault, and presented the facts in a way that wrongly resulted in Close Management I status for the inmate victims.

55. Capt. Heffner's mischaracterization of the events as a fight was not innocent but was a common strategy to accuse the victims as well as the aggressors in order to undermine the victim's credibility and cover up official misconduct.

56. Capt. Heffner was aware that the three victims were perceived as gay and suffered injuries and that at least two of the three attackers were known gang members who had official animus toward inmates perceived as gay.

57. Capt. Heffner's mischaracterization of the events as a "fight" also reflected the fact that gay inmates are disfavored by prison officials due to systemic homophobia.

58. Capt. Heffner could have set the record straight at any time but allowed all three inmate victims to go to Close Management I as a retaliatory punishment.

59. Currie and the other victims were not charged with disciplinary infractions as a result of this incident but all three were placed on Close Management I.

60. Inspector James Winterburn was trained to download and review the fixed wing video to preserve evidence of what could have been charged as attempted murder, including the identities and roles of the participants.

61. On information and belief as may be further substantiated by aggressive discovery, Winterburn either destroyed or hid the video because it also showed corrections staff failing to protect inmate victims, including Plaintiff, from assault.

62. Although there are witnesses to prison officials showing clips of the video in the course of interviews, prison officials deny any video currently exists.

63. However, the initial report of the incident states clearly that video *did* exist and that it was turned over to the Office of Inspector General.

64. Florida Department of Corrections records custodians report there is now only an envelope with an empty disk.

65. Thus, the destruction or concealment of the video was not only a violation of the Plaintiff's constitutional rights but also a crime under Florida law.

66. Destruction or suppression of the video allowed Heffner and Winterburn to falsely portray the incident as a "fight" rather than a physical assault and present the facts in a way that justified placing the victims on punitive Close Management.

67. The failure to preserve evidence and false presentation of the facts of the attack, including the failure to mention the role of the Defendant dorm staff, was designed to cover up their wrongdoing and intimidate the inmate victims.

## Causes of Action

I. **Eighth Amendment: Cruel and Unusual Punishment: Failure to Protect as to Patterson, Green, and McKinnie (42 U.S.C. § 1983)**

The Common Allegations of Fact above are stated herein by reference.

68. Plaintiff is entitled to relief against Defendants Patterson, Green, and

McKinnie, for failure to protect Plaintiff in violation of his rights under the Eighth Amendment against "cruel and unusual punishment."

69. Defendants Patterson and Green were assigned to Apalachee East, P-Dorm.

70. Patterson and Green, along with McKinnie, were in the Dorm preparing for Master Roster Count, in which each inmate in the Dorm is encountered, one-on-one with corrections staff, has their face compared with their prisoner i.d. and their prisoner i.d. compared with the roster of prisoners assigned to the Dorm.

71. Defendant McKinnie is identified as being present in the Wing at that time.

72. In the course of their preparation and execution of Master Roster Count, these defendants were on a heightened alert. Officers were required to individually identify each inmate and Patterson was on duty to observe as they went from wing to wing.

73. The two-phase attack on Plaintiff Currie, ultimately to include Inmates Gaddis and Williams, was loud and noisy and physically demonstrative.

74. There was loud shouting and disruptive movement throughout the Master Roster Count in Wing 2 that would have been obvious to any observer.

75. The attack involved the attackers wielding broom and mop handles in the bathroom before Master Roster Count in Wing 2, and with edged weapons in the open bay dorm after Officer Green and Sgt. McKinnie moved on.

76. As Green and McKinnie conducted count, gang members including the first three attackers and several others loudly threatened inmates perceived as gay.

77. The threats were that Currie and the rest of the homosexuals (LGBTQ) in the

9

wing had to pack their property and "get off the compound" (go to confinement).

78. As Master Roster Count continued, one of the gang members very loudly shouted out, "Ya'll faggots gotta get up outta here."

79. Before they moved on, Green and McKinnie were confronted by Plaintiff Currie who said that he was afraid and needed to be moved from the Dorm.

80. Officer Green and McKinnie would have clearly seen that Currie's clothes were ripped and his body and clothing were already smeared with blood.

81. Green and McKinnie would have heard the shouted threats and understood what the threats meant for Currie and other inmates perceived as gay.

82. Officer Green responded to Currie's pleas with the words, "I ain't doing no paperwork," referring to the report on the request for protection or to be moved.

83. After Green and McKinnie left P Dorm Wing 2, the initial attackers, joined by additional attackers, resumed the attack on Currie with hand-made knives.

84. Inmates Gaddis and Williams, also perceived as gay, tried to intervene to reason with the attackers and to protect Plaintiff Currie.

85. In response to their intervention, Gaddis and Williams were both stabbed multiple times, with Gaddis and Currie receiving life-threatening injuries.

86. Patterson, Green, and McKinnie would have been aware of the potential for severe injuries and death because of the frequency and severity of serious stabbing injuries at Apalachee Correctional Institution and other Florida prisons.

87. As a proximate result of Defendants' denial of protection, Plaintiff has

suffered significant physical injury, mental distress, humiliation, and immense pain and suffering, and will continue to suffer from such injuries in the future.

88. As it was necessary for Plaintiff to retain the undersigned attorneys to represent him, Plaintiff is entitled to an award of attorney's fees and costs.

WHEREFORE, Plaintiff seeks relief as noted below.

