UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DEVON CURRIE,

    Plaintiff,

vs.

MICHELLE McKINNIE,
ANTOINETTE PATTERSON, and
DELISIA GREEN, individually,

    Defendants.

Case No. 5:23-cv-00183-TKW/MJF

### SECOND AMENDED COMPLAINT FOR DAMAGES

PLAINTIFF sues DEFENDANTS, and alleges:

#### Jurisdiction and Venue

1. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1343.

2. Plaintiff's federal claims are predicated upon 42 U.S.C. §§ 1983 and 1988.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c).

4. All conditions precedent to this action have been performed or waived.

#### Parties

5. At all times material hereto, Plaintiff DEVON CURRIE was an inmate at Apalachee Correctional Institution East Unit ("Apalachee East").

6. At all times material hereto, Defendant SGT. MICHELLE McKINNIE was a Corrections Sergeant at Apalachee East and is sued individually.

7. At all times material hereto, Defendant SGT. ANTOINETTE PATTERSON

1

was a Corrections Sergeant at Apalachee East and is sued individually.

8. At all times material hereto, Defendant C.O. DELISIA GREEN was a Corrections Officer at Apalachee East and is sued individually.

9. All the above Defendants acted under color of law.

## Common Allegations of Fact

10. On July 20, 2022, as of approximately 10:00 p.m., Sgt. Patterson and C.O. Delisia Green were assigned to Dorm P, Apalachee East, an "open bay" dormitory, meaning that the bunks were arranged in rows in a common room.

11. Plaintiff herein was a gay inmate, housed with a number of open gang members, with a provision in their gang rules that they may not be housed with gay inmates and must use violence, if necessary, to drive them out.

12. Patterson and Green were preparing for Master Roster Count (final count) and Sgt. Michelle McKinnie, from M Dorm, assisted with the Master Roster Count.

13. During this time, Plaintiff Devon Currie was in the bathroom of Dorm P, Wing 2, brushing his teeth in the sink area before Master Count began.

14. During Master Roster Count, inmates are required to sit on their bunks with their i.d. badges so a dorm officer can match his face to his badge to their roster.

15. Currie was taking advantage of his last chance to do his evening hygiene before Master Roster Count required him to stay on his bunk.

A. Attack One

16. As Currie brushed his teeth, three known gang members approached him

loudly shouting threats demanding he get out of the Dorm and brutally attacking him with wooden broom and mop handles, drawing blood with their assault.

17. The area where the attack took place was within the direct view of the large windows of the Officer's Station that provide a 360-degree view of the Wings.

18. The attack continued for a sustained period and was accompanied by loud shouting by the initial attackers, additional gang members who joined with verbal abuse, and other inmates who saw the attack and shouted to alert the officers.

19. The Defendants in the officers' station were trained to be observant of threats of harm to the inmates that were in their "care, custody, and control," and, in fact, protecting inmates was one key reason for their being hired and trained.

20. Master Roster Count was one of the closest inspections of inmates in the course of a shift, when dorm officers are one-on-one with each inmate in the Dorm.

21. There is a subculture among corrections staff that will often not call backup or intervene for a significant period when physical violence breaks out among inmates, but wait to see if the violence resolves on its own before calling backup.

22. This is particularly true when the attackers are predatory inmates and the victims are disfavored inmates, such as inmates who are perceived to be gay.

23. It is also particularly true when attackers are members of powerful gangs, referred to as Strategic Threat Groups ("STG"), who can make life more difficult for understaffed corrections employees but sometimes also carry out "tasks" for them.

24. As the chaos unfolded in Wing 2, the Defendants failed to call backup after

the first attack, waiting to see if the situation would resolve without intervention.

25. While the Defendants in the Officer's Station, Patterson and Green, joined by another corrections staff member, identified as Sgt. Michelle McKinnie, of M Dorm, who came to assist P Dorm in carrying out Master Roster Count, were aware of the violent incident, they did nothing to stop, defuse, or control the attack.

26. As the Defendants in the officers' station waited, the attack let up and Plaintiff Currie stumbled from the bathroom, his clothing ripped and covered with blood and with bleeding gashes on his face and head, clearly visible to the Defendants.

27. Although the violence had temporarily ceased, the threats continued, with gang members shouting that all homosexual inmates had to leave the dorm.

28. Plaintiff Currie began packing his property, hoping to be allowed by the dorm officers to move to protective housing. This is known as "checking in."

29. While all this was going on, Defendant Green came out of the officers' station and announced "Master Roster Count," a methodical count of each inmate.

