## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PANAMA CITY DIVISION

**DEVON CURRIE**
**DOC# A51859,**

      **Plaintiff,**

**v.**                        **Case No.: 5:23-cv-183-TKW/MJF**

**MCKINNIE, ET AL.,**

      **Defendants.**
_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

    **McKinnie** ("Defendant"), through counsel, hereby move for Summary Judgment in her favor pursuant to Rule 56, Fed. R. Civ. P., and Rule 56.1, N.D. Fla. Loc. R., and alleges the following in support thereof:

## STATEMENT OF MATERIAL FACTS

    Plaintiff is prisoner within in the custody of the Florida Department of Corrections ("FDOC"). *See* (Exhibit A). *See also* (Doc. 52 at ⁋ 5).[1] Plaintiff's allegations of injury are related to an incident which occurred on July 20, 2022. *See generally* (Doc. 52).

    A. *Layout of P-Dorm.*

---

[1] Each document filed in this case as part of the Electronic Case File will be referenced as "Doc." followed by the document number.

On July 20, 2022, Plaintiff was incarcerated at Apalachee Correctional Institution, East Unit ("Apalachee") and was housed within Dorm P-2 of the institution. *See* (Doc. 52 at ¶ 10). *See also* (Exhibit F at 11). Dorm P-2 is an open population dorm that has a unique layout. (Exhibits B at 20-21, 25-27; C; D; E at 17-22; F at 11, 14). The dorm itself is separated into two wings, P-1, and P-2, with the Officer Station located between the two wings. (Exhibits C; F at 11-12, 88-89). The Officer Station has clear glass, and inmates can see into the Office Station. (Exhibits F at 89-90; G at 80-81). Both wings have a physical wall in between them with a door that can be opened from the Officer Station which allows movement between both wings. (Exhibits C; F at 88-89). The Officer Station has a door which opens into P-1, and a separate door that opens into P-2. (Exhibits B at 31; C).

If an individual is situated inside the Officer Station, and looks out into P-2, the individual will see several bunk beds along the walls, with windows looking outside of the dorm. (Exhibits H-J). In the middle of the dorm, there are several individual bunks that inmates are assigned. (Exhibits B at 25; D; H-J).

At the far end of P-2, across from the Officer Station, there are bathrooms starting from the left wall of P-2 and terminating in the middle of the Dorm. (Exhibits C; D; H-J). The bathroom is comprised of two entrances. (Exhibits C; D; H-J). First, an entrance to an area comprised of the shower and sinks, and

2

additional row of sinks on the left wall. (Exhibits D; H-M). The row of sinks along the left wall will be referred to as the "bird bath area" because inmates often shower themselves in the area when the shower is otherwise occupied. (Exhibits C; D; H-J; M). The area comprising the shower, sinks, and bird bath area, has two windows, which allow the officers to see inside the area from the Officer Station. (Exhibits C; D; H-J). There is only a single entrance to the bird bath, sink, and shower area. (Exhibits C; D; E at 20-21; H-J). Importantly, the bird bath area is partially obstructed by the row of bunk beds along the left wall of P-2, if looking outwards from the Officer Station. (Exhibits C; D; H-J).

The second large area of the bathroom is where the toilets are located. (Exhibits C; D; H-J; O-Q). The toilets are located on the right side of the bathroom and can be seen from inside of the Officer Station. (Exhibits C; D; H-J; O-Q). Between the toilets and the shower and sink area is a closet, and inside the closet, cleaning materials are stored within, including mops and buckets. (Exhibits C; D; H-J).

B. *Background of individuals involved in the July 20, 2022, incident.*

There are several individuals involved in the July 20, 2022, incident. Many of the individuals involved either are members or associates of the Outkast gang (also known as "OKs") and the Latin Kings gang. (Exhibits E at 12, 15; F at 26-27). One aspect to note about the Outkast gang is that it is comprised of LGBTQ

individuals. (Exhibits B at 59; F at 41). Additionally, the Latin Kings have general

animosity towards individuals who are gay. (Exhibits B at 50-51; E at 12; G at 15,

61). A brief description of the individuals is as follows:

- Plaintiff (alias "boots") is an LGBTQ individual who identifies as gay.[2] (Exhibit A; Exhibit B at 50; Exhibit F at 16-17, 70; G at 24). Plaintiff is not a member of any gang but is an associate of the Outkast gang through Brandon Williams, DC# 130662 (alias "Blue") ("Williams") and Charles Gaddis, DC# 127714 (alias "Mississippi") ("Gaddis"). (Exhibits B at 59; E at 12, 15; F at 41; CC at 20; R; S).

- Williams is a member of the Outkast gang. (Exhibit E at 15; F at 26). Williams is also a friend of Plaintiff. (Exhibit F at 25).

- Gaddis is a member of the Outkast gang. (Exhibit E at 15; F at 25-26). Gaddis is also a friend of Plaintiff. (Exhibit F at 26).

- Rascual Rentas, DC# B10151 (alias "King Pace" or "Pace") ("Rentas") is a member of the Latin Kings gang. (Exhibits CC at 15; T).

- Luis Rodriguez, DC# M53592 (alias "Peru") ("L. Rodriguez") is a member of the Latin Kings gang. (Exhibits G at 25, 38; U).

- Wilson Rodriguez, DC# K86552 (alias "King YG" or "YG") ("W. Rodriguez") is a member of the Latin Kings gang. (Exhibits G at 39-40; V).