## II. First Amendment: Actions to Chill Protected Speech and Redress of Grievances: Heffner, and Winterburn (42 U.S.C. § 1983)

The Common Allegations of Fact above are stated herein by reference.

89. Plaintiff is entitled to relief against Heffner, and Winterburn, acting under color of law, for actions to chill speech and redress of grievances, aimed at disfavored inmates such as gay inmates and inmates who are known to write grievances, and pre-empting resistance to their plan to punish him, a victim, as an attacker.

90. Defendants Heffner and Winterburn took actions calculated to chill the exercise of protected speech and redress by a person of ordinary firmness.

91. Capt. Heffner and Inspector Winterburn were prison officials on the scene who had contact with attackers, victims and witnesses, and had the ability to review video, identify participants, and prevent the victims from being wrongly punished.

92. Capt. Heffner, the Officer in Charge (OIC) at the time of the attack, came on the scene and failed to preserve evidence with the motive of covering up officer misconduct and setting inmate victims up for undeserved punitive treatment in order to warn the inmate victims that they needed to remain silent as to any officer misconduct or face further reprisals.

93. Inspector Winterburn came on the scene and directly participated in suppressing or destroying evidence with the goal of covering up officer misconduct and setting inmate victims up for unjustified punitive treatment in order to warn the inmate victims that they needed to remain silent as to any officer misconduct or face further reprisals.

94. Inspector Winterburn had the ability to identify all the six or more attackers by reviewing video but named only three attackers as having been involved and further represented that they were involved in a "fight" and not a gratuitous attack.

95. Actions by Defendants Heffner and Winterburn were a direct and proximate cause of significant mental distress, humiliation, and unjustified punishment for the Plaintiff's past and prospective future exercise of his rights, warranting the imposition of punitive damages.

96. As it was necessary for Plaintiff to retain the undersigned attorneys to represent him, Plaintiff is entitled to an award of attorney's fees and costs.

WHEREFORE, Plaintiff seeks relief as noted below.

### III. Eighth Amendment: Cruel and Unusual Punishment: Interference with Medical Treatment pursuant to 42 U.S.C. § 1983 (Green, McKinnie)

The Common Allegations of Fact above are stated herein by reference.

97. Defendants Green and McKinnie were deliberately indifferent to Plaintiff Currie's bleeding injuries which they observed during Master Roster Count yet did nothing to call for medical providers or assist Currie in getting timely medical care.

98. Green and McKinnie's failure to call backup and allow Currie to get medical

help resulted in his exposure to further injury in a renewed attack, leading to loss of consciousness from exsanguination, and endangering his life.

99. Plaintiff Currie "flat-lined" twice during emergency medical care.

100. Green and McKinnie interfered with Plaintiff's medical treatment for known serious injuries as a result of their deliberate indifference to a known risk of harm.

101. As a direct and proximate result of Green's and McKinnie's breach of duty to Currie, he suffers more severe pain and disability than if he had been timely treated.

102. As it was necessary for Plaintiff to retain the undersigned attorneys to represent him, Plaintiff is entitled to an award of attorney's fees and costs.

WHEREFORE, Plaintiff seeks relief as noted below.

## IV. Conspiracy pursuant to 42 U.S.C. § 1983 (All Defendants)

The Common Allegations of Fact above are stated herein by reference.

103. All named Defendants, Patterson, Green, Heffner and Winterburn, were involved in a conscious conspiracy, together with certain inmates, to cause harm to Plaintiff based on animus for gay inmates and to add to their injuries by destroying evidence and drafting them into the harsh, repressive Close Management I status.

104. The named Defendants were joined in this mission by the inmate attackers who were known or could have been known through examination of the fixed wing video of the open bay dormitory, several of whom were spared punishment.

105. Members of the conspiracy demonstrated by their acts a common criminal purpose to cause or allow harm, not excluding death, to the disfavored inmates.

106. The members of the conspiracy also acted to allow the deliberately indifferent dorm staff to escape blame and place the punishment largely on the victims.

107. Actions by Defendants were a direct and proximate cause of more significant permanent severe physical injury, mental distress, humiliation, and immense pain and suffering, that Plaintiff will continue to suffer from in the future.

108. As it was necessary for Plaintiff to retain the undersigned attorneys to represent him, Plaintiff is entitled to an award of attorney's fees and costs

## Prayer for Relief

Plaintiff respectfully requests of the Court:

A. Compensatory damages against all defendants;

B. Punitive damages against individual defendants where indicated;

C. Reasonable attorney's fees and costs as provided by law;

D. Trial by jury for those counts so triable; and

E. Such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ James V. Cook  
JAMES V. COOK, ESQ.  
Florida Bar Number 0966843  
Law Office of James Cook  
314 West Jefferson Street  
Tallahassee, FL 32301  
Phone: (850) 222-8080  
Fax: (850) 561-0836  
Email: cookjv@gmail.com

/s/ Joshua Tarjan  
JOSHUA TARJAN, ESQ.

>Florida Bar Number 107092
>The Tarjan Law Firm P.A.
>12372 SW 82 Avenue
>Pinecrest, FL 33156
>(305) 423-8747
>(323) 243-3186 (cell)
>(786) 842-4430 (fax)
>josh@tarjanlawfirm.com
>
>*Counsel for Plaintiff*

I CERTIFY the foregoing was filed electronically on 8/9/2024, serving counsel of record registered to be notified by the CM/ECF electronic filing system.

>*/s/James V. Cook*