30. Sgt. McKinnie watched the events in Wing 2 from the doorway of the officers station and had a clear vantage point for the shouts and acts of the gang members.

31. During this Count, all inmates should have been seated quietly on their bunk with their inmate i.d. badges out to be displayed so officers can identify each one.

32. However, the threats were still being made and the predatory inmates were refusing to sit quietly on their bunks, which would have been impossible to ignore.

33. As Defendant Green approached Plaintiff Currie's bunk, Currie, in torn and

blood-stained clothing, pleaded with her to let him check in to protective custody.

34. Officers at Apalachee C.I. tended to be resistant to letting inmates "check in" (seek protection) because it was extra work and sometimes offended gang members.

35. Although Plaintiff pled with Green to be moved and Defendant Green could clearly see Currie's distress, and that he had torn clothing and bleeding injuries, Green responded, "I ain't doing no paperwork," and moved on.

36. Sgt. McKinnie was able to see and hear this exchange and failed to help though she would have been able to do so.

37. Under FDC rules, one dorm officer has to remain in the officers' station at all times and since Dorm P only had two staff, Sgt. Patterson had to stay there but given the chaos and noise, she would have seen and heard everything through the glass.

38. At minimum, Patterson, McKinnie, and Green should have called backup during the first attack, and more so after a bleeding Currie pled to be moved.

B. Attack Two

39. As C.O. Green and Sgt. McKinnie conducted count, gang members continued to threaten Currie, including the original attackers and several other gang members.

40. The loud threats were that he and any other gay inmates in the wing had to pack their property and "get on the door" (leave the Dorm).

41. As Master Roster Count continued, one of the gang members very loudly shouted out, "Ya'll faggots gotta get up outta here".

42. Once this threat was made, two other inmates, Charles Gaddis and Brandon

5

Williams, both perceived as gay, tried to defuse the situation with reason.

43. But Gaddis and Williams themselves were instantly attacked by six or more gang members and immediately received serious stab wounds.

44. Gaddis was stabbed in the face requiring 142 stitches in the face. Facial scarring is a way of "marking" an inmate as a future target for attack.

45. Williams was stabbed twice in the back as he tried to escape attackers.

46. Plaintiff Currie was stabbed a total of six times including the neck, chest, both shoulders, side and another stab wound which punctured Currie's left lung.

47. From start to finish, the two attacks went on for up to 20 minutes.

48. During that time, the loud sound and frenetic movement would have alerted anyone in Dorm P or in the officers' station that a violent attack was going on.

49. By the time help finally came, long after the attacks began, Plaintiff Currie had already bled out and was unconscious and non-responsive.

50. All the attack victims were rushed for emergency medical care. Plaintiff Currie told medical providers that he couldn't breathe and it was later found that a stab wound had penetrated his lung which was filling up with blood.

51. Plaintiff Currie was rushed to surgery at Tallahassee Memorial Hospital, where he was told that he had "flat-lined" twice on the operating table.

52. Plaintiff Currie was kept in the hospital for five days until all the blood was drained from his lung. He still suffers pain, shortness of breath, neck and chest pains, low energy, nausea, light-headedness, nightmares, humiliation and great continuing

physical pain, which has not been abated.

53. Inmate Gaddis was also rushed to a hospital with life-threatening wounds, and inmate Williams was sent to a hospital with serious wounds.

## Causes of Action

I. **Eighth Amendment: Cruel and Unusual Punishment: Failure to Protect as to Patterson, Green, and McKinnie (42 U.S.C. § 1983)**

The Common Allegations of Fact above are stated herein by reference.

54. Plaintiff is entitled to relief against Defendants Patterson, Green, and McKinnie, for failure to protect Plaintiff in violation of his rights under the Eighth Amendment against "cruel and unusual punishment."

55. Defendants Patterson and Green were assigned to Apalachee East, P-Dorm.

56. Patterson and Green, along with McKinnie, visiting from Dorm M, were in the Dorm preparing for Master Roster Count, in which each inmate in the Dorm is one-on-one with corrections staff, has their face compared with their prisoner i.d. and their prisoner i.d. compared with the roster of prisoners assigned to the Dorm.

57. In the course of their preparation and execution of Master Roster Count, these defendants were on a heightened alert. Officers were required to individually identify each inmate and Patterson was on duty to observe as they went from wing to wing.

58. The two-phase attack on Plaintiff Currie, ultimately to include Inmates Gaddis and Williams, was loud and physically demonstrative.

59. There was loud shouting and disruptive movement throughout the Master Roster Count in Wing 2 that would have been obvious to any observer.