- Richard Utria, DC# 183499 ("Utria") is not a gang member and is not a known associate of any gang. (Exhibits W).

- Cody Parker, DC# X92075, (alias "Flaco") ("Parker") may be a member of the Latin Kings, but it is not clear. (Exhibit X).

- Alfredo Pedro, DC# S71334 ("Pedro") may be a member of the Latin Kings or a different prison gang such as the Nietas, but it is not clear. (Exhibits Y).

---

[2] Defendant notes this fact as it is important to the case. Defendant expresses no opinion on Plaintiff's sexual preference or identity.

4

There are also several individuals who were present during the July 20, 2022, incident, but were not involved, and instead are only witnesses. *See e.g.* (Exhibits F; G). There were also other individuals in P-2 that were gay, but only Plaintiff, Williams, and Gaddis were attacked. (Exhibit B at 53). *See also* (Exhibit F at 70-71).

   *C. The July 20, 2022, incident.[3]*

   On July 20, 2022, at around 10:00 PM, Plaintiff entered the shower, sink, and bird bath area through the doorway. (Doc. 52 at ⁋ 16). Already in the bathroom were Rentas, L. Rodriguez, and Utria. (Exhibits G at 15, 18, 37; CC at 13-15, 16). Rentas was in the bathroom taking a shower, and L. Rodriguez was keeping watch on his behalf near the entrance. (Exhibits G at 18, 37; CC at 13-15, 16). Utria was in the bird bath area utilizing the sinks. (Exhibits G at 16; Z at 16).

   Within P-2, there was an unwritten agreement between the Latin Kings and other LGBTQ individuals that while a Latin King was in the bathroom, any LGBTQ individual was not allowed in the bathroom. (Exhibits E at 16-17; G at 17). Despite knowing the agreement, and Rentas being in the shower, Plaintiff insisted on entering the bird bath, sink, and shower area. (Exhibits G at .

---

[3] As has been detailed in previous motions, there has not been any video that has been obtained which records the incident on July 20, 2022. *See* (Docs. 55, 57, 63). As a result, the facts gleaned about the July 20, 2022, incident have been obtained through the taking of depositions of the individuals involved and witnesses.

Upon entering the area, and heading towards the bird bath area, L. Rodriguez approached Plaintiff and told him he needed to leave the area. (Exhibit F at 16; G at 18, 25, 39). In response, Plaintiff refused to leave and continued to utilize the sinks in the bird bath area. (Exhibits F at 17-18; G at 18). Based on Plaintiff's actions, a fight began between himself and L. Rodriguez. (Exhibits F at 18-19, 23; G at 20, 39). During the fight, W. Rodriguez became involved, and Rentas may have also become involved in the fight after finishing up in the shower. (Exhibits G at 60-61; F at 48). *See also* (Exhibit B at 20). The fight occurred in the bird bath area.[4] (Exhibits B at 19-21). During the fight, Plaintiff ended up punching and knocking unconscious, Utria, who was not involved in the fight. (Exhibit Z at 16). Plaintiff also was getting the better of his attackers, despite being outnumbered. (Exhibit G at 25; CC at 19). Eventually the fight subsided as Master Roster Count was announced in the dorm.[5] (Exhibits B at 16). Based on Master Roster Count, Plaintiff, and the other inmates, returned to their beds as

---

[4] During the fight, mops and buckets may have been utilized by the Latin Kings, but it is not entirely clear whether this is the case. (Exhibits B at 16, 18).

[5] Master Roster Count is a process conducted by security staff which is intended to count all the inmates in a prison to ensure that none of the inmate population is missing. (Exhibits B at 40-41; BB at 88). Two officers need to be involved in count as both officers confirm the number of inmates. Normally, movement during count is suspended until count is cleared. *See e.g.* (Exhibit B at 41).

required. (Exhibits B at 16, 27, 29). After the fight, Plaintiff had no significant injuries the required immediate medical attention.[6] (Exhibit B at 22-24, 45).

Upon returning to his bunk, Plaintiff began to pack his property and put on his shoes. (Exhibit B at 16, 25; F at 24). Plaintiff performed these actions not because he expected to leave the leave the dorm, but to prepare for further altercations with the Latin Kings. (Exhibits B 36-37; F at 22, 24-25; G at 13). *Cf.* (Exhibit AA at 20-21) (explaining why property was being packed). Plaintiff packed his property so that no one else would pack it and nothing would be missing as he expected to be leaving the dorm after a further altercation. (Exhibits F at 24-25; G at 13). *Cf.* (Exhibit AA at 20-21) (explaining why property was being packed). The Latin Kings also began packing their property and preparing for further altercations. (Exhibit AA at 20-21). At this point, one of the two female officers exited the Officer Station into P-2, and began to count the inmates. (Exhibits B at 29). The female officer then reentered the Officer Station, and the second female officer conducted her count of the dorm as well. *See* (Exhibit B at 29-30). The second female officer then reentered the Officer Station. *See* (Exhibit B at 46-47).

---

[6] The parties dispute whether Plaintiff had any injuries at all at this point. *See e.g.* (Exhibits B at 43-45; F at 63-65, 120-21; AA at 20). However, at a minimum, Plaintiff did not have any significant injuries that required immediate medical attention. (Exhibits B at 43-45) (Plaintiff indicates that he was not concerned with medical treatment and was only concerned with attempting to get out of the dorm.).