60. The attack involved the attackers wielding broom and mop handles in the bathroom before Master Roster Count in Wing 2, and with edged weapons in the open bay dorm after Master Roster Count had concluded.

61. As Green and McKinnie conducted count, gang members including the first attackers and several others loudly threatened gay inmates with physical harm.

62. The threats were that Currie and the rest of the gay inmates (LGBTQ) in the wing had to pack their property and "get off the compound" (go to confinement).

63. As Master Roster Count was held, the threats continued with one of the gang members very loudly shouting out, "Ya'll faggots gotta get up outta here."

64. Before they moved on, Green and McKinnie were confronted by Plaintiff Currie who said that he was afraid and needed to be moved from the Dorm.

65. Officer Green and McKinnie would have clearly seen that Currie's clothes were ripped and his face and clothing were already smeared with blood.

66. Green and McKinnie would have heard the shouted threats and understood what the threats meant for Currie and other inmates perceived as gay.

67. Officer Green responded to Currie's pleas with the words, "I ain't doing no paperwork," referring to the report on the request for protection or to be moved.

68. After Green and McKinnie left P Dorm Wing 2, the initial attackers, joined by additional attackers, resumed the attack on Currie with hand-made knives.

69. Inmates Gaddis and Williams, also perceived as gay, tried to intervene to reason with the attackers and to protect Plaintiff Currie.

70. In response to their intervention, Gaddis and Williams were both stabbed multiple times, with Gaddis and Currie receiving life-threatening injuries.

71. Patterson, Green, and McKinnie would have been aware of the potential for severe injuries and death because of the frequency and severity of serious stabbing injuries at Apalachee Correctional Institution and other Florida prisons.

72. If the officers had permitted Currie to be taken to confinement, he also would have, as a matter of policy, received a medical examination and care.

73. As a proximate result of Defendants' denial of protection, Plaintiff has suffered significant physical injury, mental distress, humiliation, and immense pain and suffering, and will continue to suffer from such injuries in the future.

74. The failure to protect also led to the foreseeable result that Currie was placed on punitive Close Management as if he were an attacker rather than a victim.

75. As it was necessary for Plaintiff to retain the undersigned attorneys to represent him, Plaintiff is entitled to an award of attorney's fees and costs.

WHEREFORE, Plaintiff seeks relief as noted below.

II. **Eighth Amendment: Cruel and Unusual Punishment: Interference with Medical Treatment pursuant to 42 U.S.C. § 1983 (Green, McKinnie)**

The Common Allegations of Fact above are stated herein by reference.

76. Defendants Green and McKinnie were deliberately indifferent to Plaintiff Currie's bleeding injuries which they observed during Master Roster Count yet did nothing to call for medical providers or assist Currie in getting timely medical care.

77. Green and McKinnie's failure to call backup and allow Currie to get medical

9

help, though able, resulted in his exposure to further injury in a renewed attack, leading to loss of consciousness from exsanguination, and endangering his life.

78. Plaintiff Currie "flat-lined" twice during emergency medical care.

79. Green and McKinnie interfered with Plaintiff's medical treatment for known serious injuries as a result of their deliberate indifference to a known risk of harm.

80. As a direct and proximate result of Green's and McKinnie's breach of duty to Currie, he suffers more severe pain and disability than if he had been timely treated.

81. As it was necessary for Plaintiff to retain the undersigned attorneys to represent him, Plaintiff is entitled to an award of attorney's fees and costs.

WHEREFORE, Plaintiff seeks relief as noted below.

### Prayer for Relief

Plaintiff respectfully requests of the Court:

A. Compensatory damages against all defendants;

B. Punitive damages against individual defendants where indicated;

C. Reasonable attorney's fees and costs as provided by law;

D. Trial by jury for those counts so triable; and

E. Such other relief as the Court deems just and proper.

Respectfully submitted,   */s/ James V. Cook*
JAMES V. COOK, ESQ.
Florida Bar Number 0966843
Law Office of James Cook
314 West Jefferson Street
Tallahassee, FL 32301
Phone: (850) 222-8080

Fax: (850) 561-0836
Email: cookjv@gmail.com

/s/ Joshua Tarjan
JOSHUA TARJAN, ESQ.
Florida Bar Number 107092
The Tarjan Law Firm P.A.
12372 SW 82 Avenue
Pinecrest, FL 33156
(305) 423-8747
(323) 243-3186 (cell)
(786) 842-4430 (fax)
josh@tarjanlawfirm.com

*Counsel for Plaintiff*

I CERTIFY the foregoing was filed electronically on 9/24/2024, serving counsel of record registered to be notified by the CM/ECF electronic filing system.

/s/James V. Cook