Shortly after Master Roster Count was concluded, the Latin Kings, including L. Rodriguez, Rentas, and W. Rodriguez, approached Plaintiff, and began to fight with him. (Exhibits B at 17-18, 47, 49; F at 46-50). During the fight, the Latin Kings utilized weapons to attack Plaintiff. (Exhibits B at 17-18; F at 27). The weapons consisted of knives and mops. (Exhibits B at 17-18; F at 27, 28). The fight occurred at the back of P-2 by the entrance to the showers, sink, and bird bath area. Additionally, Williams and Gaddis joined in during the fight to fight for Plaintiff. (Exhibits B at 17, 27-28, 49). Other Latin Kings also became involved in the fight, as did Parker and Pedro.[7] The fight resulted in L. Rodriguez seriously injuring Plaintiff by stabbing him multiple times in the chest, neck, and back. (Exhibits B at 53; F at 27; G at 28-29; 39; FF; GG; HH).

At approximately 10:20 PM, Emergency Traffic was documented by "DG" in the Housing Unit Log. (Exhibit DD). Around the time the Emergency Traffic was documented, a large group of officers, including Captain Heffner ("Heffner"), entered P-2. (Exhibits F at 34; G at 27). By the time the officers entered P-2, the fight had ended, and all inmates, including Plaintiff, had returned to their bunk.

Upon returning to his bunk, Plaintiff sat down, and then lay down on his bunk, and was bleeding profusely, to the point that some witnesses believed

---

[7] During this time, additional unidentified inmates may have also been attempting to distract the officers in the Officer Station or otherwise obstruct their view. (Exhibit G at 26, 83, 84).

8

Plaintiff may have died. (Exhibits F at 33; G at 29, 30). Plaintiff became unconscious, and only woke up later in medical. (Exhibit B at 58). Based on Plaintiff's clear injuries, Heffner approached Plaintiff's bunk and began to render assistance until medical arrived sometime later.

Once medical arrived, Plaintiff was placed on a stretcher and was escorted out of the wing. (Exhibits B at 56; F at 33-34). Medical additionally escorted Williams and Gaddis out of the wing as well. (Exhibits F at 34). As a result of the incident, Plaintiff received serious stab wounds and Williams and Gaddis also received serious injuries. (Exhibits G at 53-54).

D. *Officers present in the Officer Station of P-Dorm.*

During the incident, two female officers were present in the Officer Station. (Exhibit B at 29). *See also* (Doc. 52 at ¶¶ 12, 25). On the date of the incident, Defendant was stationed in M Dorm. (Exhibits BB at 19, 86; EE). *See also* (Doc. 52 at ¶¶ 12, 25). M-Dorm is located across the compound of Apalachee. (Exhibit BB at 86-87). Defendant conducted count in M-Dorm on the date of the incident. (Exhibit BB at 88-89). The officers assigned to P-Dorm during the incident were Antionette Patterson ("Patterson") as the P-Dorm Sergeant and Delisia Green ("Green") as the P-Dorm Officer. (Exhibit EE). *See also* (Exhibit F at 29). Notably, an individual who initialed "DG" completed the Housing Unit Log for P-Dorm.

(Exhibit DD). Defendant's name does not appear on any document associated with P-Dorm on July 20, 2022.

## MEMORANDUM OF LAW

### Standard for Summary Judgment

Summary Judgment is proper if the pleadings and sworn statements show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for Summary Judgment bears the initial burden of demonstrating an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 322-23. Upon meeting this burden, the burden shifts to the nonmoving party to present evidentiary material demonstrating that a genuine issue of material fact exists. *Id*.

Applicable substantive law identifies those facts that are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual issues must have a real basis in the record to be considered genuine and the nonmoving party must show more than a "metaphysical doubt" regarding the material facts. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The evidence and reasonable inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party. *Watkins v. Ford Motor Co.*, 190 F.3d 1213, 1216 (11th Cir. 1999).

Although all reasonable inferences are made in favor of the nonmoving party, a court need not permit a case to go to a jury when the inferences drawn from the evidence and upon which the nonmoving party relies are 'implausible.' *Cuesta v. School Bd. of Miami-Dade County*, 285 F.3d 962, 970 (11th Cir. 2002) (citations omitted). A mere "scintilla" of evidence in support of the nonmoving party's position is not sufficient; there must be evidence upon which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 252. *See also Matsushita*, 475 U.S. at 587 (there is no genuine issue for trial if record taken as a whole would not lead a rational trier of fact to find in favor of non-moving party). In other words, Summary Judgment is warranted against a nonmoving party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

To create an issue of fact for trial sufficient to defeat a well-supported Summary Judgment motion, the non-movant's evidentiary material must consist of more than conclusory, uncorroborated allegations from an affidavit. *West v. Higgins*, 346 F. App'x 423, 425 (11th Cir. 2009) (per curiam) (unreported op.) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)). Further, if "two parties tell different stories [where one] is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that

version of the facts for purposes of ruling on a motion for summary judgment."

*Scott v. Harris*, 550 U.S. 372, 380 (2007). If a fact cannot be presented in a form

that would be admissible in evidence, it cannot be used for purposes of Summary

Judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999). *See also* Rule

56(c), Fed. R. Civ. P.

In *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996), the Eleventh

Circuit clarified its earlier rulings on this point by indicating that their cases

applying *Celotex* read *Celotex* "as simply allowing *otherwise admissible evidence*

to be submitted in inadmissible form at the summary judgment stage, though at

trial it must be submitted in admissible form." The Court continues to apply this

principle. *See McCaskill v. Ray*, 279 Fed. App'x. 913, 914 (11th Cir. 2008).

However, the court was clear that "potential impeachment evidence [although

admissible] . . . may not be used to create a genuine issue of material fact for trial"

that would defeat a Motion for Summary Judgment. *McMillian*, 88 F.3d at 1584.

## I.    Plaintiff fails to state a claim based on a theory that Defendant failed to Protect Plaintiff or intervene on his behalf.

The 8th Amendment requires prison officials to "take reasonable measures to

guarantee the safety of the inmates," *Farmer v. Brennan*, 511 U.S. 825, 832

(1994), but the requirement does not make officials "guarantor[s] of [prisoners']

safety." *Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1321

(11th Cir. 2005). As a result, prison officials are not constitutionally liable for

every inmate-on-inmate attack. *Farmer*, 511 U.S. at 832. To state a cause of action for failure to protect, Plaintiff must demonstrate three elements: (1) Plaintiff must show that he was "incarcerated under conditions posing a substantial risk of serious harm;" (2) that Defendant "'[had] a sufficiently cuplable statement of mind,' amounting to 'deliberate indifference;'" and (3) that the constitutional violation caused Plaintiff's injuries.[8] *Cox v. Nobles*, 15 F. 4th 1350, 1357-58 (11th Cir. 2021).

"Deliberate indifferent exists when a prison official 'knows of and disregards an excessive risk to inmate health or safety.'" *Cox*, 15 F. 4th at 1358 (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Recently, the 11th Circuit made clear, *en banc*, that the standard for deliberate indifference brought under the 8th Amendment is as follows:

> For reasons we'll explain, we now hold, in accordance with the Supreme Court's decision in *Farmer v. Brennan*, that in addition to an "objectively serious" deprivation, a deliberate-indifference plaintiff must show that the defendant acted with "subjective recklessness as used in criminal law," and that in order to do so, the plaintiff must demonstrate that the defendant actually knew that his conduct – his own actions or omissions – put the plaintiff at substantial risk of serious harm. We add the caveat, likewise prescribed by *Farmer*, that even if defendant "actually knew of a substantial risk to inmate health

---

[8] For purposes of this Motion only, Defendant does not contest that Plaintiff was injured and that if a constitutional violation exists, the injury was contributed to by the violation.

or safety," he cannot be found liable under the Cruel and Unusual Punishments Clause if he "responded reasonably to th[at] risk."

*Wade v. McDade*, 106 F.4th 1251, 1253 (11th Cir. 2024) (internal citations removed). *See also Farmer v. Brennan*, 511 U.S. 825, 839 (1994). *See also Terry v. Baily*, 376 Fed. App'x 894, 895-96 (11th Cir. 2010) (analyzing a failure to protect claim in the context of an inmate-on-inmate attack between cellmates). The 11th Circuit has "been at pains to emphasize that 'the deliberate indifferent standard . . . is far more onerous than normal tort-based standards of conduct sounding in negligence,' and is in fact akin to 'subjective recklessness as used in the criminal law.'" *Hoffer v. Secretary, Florida Department of Corrections*, 973 F. 3d 1263, 1271 (11th Cir. 2020).

A generalized risk of harm does not satisfy the subjective element of a deliberate indifferent claim, and instead the substantial risk must be known, and an inference must be drawn by the individual which demonstrates an understanding of the substantial risk. *Cox*, 15 F.4th at 1358-60. A prison official cannot be held liable under the Eighth Amendment for not appreciating that a prisoner faced a substantial risk of serious harm, even if "the risk was obvious and a reasonable prison official would have notices." *Farmer*, 511 U.S. at 842 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment.").

14

To establish an 8th Amendment violation, a prisoner must point to evidence permitting the reasonable inference that the defendant was deliberately indifferent to conditions that were "sufficiently serious." *See Chandler v. Crosby*, 379 F.3d 1278, 1288 (11th Cir. 2004). Conditions of confinement are "sufficiently serious" only if they are so extreme that they expose the prisoner to "an unreasonable risk of serious damage to his future health or safety." *Id.* at 1289 (internal quotation marks omitted). "Showing substantial risk of serious harm requires the prisoner to provide evidence that there was a 'strong likelihood' of his injury occurring." *Visage v. Woodall*, 798 F. App'x 406, 408 (11th Cir. 2020) (citing *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015)). A court's consideration of whether there was a strong likelihood, as opposed to a "mere possibility," of an injury occurring cannot be based on "hindsight bias." *Brooks*, 800 F.3d at 1301. Moreover, isolated incidents do not satisfy the "substantial risk" standard articulated in *Farmer*. *See e.g.*, *Purcell*, 400 F.3d at 1320 ("[O]ccasional, isolatd attacks by one prisoner on another may not be constitute cruel and unusual punishment, [but] confinement in a prison where violence and terror reign is actionable."). *See also Lakin v. Barnhart*, 758 F.3d 66, 70-72 (1st Cir. 2014) (Souter, J., sitting by designation) (explaining that the risk must be "substantial," not isolated or infrequent, and affirming summary judgment in defendants' favor

where plaintiff's evidence did not reach the "substantial" threshold required by *Farmer* as "not every risk carries an inherent threat at a substantial level.").

As a result, a prisoner cannot survive summary judgment based solely on evidence of past isolated incidents or his own injury. *Visage*, 798 F. App'x at 408. Rather, the prisoner must demonstrate that the complained-of condition – most commonly inmate-on-inmate violence – resulted in so many incidents or injuries that such incidents or injuries were "the norm or something close to it." *Marbury v. Warden*, 936 F.3d 1227, 1234 (11th Cir. 2019) (quoting *Purcell*, 400 F.3d at 1322)).

As it relates to an officer's failure to intervene, the law is clear that "[p]rison correctional officers may be held directly liable under § 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence." *Terry*, 376 Fed. App'x at 896 (citing *Ensly v. Soper*, 142 F. 3d 1402, 1407 (11th Cir. 1998)). "[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim . . . can be held personally liable for his nonfeasance." *Skritch v. Thornton*, 280 F3d 1295, 1301 (11th Cir. 2002).

A. Defendant was not present during the July 20, 2022, incident, and as a result cannot be held liable under any of Plaintiff's theories.

In this case, it is undisputed that Defendant was stationed in M-Dorm. (Exhibits BB at 19, 86; EE). *See also* (Doc. 52 at ¶¶ 12, 25). Several witnesses present during the July 20, 2022, incident have been surprised to learn that

16

Defendant was being sued in this case as she was not present in the dorm during the incident. (Doc. 43-1); (Exhibit BB at 85). Not a single record in this case places Defendant in P-Dorm at the time of the incident.

Further, the records from P-Dorm demonstrate that an individual initialed all the housing logs with the initials "DG." (Exhibit DD). One of the officers identified as working in P-Dorm is Green. (Exhibit EE). *See also* (Doc. 52 at ¶¶ 12, 25, 29, 33, 35, 37). The Daily Security Roster demonstrates that the two officers identified as working in P-Dorm were Patterson and Green. (Exhibit EE). Witness testimony taken during Discovery has confirmed that only two officers were present in the Officer Station, and that no officers were in P-2 while the incident occurred. (Exhibits F at 30-31).

During her testimony at deposition and within interrogatories, Defendant has consistently stated she was not present during the July 20, 2022, incident. (Exhibit BB at 85). Instead, Defendant has indicated that she responded to the incident after the incident had concluded and took either Plaintiff, Williams, or Gaddis (she does not remember which one) to the hospital. (Doc. 43-1); (Exhibit BB at 85).

Also of importance is the location of M-Dorm in relation to P-Dorm. M-Dorm is located across the compound of the institution and Defendant would need to walk through several locked doors to get to P-Dorm. (Exhibit BB at 86-87). O-Dorm is much closer to P-Dorm, and an officer would not need to walk across the

compound to get there. (Exhibit BB at 86-87). However, Plaintiff's theory is that Defendant, who was required to conduct count in M-Dorm – as a minimum of 2 officers must conduct count to ensure accuracy – completed count so quickly that she walked across the compound to arrive at P-Dorm and then assist with count there *before count had even begun* in P-2. Plaintiff's theory is completely implausible given that there was a dorm which was much closer and that there are no records demonstrating Defendant was there.

As a result, the evidence in this case clearly demonstrates that Defendant was not present during the July 20, 2022, incident. As Defendant was not present during the incident, she could not have protected Plaintiff from the attacks, intervened on his behalf during the incident, or provided him with the ability to obtain medical treatment.

B. <u>Defendant did not fail to protect Plaintiff.</u>

Additionally, if Plaintiff somehow demonstrates that Defendant was present during the July 20, 2022, incident, he still fails to state a cause of action against Defendant for failure to protect him. In addressing Plaintiff's claims, Plaintiff attempts to attribute liability for both fights Plaintiff embroiled himself in.

i. *Objective element in relation to Plaintiff's claims.*

In attempting to demonstrate the required objective component of his claim, Plaintiff relies on officer training to be "observant," (Doc. 52 at ¶ 19), an alleged

18

"sub-culture" among officers, *Id.* at ¶¶ 21-23, and inadmissible hearsay "threats," *Id.* at ¶¶ 39-41, 62-63. None of the unsupported statements satisfy the objective requirement of a deliberate indifference claim.

First, Plaintiff's allegation that officers are trained to be "observant" is not supported by a single piece of evidence. There is no evidence that officers are required to be any more observant than any other individual or are provided with specialized training to heighten an officer's observation skills. Officers are not superheroes; they are normal humans. Even if such training did exist, there is no evidence that Defendant underwent such training.

Even more problematic for Plaintiff's assertion related to the observation skills of officers in general is when the incident occurred. The incident occurred during master roster count, which is a period when officers are **required** to count all inmates to ensure that everyone is accounted for. (Exhibits B at 40-41; BB at 88). During this time, officers are going to be focused on the count and ensuring its correct and may inadvertently overlook actions taken by inmates.

Second, there is not a single piece of evidence in this case that the alleged "subculture" described by Plaintiff exists. Even more problematic is the fact that there is also a dearth of evidence demonstrating that Defendant was a part of the described "subculture." Plaintiff's "subculture" assertion is entirely and completely speculative and unsupported by a single piece of evidence.

Third, the reliance on the hearsay statements should not be a basis for demonstrating the required objective component. If a fact cannot be presented in a form that would be admissible in evidence, it cannot be used for purposes of Summary Judgment. *Macuba*, 193 F.3d at 1322. *See also* Rule 56(c), Fed. R. Civ. P. The statements Plaintiff alleges occurred are not identified as being made by any person, and instead only came from the alleged "predatory inmates." (Doc. 52 at ¶¶ 39-41, 62-63). No inmate deposed has offered up the statements as being his own, and Plaintiff has not identified who made the statements. The statements are inadmissible hearsay that cannot be reduced to admissible evidence and should not be relied upon. As the statements are not admissible as evidence, the statements cannot be utilized to demonstrate that Defendant heard them or was aware of the content, as Plaintiff alleges. *See Id.* at ¶¶ 62-63, 66.

    ii. *Subjective element as it relates to the first fight.*

Also required for Plaintiff to prove is the subjective component of their claim against Defendant. Plaintiff fails to demonstrate this required element of his claim as well. To be successful, Plaintiff must demonstrate that Defendant's actions demonstrate a state of mind amounting to criminal recklessness. *Farmer*, 511 U.S. at 839; *Wade*, 106 F.4th at 1253. More specifically, Plaintiff "must demonstrate that the defendant actually knew that [her] conduct – [her] own actions or omissions – put the plaintiff at substantial risk of serious harm." *Wade*,

106 F.4th at 1253. There is no evidence which demonstrates a mind-set of criminal recklessness on the part of Defendant.

Prior to the first fight, there was no knowledge, on behalf of the officers, that Plaintiff would be involved in an altercation. As alleged by Plaintiff, and confirmed by several other witnesses, the fight began spontaneously while he was attempting to shower in the bird bath area. (Exhibit B at 15-16). *See also* (Doc. 52 at ¶ 16). There was no indication that Plaintiff would be attacked by any inmate, or any fight would occur. Plaintiff states no claim for failure to protect in relation to the first fight.

iii. *Subjective element as it relates to second fight*.

Prior to the second fight, Plaintiff alleges that he spoke with an officer, who is **not** Defendant, and told her that he needed to leave. (Exhibit B at 17, 30-32, 34). *See also* (Doc. 52 at ¶¶ 35, 64). In response, the officer, again **not** Defendant, responded in a manner that Plaintiff alleges was inappropriate. (Exhibit B at 17, 32-33, 34). *See also* (Doc. 52 at ¶¶ 35, 67). During this alleged conversation, Plaintiff presumes that Defendant heard the exchange and did nothing yet offers no evidence to support his position. There is no evidence supporting any fact which suggests that the other officer relayed the information to Defendant nor that the information relayed by Plaintiff would have alerted Defendant to the fact that Plaintiff was at a substantial risk of serious harm. *Wade*, 106 F.4th at 1253.

Furthermore, Plaintiff attempts to paint a portrait of his being beaten up, bloodied, and in torn clothing. Exhibits B at 43-45. *See also* (Doc. 52 at ¶¶ 35, 65). Plaintiff's statements related to his appearance at the time are far from accurate; instead, if he suffered any injuries at all,  as described by several other witnesses to the incident. (Exhibits F at 63-65). Additionally, Plaintiff merely presumes that Defendant saw his condition. *See also* (Doc. 52 at ¶¶ 35, 65). No evidence has been uncovered to support Plaintiff's assertions.

Moreover, evidence exists that inmates attempted to cover up that the first fight occurred. (Exhibits 66-68). There also exists evidence that inmates may have purposely tried to distract or obstruct officers from being able to see what was occurring during the second fight. (Exhibit G at 26, 83, 84). *Cf.* (Exhibit F at 87) (indicating that officers would only have known about the issue if they were paying attention and watching). The actions by inmates in trying to cover up the first fight and distract the officers weighs against Plaintiff's allegations that the officers were subjectively aware of the fights.

Finally, there is a substantial amount of evidence that exists which supports the fact that the officers acted reasonably in response to risk of serious injury in relation to the second fight.[9] *Wade*, 106 F.4th at 1253. As it relates to the second

---

[9] Defendant does not address this defense in relation to the first fight under a theory of failure to protect because the claim relating to the first fight is best

fight, the officers acted reasonably in response to the fight. As detailed by Defendant, and a declaration from Mike Harrell, the officers present were responsible for reporting on the incident and acting out the Florida Department of Corrections' tactical policies. (Exhibits BB at 90-93; II). At a minimum, when the officers observed the second fight, they were required to report the incident and begin the Incident Command System ("ICS"). (Exhibits BB at 90-93; II).. The officers themselves could not leave the officer station until a sufficient amount of other responding staff were present, as to do so would put themselves and the institution at risk. (Exhibits BB at 90-93; II).. Once the appropriate number of staff arrived, one of the two officers could then become involved with the assistance of other staff, and the other officer would remain in the Officer Station. (Exhibits BB at 90-93; II).. The officer in the Officer Station is necessary to open doors to allow staff to arrive. (Exhibits BB at 90-93; II).. *See also* (Doc. 52 at ⁋ 37) (acknowledging that one officer must always remain in the officer station).

In this case, the officers in the Officer Station must have initiated ICS as officers arrived shortly after the second fight began. By the time the officers had arrived in the Dorm, the fight had already ended. As a result, under the circumstances, the officers acted reasonably in response to any substantial risk of

---

understood as a failure to intervene claim since due to the spontaneous nature of the fight, there was no indication that a fight would occur.

harm which could potentially be suffered by Plaintiff once they determined one existed.

C. <u>Defendant did not fail to intervene on Plaintiff's behalf</u>.

Though Plaintiff claims does not allege a failure to intervene specifically, allegations that the officers did not act to stop the fights while they are ongoing are best understood as a failure to intervene claim. Within his Complaint, Plaintiff alleges that Defendant, and two other officers did nothing to act on Plaintiff's behalf during the first and second fights. *See* (Doc. 52 at ¶¶ 25-26, 38, 58, 60, 68, 72). Plaintiff's allegations do not demonstrate claims against Defendant.

At the outset, Plaintiff's claims presume that Defendant was present during the July 20, 2022, incident, which is problematic. *See e.g.* Section I.A., *supra*. However, assuming that Defendant was present, Plaintiff still fails to demonstrate that Defendant was aware of the first fight or that no action was taken on Plaintiff's behalf during the second attack.

The first fight occurred within the bird bath area of the bathroom in P-2. The bird bath area is on the far-left side of the bathroom along the left wall of the dorm and consists of a row of sinks. Photos taken from inside of the Officer Station demonstrate that there is a row of bunk beds which almost completely obstruct the bird bath area. *See* (Exhibits D; H-J). If any inmates were on the top bunks of the bunk beds, the bird bath area would be completely obstructed. Furthermore, if

24

there are several – presumably up to 4 inmates in this case – in the bird bath area, the ability to see what is going on in the area would be completely obstructed. It is not plausible to say that the officers in the Officer Station would have seen the first fight.

Additionally, due to how far away the Officer Station is from the bird bath area, the officers could not hear what was being said in the bird bath area. Defendant testified that conversations in the area could not be heard from the Officer Station. (Exhibit BB at 41). Though Plaintiff attempts to state that the conversations could be heard, he has no knowledge of the fact because he has never been in the Officer Station himself. It is not plausible that the officers could hear the first fight, as Plaintiff alleges.

As it relates to the second fight, Plaintiff's allegation that Defendant did not do anything is incorrect. The officers in the Officer Station, upon noticing the second fight, despite being purposely obstructed and distracted by other inmates, initiated ICS. ICS must have been initiated because of the response by the number of officers and the fact that Emergency Traffic is documented. (Exhibits F at 34; G at 27; Exhibit DD). The fact that many officers responded is undisputed. *See e.g.* (Doc. 52 at ℙ 49). The officers present during the incident acted in a manner that was reasonable under the circumstances.

Plaintiff's case is like a case which was recently decided in the Middle District of Florida. *See* (Exhibit JJ). In the case, two inmates were spontaneously attacked by a third inmate and the only officer near the area was a sole officer in the Officer Station. *Id*. In the circumstance, the officer could not leave the Officer Station, and only initiated ICS, resulting in a response by a Captain. *Id*. After extensively analyzing the arguments by the parties, the court determined that the defendant could not be held liable for Plaintiff's injuries. *Id*. This Court should find in favor of Defendant for the same reasons.

D. <u>Defendant did not interfere with Plaintiff's medical treatment.</u>

Plaintiff also claims that Defendant interfered with Plaintiff's medical treatment, and as a result caused him injury. *See* (Doc. 52 at 9-10). Plaintiff's claim is due to be denied for similar reasons as his other claims.

First, in relation to the first fight, there was no objective basis for Plaintiff to receive immediate medical treatment. If Plaintiff had any injuries, they were minor and did not demonstrate an objective basis that Plaintiff was at a substantial risk of harm. *See e.g.* (Exhibit B at 43-45). Plaintiff was not even concerned with going to medical. *Id*. There was no objective indication that Plaintiff required immediate medical attention.

Second, after the first fight, there was no subjective determination made by Defendant, or any officer, that Plaintiff needed immediate medical attention, which

left untreated, would lead to a substantial risk of harm. Plaintiff's injuries were minor at worst, and did not impart on any individual a subjective impression that if left untreated immediately, would cause a substantial risk of serious harm. (Exhibit B at 43-45). Plaintiff was not even concerned with going to medical at the time. *Id.*

In relation to the second fight, it is undisputed that Plaintiff received immediate medical attention which necessitated him going to the hospital. (Exhibit B at 43-45). *See also* (Doc. 52 at ℙℙ 50-52). All testimony confirms that after the officers responded, Plaintiff was taken out on a stretcher before any other inmate was removed. (Exhibits F at 33). Plaintiff himself does not know how quickly he was removed from the wing because he fell unconscious shortly after the second fight. (Exhibit B at 58). *See also* (Doc. 52 at ℙ 49).

## II.    Defendant is entitled to Qualified Immunity as it relates to Plaintiff's claim for Failure to Protect, Failure to Intervene, and Interference with Medical Treatment.

In this case, it is clear Defendant is entitled to Qualified Immunity on Plaintiff's Constitutional claims related to an allegation that Defendant failed to protect, failed to intervene and interfered with Plaintiff's medical treatment. Defendant is entitled to Qualified Immunity as she did not violate Plaintiff's constitutional rights, and further, Defendant did not violate any "clearly established law."

27

Qualified Immunity offers complete protection for government officials sued in their individual capacities who act within their discretionary authority. *Pearson v. Callahan*, 555 U.S. 223 (2009). Officials are entitled to Qualified Immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (January 22, 2018) (citing *Reichle*, 566 U.S. at 664). Courts are not required to address the two prongs of this test in any particular order. *Pearson*, 555 U.S. 223.

"'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *Wesby*, 138 S. Ct. at 589 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). *See also Santana v. Miami-Dade County*, 688 Fed. App'x 763, 770 (11th Cir. 2017) (stating that the circumstances must be viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 hindsight. [While] allow[ing] for the fact that officers are required to make 'split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in particular situation.") In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate." *Wesby*, 138 S. Ct. at 589 (citing *al-Kidd*, 563 U.S. at 741). The "demanding standard protects 'all but the plainly incompetent or those

who knowingly violate the law.'" *Wesby*, 138 S. Ct. at 589 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S. Ct. at 589. "The rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *Id*. (internal citations removed). "It is not enough that the rule is suggested by then-existing precedent." *Id*. "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id*. "Otherwise, the rule is not one that 'every reasonable official' would know." *Id*.

Furthermore, when considering a defense of Qualified Immunity, courts must only consider the facts that were knowable to the Defendant. *White v. Pauly*, 137 S. Ct. 548, 550 (2017). The United States Supreme Court has recently reversed lower courts in several decisions, and in each decision the Court has expressed the concern that clearly established law should not be defined "at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Id*. (citing *al-Kidd*, 563 U.S. 731 at 741 (2011)). *See e.g. Mullenix*, 136 S. Ct. 305 (The United States Supreme Court determined that an officer had acted reasonably under circumstances involving a clear violation of the general rule that deadly

force may not be used "against a fleeing felon who does not pose a significant threat of harm to the officer or others."). "The clearly established law must be 'particularized to the facts of the case. Otherwise, 'plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White*, 137 S. Ct. at 552.

In this case, Defendant did not violate Plaintiff's constitutional rights. *See* Section I, *supra*.

Alternatively, if this Court somehow finds that Defendant's actions constituted a Constitutional violation, there has not been a violation of "clearly established law" which would allow for liability. Defendant was not present during the July 20, 2022, incident, but presuming she was there was no objective or subjective basis for a belief that Plaintiff was at a substantial risk of harm, and more importantly, the officers acted reasonably. There is no legal requirement which would demonstrate that the actions of the officers was anything but reasonable or that they were unaware of any substantial risk to Plaintiff.

Additionally, presuming that Defendant was present and was mistaken in her perceptions, Defendant still would be entitled to Qualified Immunity. In an Opinion issued by the United States Supreme Court, the Court overturned a decision by the DC Circuit Court which found that the officers in the case were not

entitled to Qualified Immunity. *Wesby*, 138 S. Ct. 577. In the case, the Court addressed the decision by the DC Circuit[10] and specifically stated that "[e]ven assuming the officers lacked actual probable cause to arrest the partygoers, the officers are entitled to qualified immunity because they 'reasonably but mistakenly conclude[d] that probable cause [wa]s present.'" *Id*. at 591. In making such a finding, the Court belied the fact that there was not "a single precedent – much less a controlling case or robust consensus of cases – finding a Fourth Amendment violation 'under similar circumstances.'" *Id*. And the Court went on to say that the case was not an "'obvious case' where a 'body of relevant case law' is not needed." *Id*. After making such a finding, the Court overturned a judgment of nearly $1 million against the officers. *Id*.

Like in *Wesby*, even if Defendant was present and was mistaken in her perceptions,, Defendant would still be entitled to Qualified Immunity. There is not a "controlling or robust consensus of cases" demonstrating the unlawfulness of Defendants' actions. *Wesby*, 138 S. Ct. at 591. Nor is there an "obvious case" which would demonstrate such a precedent. *Id*. at 591. In fact, based on Florida statutory law, and decisions from this Court, the 11th Circuit, and the U.S. Supreme

---

[10] Prior to reaching the Qualified Immunity issue, a majority of the Court found that probable cause did in fact exist and that the Appellate Court had made an incorrect finding. However, even though the probable cause issue would have resolved the case, the Court specifically addressed Qualified Immunity due to the clearly erroneous ruling on the issue by the DC Circuit. *See Wesby*, 138 S. Ct. at 589.

Court, there would seem to be a "controlling or robust consensus of cases" demonstrating that the officer's actions were in fact lawful. As a result, Defendant should be entitled to Qualified Immunity.

**III.    Defendant renews her claim that Plaintiff failed to exhaust his administrative remedies in relation to Plaintiff's medical claim and is not entitled to Punitive Damages as a matter of law.**

Previously, Defendant asserted that Plaintiff failed to exhaust his administrative remedies related to his medical claim, and that he is not entitled to punitive damages as a matter of law. *See* (Doc. 58). Plaintiff responded to the arguments. (Doc. 64). The Motion that Defendant made the arguments remains outstanding and has not yet been ruled upon. Defendant renews the arguments for purposes of receiving a decision on the merits in this Motion.

## <u>CONCLUSION</u>

**WHEREFORE**, for the foregoing reasons, Defendant respectfully requests this Court enter Summary Judgment in her favor.

Respectfully Submitted,

**ASHLEY MOODY**
**ATTORNEY GENERAL**
Office of the Attorney General
The Capitol PL-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Facsimile: (850) 488-4872

/s/ Erik Kverne
Erik Kverne
Assistant Attorney General
Florida Bar No.: 99829
Erik.Kverne@myfloridalegal.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing *Defendant's Motion for Summary Judgment* was e-filed electronically and served electronically on Plaintiff's counsel of record through CM/ECF on December 11, 2024.

/s/ Erik Kverne
Erik Kverne
Assistant Attorney General
Florida Bar No.: 99829
Erik.Kverne@myfloridalegal.com

## <u>CERTIFICATE OF COMPLIANCE WITH WORD LIMIT</u>

**I HEREBY CERTIFY** that the above Motion totals **2,375** words and that the Supporting Memoranda required by N.D. Fla. Loc. R. 7.1(E) contains **5,618** words, totaling **7,993** words, not exceeding 8,000 total word maximum created by N.D. Fla. Loc. R. 7.1(F).

/s/ Erik Kverne
Erik Kverne
Assistant Attorney General
Florida Bar No. 99829
Erik.Kverne@myfloridalegal.com
