Exhibit JJ

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

EVERETTE LEON BLACK, JR.,

       Plaintiff,

v.                               Case No. 3:22-cv-260-MMH-SJH

SERGEANT KISER,

       Defendant.

_____

## **ORDER**

### **I. Status**

Plaintiff Everette Leon Black, Jr., an inmate in the custody of the Florida Department of Corrections (FDOC), initiated this action on March 4, 2022,[1] by filing a pro se Complaint for Violation of Civil Rights (Complaint; Doc. 1) with attachments.[2] In the Complaint, Black alleges the two named Defendants, Warden Godwin and Sergeant Kiser, violated his Eighth Amendment right to be free from cruel and unusual punishment when they failed to protect him from another inmate's attack at Columbia Correctional Institution (Columbia CI) Annex on October 25, 2021. See Complaint at 3–5. On December 15, 2022,

---

[1] See Houston v. Lack, 487 U.S. 266, 276 (1988) (mailbox rule).

[2] For all pleadings and documents filed in this case, the Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

the Court dismissed all claims against Godwin and the official capacity claims for monetary damages against Kiser. <u>See</u> Order (Doc. 20). Only the Eighth Amendment claim against Kiser in her individual capacity remains.

This matter is before the Court on the parties' cross-motions for summary judgment: (1) Plaintiff's Motion for Summary Judgment (Black's Motion; Doc. 32)[3] and Defendant Kiser's Response[4] (Kiser's Response; Doc. 39); and (2) Defendant Kiser's Motion to Dismiss or for Summary Judgment (Kiser's Motion; Doc. 35) with exhibits (Docs. 35-1 through 35-9), Plaintiff's Response (Black's Response; Doc. 51) with exhibits (Docs. 51-1, 51-2), Defendant Kiser's Reply (Kiser's Reply; Doc. 62) with an exhibit (Doc. 62-1), and Plaintiff's Response to Reply (Black's Sur-Reply; Doc. 65) with exhibits (Docs. 65-1 through 65-14).

The Court previously deferred ruling on these motions to allow the parties to complete additional limited discovery in connection with Kiser's Motion. <u>See</u> Order (Doc. 54). In addition, the Court advised Black of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a

---

[3] Black did not submit any exhibits in support of his Motion.

[4] Black's request (Doc. 42) that the Court decline to accept Kiser's Response as untimely is denied as moot in light of the Court's June 20, 2023 Order (Doc. 30).

final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to such motions. See Order (Doc. 4); Summary Judgment Notice (Doc. 33). As briefing has now completed, the parties' Motions are ripe for review.

## II. Black's Allegations

In the Complaint, Black alleges that on the morning of October 25, 2021, Black was in the dormitory dayroom while Kiser was assigned as a supervisor in the security station. Complaint at 4. Black saw inmate Allen Cashe (FDOC #E33535) stab inmate Saquin Scott (FDOC #N19231) with a homemade knife.[5] Id. The assault against Scott allegedly lasted about five minutes. Id. Then, after Cashe left Scott bleeding on the floor, he rushed towards Black and stabbed him below the left eye. Id. According to Black, Cashe chased him around the dayroom and yelled he "was going to kill [Black]." Id. When Black perceived Cashe to be tired from the assaults, Black dashed up the stairs and locked himself in another inmate's cell "to save [his] life." Id.

Black estimates that about eight to ten minutes later, Captain Teems entered the wing, handcuffed Cashe, and escorted him to the holding cells. Id.

---

[5] Scott filed a civil rights action based on this incident, which the parties resolved by a settlement agreement on May 29, 2024. See Scott v. Godwin, Case No. 3:22-cv-349-MMH-PDB (M.D. Fla.).

3

Teems then handcuffed Black, placed him in a holding cell next to Cashe, photographed him, and escorted him to the medical clinic. Id. While in the holding cells, Black asked Cashe why he stabbed him and Scott. Id. Cashe allegedly replied that he did not want to be at Columbia CI anymore and chose Scott and Black to be his exit "ticket" because they were the only ones awake at that time. Id.

Black estimates that the entire incident—from Cashe's initial assault on Scott until Teems arrived—took approximately twenty minutes. Id. Black alleges that Kiser watched the incident for at least fifteen minutes and "did nothing." Id. He suggests that Kiser should have announced the incident on the radio, activated her personal body alarm, or otherwise called for additional security. Id. He adds that Kiser should have left the security station and deployed chemical agents to stop the attack or at least should have opened the electronic entrance door to the wing to allow him and Scott to escape in the hallway. Id. Black contends that Kiser did not even use the intercom system to order Cashe to cease the assault, but instead watched the events unfold for twenty minutes "with no action." Id.

Based on the foregoing, Black alleges Kiser violated his Eighth Amendment right to be free from cruel and unusual punishment when she failed to protect him from Cashe's attack. Id. at 3–5. Black asserts the incident

4

left him with "a serious facial wound with permanent scarring," permanent disfigurement, loss of self-esteem, fear, anxiety, post-traumatic stress disorder, nightmares, and inability to sleep. Id. at 5. As relief, Black seeks compensatory and punitive damages, and asks to be transferred to the federal Bureau of Prisons, or alternatively, to an FDOC Region III correctional facility. Id. at 5.[6]

### III. Summary of the Arguments

### A. Kiser's Motion[7]

In Kiser's Motion, she asks the Court to either dismiss this case as frivolous and/or malicious or grant summary judgment in her favor on Black's claim for failure to protect and/or intervene. See Kiser's Motion at 1. Kiser argues that Black cannot prove a constitutional violation against her for the following reasons. Id. at 10. First, taking the allegations in the Complaint as true, Black does not state a claim that Kiser had the requisite subjective awareness of a substantial risk of serious harm to Black prior to the incident or that there was a causal connection between Kiser's alleged inaction and the attack. Id. at 10–11. Second, the undisputed material facts demonstrate that

---

[6] The Complaint includes several exhibits, such as inmate requests, grievances, and responses, which are not pertinent to the issues before the Court. See Complaint at 9–19. It also includes an undated and unnotarized "sworn affidavit" by Scott, in which he recounts a similar version of the events.

[7] Kiser's Motion will be addressed first because it is supported by evidence.

5

Kiser was not deliberately indifferent and acted reasonably under the circumstances where the entire incident lasted less than three minutes and Kiser's primary role as the initial responder was communication rather than direct intervention. Id. at 11, 13. On this issue, Kiser argues that Black's allegations that she did nothing are unsubstantiated, because: (1) Black admitted to another inmate that from his position he could not see Kiser inside the officer's station; and (2) the photographs and video footage reveal that the view into the officer's station during various hours of the day is obstructed due to a glare. Id. at 11. Kiser also contends that she is entitled to qualified immunity because she did not act unreasonably and did not violate any of Black's constitutional rights. Id. at 15–17. Further, Kiser asks the Court to dismiss Black's request for compensatory damages pursuant to 42 U.S.C. § 1997e(e), because his alleged physical injury is not greater than de minimis. Id. at 18–24. In addition, Kiser argues that Black's request for punitive damages is statutorily barred. Id. at 24–27. Finally, Kiser contends that the Court should dismiss this case as frivolous or malicious pursuant to 28 U.S.C. § 1915(e)(2)(B)(i), because Black intentionally submitted false and misleading information about his claims to the Court. Id. at 27–31.

In response to Kiser's Motion, Black asserts there are many disputed issues precluding summary judgment in Kiser's favor, but not in his favor. See

6

Black's Response at 1–6. Black argues he is entitled to both compensatory and punitive damages, while Kiser is not entitled to qualified immunity. Id. at 3–4, 7–17.

In Kiser's Reply, she argues that Black's claims whether framed as claims for failure to protect and/or intervene must be dismissed as argued in her Motion. See Kiser's Reply at 2–4. In his Sur-Reply, Black continues to highlight what he believes are disputed issues of material fact, but nevertheless seeks summary judgment in his favor. See Black's Sur-Reply at 1–10.

## B. Black's Motion

In contrast to Black's stance on Kiser's Motion, in Black's Motion he submits there are no disputed issues of material fact because the video evidence confirms his allegations. Black's Motion at 1, 4, 6. Black also argues that as a high ranking official, Kiser was aware of the pervasive history and culture of stabbings and assaults in the institution, but nevertheless failed to ensure she had enough staff for inmate protection. Id. at 1–2.

In response, Kiser largely adopts the arguments from her Motion, points out that Black did not attach any evidence to support his Motion, and states that several of the facts that Black describes as being undisputed are actually disputed and controverted by Kiser's evidence. See Kiser's Response at 2–3.

7

Accordingly, Kiser argues that the Court should grant Kiser's Motion and deny Black's Motion. Id. at 4.

## IV. Summary of the Evidence[8]

### A. Kiser's Evidence

In support of Kiser's Motion, she provides the following exhibits: (1) the incident report, Doc. 35-1; (2) her own declaration, Doc. 35-2; (3) the declaration of Michael Harrell, Bureau Chief of Security Operations with FDOC, Doc. 35-3; (4) the declaration of inmate Lester Fisher, Doc. 35-4; (5) an emergency room record from October 25, 2021, Doc. 35-5; (6) a complaint review report from the FDOC Office of the Inspector General (OIG), Doc. 35-6; (7) fixed wing videos, Doc. 35-7; (8) T-Dorm wing photo stills, Doc. 35-8; and (9) Black's deposition transcript,[9] Doc. 35-9.

**Incident Report**

In the incident report, Kiser and Teems describe the incident as follows:

> [By Kiser:]
>
> On October 25, 2021 at approximately 0515 hours while assigned as T-Dormitory Housing Supervisor, I

---

[8] Because this case is before the Court on cross-motions for summary judgment, the Court will, when addressing the merits of either party's Motion, view the facts presented in the light most favorable to the party opposing summary judgment. The Court will so note its perspective when appropriate.

[9] Although titled as "Volume I" of Black's deposition, defense counsel clarified that the deposition is limited to a single volume. See Notice (Doc. 69).

observed Inmate Cashe, Allen DC# F33535 housed in T1-210U striking Inmate Scott, Saquin DC# N19231 housed in T1-106U and Inmate Black, Everette DC# 364497 housed in T1-102U with what appeared to be his clenched fists. I immediately initiated ICS [Incident Command System] and waited the arrival of additional staff. Upon waiting on the arrival of additional staff, I attempted to utilize the intercom of T-Dormitory Quad #1 to have all uninvolved inmates secure themselves in their assigned housing location. Shift OIC [Officer in Charge] was notified and authorized this report to be written.

[By Teems:]

Upon arriving to T-Dormitory Quad 1, responding staff and myself secured all inmates in their assigned housing locations. Fixed wing camera review was then conducted in attempt to locate all inmates involved in the physical altercation. Upon reviewing fixed wing camera footage[,] Inmate Cashe can be seen striking Inmate Scott and Inmate Everette with what appeared to be a homemade weapon. Inmate Cashe can then be seen on fixed wing camera disposing of an unknown object under T-Dorm Quad 1 [l]ocked closet door. I then utilized T-Dorm's assigned key to open the Quad 1 closet door, in which a homemade pocket style weapon was recovered. . . .

Doc. 35-1 at 1.

**Complaint Review Report**

Upon review of the above quoted incident report and video footage, and based on her telephone interviews with Black and Scott, on November 5, 2021, Inspector Brittany Jordan with the OIG issued a complaint review report, in

9

which she concluded that there was probable cause for a finding of aggravated battery against Cashe. Doc. 35-6 at 2–3.

**Fixed Wing Videos**

Kiser submitted three fixed wing videos, all of which start at 5:07:00 AM and end at 5:15:00 AM. Doc. 35-7. Due to the different positions of the cameras, each provides a different perspective.

Q1 Front Stairs Video

The Q1 front stairs video shows that at approximately 5:10:48 AM, Cashe starts chasing Scott on the lower level of the dormitory while other inmates observe. Then, Cashe and Scott move out of sight, and around 5:13:27 AM, all other inmates appear to be responding to a command to move to their cells. At around 5:13:41 AM, Teems appears on the video waiving at Cashe to follow him. Cashe complies and can be seen walking with Teems and another staff member at 5:14:08 AM.

Q1 Dayroom Video

The Q1 dayroom video reveals a more expanded view of the dayroom compared to the first video. At around 5:07 AM, Cashe can be seen walking around the dayroom and talking to someone who is out of sight. At 5:07:50 AM, Cashe goes up the stairs to a cell on the upper level and at around 5:10:24 AM walks down the stairs with his hands in his pockets.

10

At about 5:10:47 AM, Cashe suddenly starts chasing Scott, who was standing near the tables. There are about fifteen inmates observing the chase. At 5:11:00 AM, the video shows Cashe chasing Black. At around 5:11:01 AM Black trips near the staircase, but quickly gets up and continues to run away from Cashe. Both Cashe and Black are out of sight around 5:11:06 AM. At 5:11:17 AM, Cashe can be seen walking around the staircase, then he picks up something from the floor and continues to chase Black around this staircase and the one on the opposite side of the dayroom.

At around 5:12:00 AM, when Cashe appears to walk away from the staircase, Black runs up the stairs and hides on the second floor. Cashe walks around the tables and benches on the lower level, talks with inmates, and heads to the upper level at around 5:13:01 AM. At 5:13:17 AM, Cashe appears to throw an object he was holding in his hand towards an area on the right side of the staircase. At 5:13:40 AM, Teems can be seen on the video waiving at Cashe to come down the stairs. Cashe complies by walking towards Teems and the person accompanying him. After they are out of sight, the rest of the inmates clear the dayroom and stay near their cells.

Q1 Door Video

The Q1 door video gives a front view of the officer's station, one of the stairwells, three tables, and about five benches. The officer's station has large

11

windows with glare and/or tint from floor to ceiling and a single door on the lower level towards the dayroom. Although the camera footage does not give a clear picture on the inside of the officer's station, it appears there are two levels with the upper one sitting nearly as high as the upper level of the dormitory. The visibility inside the officer's station is somewhat impeded due to glare, tint, and/or limited lighting. Nevertheless, a large monitor can be seen on the upper level as well as the silhouette of a person moving around it. Based on the video footage, it is not possible to tell who the person is or what exactly the person is doing.

When the video starts, there are about six inmates in view. At approximately 5:10:49 AM, Cashe appears on the video chasing Scott, Scott seemingly trips and falls on the ground near one of the tables in front of the officer's station, then Cashe starts striking him. While Scott is still on the floor, at around 5:10:56 AM, Cashe walks away and starts chasing Black around the nearby staircase. At about 5:11:03 AM, Cashe strikes Black who appears to be on the ground under the staircase. At around 5:11:09 AM, another inmate in a white t-shirt tries to intervene. As soon as Cashe is pulled away from Black, Black gets up and moves away from view. At 5:11:19 AM, Cashe can be seen chasing Black again going around the same staircase about four times. At

12

5:11:35 AM, they both disappear from view. The silhouette of the officer can be seen moving around the officer's station at various times throughout the video.

At 5:13:30 AM, Teems and another officer open the door to exit the officer's station and enter the dayroom. As Teems is walking through the dayroom, he can be seen waiving at Cashe to come to the offices. At 5:14:10 AM, Cashe is seen walking towards the officer's station followed by Teems and the other man. At 5:14:24 AM Cashe is handcuffed inside the officer's station near the window and taken away. At 5:14:40 AM, the officer assigned to the officer's station (it is undisputed this was Kiser), is still on the upper level in front of the monitor. At 5:14:47 AM, Teems leaves the officer's station once again and enters the dayroom. The video stops at 5:15:00 AM.

**Photographs**

Kiser submitted two photo stills from the T-Dorm wing, Doc. 35-8.

Photo #1

In the first photograph, Kiser marked: (1) the position where Cashe attacked Scott near the table in front of the officer's station; and (2) the position where Cashe started chasing Black around the staircase. Generally, this photograph shows a better visibility inside the officer's station compared to the Q1 door video, but the large staircase obstructs the view.

13

Photo #2

The second photograph shows the same area but from a greater distance, facing the staircase, the officer's station with an open door, and the tables and benches in front of it. This photograph demonstrates that the space around the staircase where Cashe was chasing Black is somewhat narrow due to benches and tables to the left and inmate cells to the right. As far as visibility into the officer's station, even with the lights on and the door open, it is still difficult to see what is happening on the upper level. Although it is clear that there is a person standing near the open door on the lower level, it is hard to tell whether there is anyone on the upper level at the time the photo was taken.

**Declarations**

Kiser's Declaration

In her own declaration, dated August 3, 2023, Kiser avers in pertinent part:

> 3. On October 25, 2021[,] I was assigned to T-Dorm as Housing Supervisor at Columbia CI Annex in Lake City, Florida. At approximately 5:10 AM, I observed Inmate Allen Cashe attacking Inmate Saquin Scott and Inmate Everette Black.
>
> 4. Regarding Inmate Black's claim that I stood and did nothing to call for assistance, I immediately initiated ICS and called for assistance. I also spoke into the intercom, giving lawful orders for the inmates to cease

14

their disruptive behavior while awaiting officer assistance.

5. I could not physically intervene as Inmate Black presupposes because I was enclosed in the officer's station which is enclosed with thick plexiglass windows and a singular door. To physically intervene[,] I would have had to leave the control room and pass through several doors to enter the wing. This would have not only taken considerable time, but broken protocol and procedure because the officer's station must always house an officer.

6. When Captain Teems arrived, at approximately 5:13 AM, three minutes after the altercation began, I unlocked the doors from the control room and Captain Teems entered the dorm, ordering all inmates into their cells.

7. During this incident[,] I utilized all options I had from the control room to restore order to the dorm.

Doc. 35-2 at 1–2.

<u>Harrell's Declaration</u>

In Harrell's declaration, dated July 14, 2023, Harrell states in pertinent

part:

3. Upon my review of the incident report written and submitted by Sergeant Kiser, it appears that she initiated ICS which stands for Incident Command System.

4. The Incident Command System is based on the National Incident Management System and is a series of protocols that outlines how to respond to emergencies as the[y] arise.

15

5. In initiating ICS, Sergeant Kiser would have been the initial responder to the incident. The initial responder's primary role is not intervention, but communication.

6. Additionally, being the sole person in the officer's station, she would be the only one able to unlock the dorm to allow other responders to enter the situation and take control of the dorm when they arrived.

7. Furthermore, leaving the officer's station would not only be a breach of protocol and training, but also put Sergeant Kiser's safety and the safety of the institution at risk, unnecessarily.

8. It would also have been a breach of protocol and training to open the door to try and allow the inmates who were attacked to try and escape because it would have put the safety of the institution at risk.

9. The actions committed by Sergeant Kiser are consistent with the training she received and given the situation alleged in the complaint, warranted to maintain her safety and the security of the institution.

Doc. 35-3 at 1–2.

<u>Fisher's Declaration</u>

In Fisher's declaration, dated July 25, 2023, Fisher states, in pertinent part:

2. . . . I was paid by [Black] for my work [as a law clerk] in this case and a couple of [Black's] other cases.

3. Several key facts in this case were embellished or created to meet certain legal standards to ensure that

16

a viable case could proceed and prevent it from being dismissed. Some of these facts are as follows.

4. [Cashe] did not randomly attack [Scott] and [Black] as claimed in the complaint. They were attacked due to a gang related issue . . . .

5. [Black] would not have been attacked had he not tried to intervene on behalf of [Scott]. . . .

6. Additionally, I embellished the time frame of the incident to make it appear more severe. At most, it lasted five minutes total not the fifteen stated in the complaint.

7. Another area that was embellished was the supposed inaction and action of Sergeant Kiser. [Black] and [Scott] informed me that where she was standing at her workstation, you could not see inside of it due to darkened windows. They could not see whether she was watching calmly or not taking any action as stated in the complaint. This statement saying that she was watching them, along with the statements saying that she was ignoring their plight was embellished in order to meet the deliberate indifference standard.

Doc. 35-4 at 1–2.

<u>Scott's Declaration</u>

Kiser submitted Scott's April 16, 2024 declaration with Kiser's Reply. In the declaration, Scott states, in pertinent part:

3. Several key facts in this case were embellished or created to meet certain legal standards to ensure that a viable case could proceed and prevent it from being dismissed.

4. Throughout this case, [Black] paid [Fisher] to write various motions and essentially conduct his case for him. When [Black] stopped paying [Fisher], he threatened to reveal to the court what had been going on. . . .

. . . .

7. Additionally, regarding some of my claims against Sergeant Kiser, while you can see shadow outlines of people moving around the control room, you cannot positively identify them or see what exactly they are doing. This would have held true during the events alleged in both [Black's] complaint and my own.

Doc. 62-1 at 2–3.

**Black's Deposition**

Kiser attached the transcript of Black's deposition, where he described the incident as he did in the Complaint. Doc. 35-9 at 11, 13, 23–25. Black testified that Cashe was stabbing Scott for "several minutes" before he started chasing Black for "close to ten minutes." Id. at 14–15, 17. According to Black, the entire incident from beginning to end took at least fifteen, maybe twenty-five, minutes. Id. at 21–22. Black and Scott were then taken for a medical check-up. Id. at 20.[10]

---

[10] The only medical record submitted to the Court is an emergency room record from 7:15 AM on October 25, 2021, noting a superficial laceration on Black's left side cheek without bleeding. Doc. 35-5 at 1–2. Medical treated Black with Bactrim and a band aid, and then released him to confinement with instructions to return as needed. Id. at 1.

## B. Black's Evidence

In response to Kiser's Motion, Black submitted many of the same exhibits that were already part of the record in this case. See Doc. 51-2 at 1–20, 23–45, 50–57, 63–82, 86–91. Black's non-duplicative exhibits include his own declarations submitted in opposition to Kiser's declaration, Fisher's declaration, and Harrell's declaration, see Doc. 51-1 at 2–3, 5–7, 9–10; a letter Black purportedly received from Fisher, see id. at 58–62; Fisher's declaration that was originally filed in Black v. Molinski, Case No. 3:22-cv-298-BJD-LLL (M.D. Fla.), Doc. 51-2 at 83–85; and Black's inmate requests, grievances, and responses for the period December 2021 through January 2022, see id. at 21–22, 46–49.[11]

**Black's Declarations**

Black avers that Kiser falsely declared that she: (1) observed Cashe attack Scott and Black, whereas in her interrogatory responses she states she did not witness Cashe stab Scott; (2) "spoke into the intercom, giving lawful orders for the inmates to cease their disruptive behavior"; and (3) "utilized all options she had from the control room to restore order to the dorm," when she did not open the door to allow Black to escape. Doc. 51-1 at 2.

---

[11] Black's inmate requests are not relevant to the Court's analysis of the issues.

As to Harrell's declaration, Black contends it was based on pure assumptions and was coerced by defense counsel in this case. Id. at 9–10. And he states that Fisher's declaration should not be credited, because: (1) the videos "clearly show" Kiser was just watching him and Scott get stabbed; (2) the windows in the officer's station "are clear glass windows absent any tint that would darken it"; (3) Fisher kept Black's legal documents in this case and in Case No. 3:22-cv-298-BJD-LLL,[12] so that Black would not have a chance to prevail at summary judgment[13]; (4) the videos show that Black "never tried to intervene" on Scott's behalf; and (5) Fisher falsified his declaration so he could be transferred to another institution. Id. at 5–7.

---

[12] Black has submitted Fisher's declaration that was originally filed in Case No. 3:22-cv-298-BJD-LLL, where Fisher declares that "[s]everal key facts in [that] case were embellished to meet certain legal standards to ensure that a viable case could proceed." Doc. 51-2 at 84.

[13] As support, Black cites to Exhibit "O," which is an unsigned, undated, and seemingly partial hand-written letter by an inmate (allegedly Fisher), who promises to discontinue all his "sabotage efforts and let [Black] get the max" in his litigation if Black gets him "moved back in P-3" and pays off his "$10 debt to Diamond." Doc. 51-2 at 59–61. The author also promises "to quit doing drugs and stack money with [Black]." Id. at 61. If Black complies with his requests, the inmate further promises to send all of Black's litigation related paperwork back to him. Id. at 62. If Black does not comply with his demands, however, Black's lawsuit would be "dead" and all of their work on the case would be "in vain." Id. at 60, 62.

20

As part of his Sur-Reply,[14] Black submitted, in relevant part, his own declaration in opposition to Scott's declaration, Doc. 65-1; and Kiser's responses to Black's interrogatories, Doc. 65-6. To the extent the rest of the exhibits are either duplicative or irrelevant to the issues, they will not be discussed. See Docs. 65-2, 65-3, 65-4, 65-5, 65-7, 65-8, 65-9, 65-10, 65-11, 65-12, 65-13, 65-14.

**Black's Declaration**

In opposition to Scott's April 16, 2024 declaration, Black declares in relevant part that: (1) no key facts were embellished in this case; (2) Scott falsified his declaration so he could obtain a favorable settlement in his case; (3) Scott's April 16, 2024 declaration conflicts with his prior "sworn affidavit"; and (4) the visibility into the officer's station is in dispute, because Scott "has terrible vision" whereas Black could clearly see Kiser inside the officer's station. Doc. 65-1 at 1–4.

**Kiser's Interrogatory Responses**

In her interrogatory responses pertaining to the October 25, 2021 incident, Kiser stated that: (1) she did not observe Cashe "stab" Scott, but

---

[14] Although Black's Sur-Reply is unauthorized, in light of the new evidence submitted as part of Kiser's Reply, the Court will not strike Black's Sur-Reply and supporting documentation.

"observe[d] a physical altercation" between Cashe, Scott, and Black; (2) she observed Cashe "assaulting" Black; (3) she used her Walkie Talkie to call for assistance; (4) she could not have opened the door to Wing 1 to allow the inmates to escape the attack; (5) she could not have activated her personal body alarm to obtain assistance; and (6) she did everything in her power to timely render assistance to Scott and Black as they were being chased by Cashe. Doc. 65-6 at 2–3.

## V. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[15] An

---

[15] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material

issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has

---

fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

In citing to Campbell, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> <u>McCormick v. City of Ft. Lauderdale</u>, 333 F.3d 1234, 1243 (11th Cir. 2003) ("The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case"). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury

24

could return a verdict for the nonmoving party." <u>Guevara v. NCL (Bahamas)</u> <u>Ltd.</u>, 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

Notably, the instant action is before the Court on cross-motions seeking summary judgment. "The principles governing summary judgment do not change when the parties file cross-motions for summary judgment." <u>T-Mobile</u> <u>S. LLC v. City of Jacksonville</u>, 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008). Instead, applying the same principles, "the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts." <u>Id.</u>

## VI. Applicable Law

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates," <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994), but this does not make them "guarantor[s] of [prisoners'] safety," <u>Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga.</u>, 400 F.3d 1313, 1321 (11th Cir. 2005). As such, prison officials are not constitutionally liable for every inmate-on-inmate attack. <u>Farmer</u>, 511 U.S. at 832. Instead, it is "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate [that] violates the Eighth Amendment." <u>Id.</u> at 828 (citations omitted). The Eleventh Circuit has explained the requirement of deliberate indifference to a substantial risk of serious harm as follows:

25

> To succeed on a failure-to-protect claim, a plaintiff must satisfy three elements. First, the plaintiff must show that [he] was "incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834. Second, the plaintiff must show that the "prison official [had] a sufficiently culpable state of mind," amounting to "deliberate indifference." Id. (internal quotation marks omitted). Third, and finally, the plaintiff must demonstrate causation—that the constitutional violation caused [his] injuries. Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014).

Cox v. Nobles, 15 F.4th 1350, 1357–58 (11th Cir. 2021) (citations modified).

Recently, the Eleventh Circuit clarified that in accordance with Farmer, courts in this circuit should apply the "subjective recklessness" standard as used in criminal law when determining liability on an Eighth Amendment deliberate indifference claim. See Wade v. McDade, 106 F.4th 1251, 1253 (11th Cir. 2024) (en banc). To satisfy this standard, the plaintiff must show:

> First . . . as a threshold matter, that he suffered a deprivation that was, "objectively, 'sufficiently serious.'" [Farmer, 511 U.S. at 834].

> Second, . . . that the defendant acted with "subjective recklessness as used in the criminal law," id. at 839, and to do so he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff—with the caveat, again, that even if the defendant "actually knew of a substantial risk to inmate health or safety," he "cannot be found liable under the Cruel and Unusual Punishments Clause" if he "responded reasonably to the risk." Id. at 844–45.

26

Wade, 106 F.4th at 1262 (enumeration and emphasis omitted).[16]

Under this standard, "liability requires consciousness of a risk." Farmer, 511 U.S. at 840. The defendant prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. As such, a prisoner-plaintiff must point to evidence showing "the defendant prison official actually knew of a substantial risk of serious harm, not just that he should have known." Wade, 106 F.4th at 1257 (emphasis in original). A prison official cannot be held liable under the Eighth Amendment for not appreciating that a prisoner faced a substantial risk of serious harm, even if "the risk was obvious and a reasonable prison official would have noticed it." Farmer, 511 U.S. at 842 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment.").

To establish an Eighth Amendment violation, a prisoner must point to evidence permitting the reasonable inference that the defendant was

---

[16] The Court notes that the Honorable Adalberto Jordan wrote a concurrence to the majority's opinion in Wade, finding that to the extent prior Eleventh Circuit deliberate indifference cases are not inconsistent with Wade, "they should continue to be cited as binding precedent." Wade, 106 F.4th at 1265 (Jordan, J., concurring).

deliberately indifferent to conditions that were "sufficiently serious." <u>See</u> <u>Chandler v. Crosby</u>, 379 F.3d 1278, 1288 (11th Cir. 2004). Conditions of confinement are "sufficiently serious" only if they are so extreme that they expose the prisoner to "an unreasonable risk of serious damage to his future health or safety." <u>Id.</u> at 1289 (internal quotation marks omitted). "Showing a substantial risk of serious harm requires the prisoner to provide evidence that there was a 'strong likelihood' of his injury occurring." <u>Visage v. Woodall</u>, 798 F. App'x 406, 408 (11th Cir. 2020) (citing <u>Brooks v. Warden</u>, 800 F.3d 1295, 1301 (11th Cir. 2015)). A court's consideration of whether there was a strong likelihood, as opposed to a "mere possibility," of an injury occurring cannot be based on "hindsight bias." <u>Brooks</u>, 800 F.3d at 1301. Moreover, isolated incidents do not satisfy the "substantial risk" standard articulated in <u>Farmer</u>. <u>See, e.g.</u>, <u>Purcell</u>, 400 F.3d at 1320 ("[O]ccasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, [but] confinement in a prison where violence and terror reign is actionable."); <u>see also</u> <u>Lakin v. Barnhart</u>, 758 F.3d 66, 70–72 (1st Cir. 2014) (Souter, J., sitting by designation) (explaining that the risk must be "substantial," not isolated or infrequent, and affirming summary judgment in defendants' favor where plaintiff's evidence did not reach the "substantial" threshold required by <u>Farmer</u> as "not every risk carries an inherent threat at a substantial level").

As such, a prisoner cannot survive summary judgment based solely on evidence of past isolated incidents or his own injury. Visage, 798 F. App'x at 408. Rather, the prisoner must demonstrate that the complained-of condition—most commonly inmate-on-inmate violence—resulted in so many incidents or injuries that such incidents or injuries were "the norm or something close to it." Marbury v. Warden, 936 F.3d 1227, 1234 (11th Cir. 2019) (quoting Purcell, 400 F.3d at 1322)).

## VII. Analysis[17]

Taking Black's allegations as true, there is no evidence supporting even an inference that Kiser knew of a substantial risk of serious harm to Black such that she could be held liable under the Eighth Amendment. In his Complaint, Black alleges that Kiser's failure to search the inmates for contraband pursuant to Florida Administrative Code (FAC) 33-602.203 and 33-602.204, resulted in Black's injury on October 25, 2021. Complaint at 3. And, through his response to Kiser's Motion and his Sur-Reply,[18] Black attempts to

---

[17] As previously noted, for purposes of summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. Thus, the facts described in the Court's analysis may differ from those that ultimately can be proven.

[18] The Court previously warned Black that he may not amend his Complaint in a response to a dispositive motion and instead must seek leave to amend his pleading. See Order (Doc. 20) at 8.

add additional facts to bolster his contention that Kiser had prior knowledge of danger not only to him, but also to all other inmates. Specifically, he argues that because of Kiser's role as a sergeant at Columbia CI for several years, she knew the facility was a violent and hostile environment with "a bad reputation for assaults and stabbings" and she knew that additional staff was needed to walk through all four quads of the T-Dormitory every 15 to 30 minutes as required by FDOC policy, but failed to do so, which ultimately resulted in Black's injury on October 25, 2021. See Black's Response at 1–2, 10; Black's Sur-Reply at 1–4, 10.

Even considering Black's unsubstantiated and belated arguments, to the extent Kiser had an affirmative duty to search for contraband and/or to have additional staff present, but failed to do so, her failure would amount only to a "dereliction of duty," which equates to mere negligence, not deliberate indifference. See Goodman v. Kimbrough, 718 F.3d 1325, 1332–33 (11th Cir. 2013) (holding the plaintiff failed to present evidence of prison guards' subjective knowledge of a substantial risk of serious harm even though the plaintiff presented evidence that one guard left her post for extended periods of time, the guards failed to conduct required head count and cell check procedures, and the guards admitted that they disengaged an emergency call button in a nearby cell). Moreover, Black does not offer any evidence that

30

inmate-on-inmate attacks occurred frequently at Columbia CI, nor does he contend that Cashe previously threatened him, so that Kiser would have had notice that a risk of harm existed. At most, Black makes unsubstantiated averments about the reputation of the institution, which if true, could establish a mere possibility, rather than a strong likelihood, of harm.

Importantly, Black points to no evidence suggesting that Kiser had some subjective knowledge of an impending attack by Cashe. In fact, in the Complaint, Black alleges this was a "sudden" attack, which occurred without any "apparent provocation." Complaint at 4. The video evidence confirms the attack was sudden, apparently unexpected, and lasted between one and two minutes against both Scott and Black. See Doc. 35-7 (Q1 dayroom video shows the chase began at around 5:10:47 AM and concluded by 5:12:00 AM; Q1 door video shows Cashe is chasing Scott at 5:10:49 AM, then starts chasing Black, but they both disappear from view around 5:11:35 AM, and by the time Teems enters the dayroom at 5:13:30 AM, the attack was over). While it is unclear how much time passed between the end of the attack and the response team's appearance, what is clear is that the response team appeared on the scene within three minutes of the start of the attack. See id. In light of the video

evidence,[19] the Court need not accept Black's averments that the entire incident lasted twenty or twenty-five minutes. See Complaint at 4; see also Doc. 35-9 at 21–22.

Similarly, the Court need not accept Black's averments, see Complaint at 4; see also Doc. 35-9 at 11, 23, that he was able to observe Kiser's actions or inactions inside the officer's station while the incident unfolded, because the record refutes them. The videos and photographs, along with the declarations of Fisher and Scott, demonstrate the visibility inside the officer's station is impeded due to glare and/or tint of the windows to the point where it is difficult to tell who is inside and what exactly the individuals are doing, particularly if they are standing in front of the monitor with their back to the camera. See Doc. 35-7 (Q1 Door Video); Doc. 35-8 (Photo #1; Photo #2); Doc. 35-4 at ¶ 7 ("Everette Black and Saquin Scott informed me that where [Kiser] was standing at her workstation, you could not see inside of it due to darkened windows."); Doc. 62-1 at ¶ 7 (stating that "while you can see shadow outlines

---

[19] The video evidence is supported by the declarations of Fisher, see Doc. 35-4 at ¶ 6 (declaring that the incident "lasted five minutes total"), and Scott, see Doc. 62-1 at ¶ 3 (declaring that several key facts "were embellished or created to meet certain legal standards").

of people moving around the control room, you cannot positively identify them or see what exactly they are doing").

Despite this evidence, Black suggests that due to his nearly perfect vision, he was able to see clearly what Kiser was doing on the upper level of the officer's station while he was being chased by an inmate with a homemade weapon on the lower level of the dormitory and while his view was also obstructed at least temporarily by a large staircase. See Doc. 65-1 at 4. Black avers that it is in dispute whether a person could "positively identify [the officer in the officer's station] or see what exactly they are doing." Id. However, other than his own declaration, Black has not submitted any other evidence, such as declarations from other inmates or his own photographs, to support his averments. Instead, he asserts that the video footage supports his contention that the windows are "clear glass windows absent any tint that would darken it," see Doc. 51-1 at ¶¶ 7, 13, but the Court finds this assertion to be inaccurate. As such, the "Court will accept the video's depiction over [Black's] account of the facts [because] the video obviously contradicts [his] version of the facts." Logan v. Smith, 439 F. App'x 798, 800 (11th Cir. 2011) (citations omitted); see also Perez v. Suszczynski, 809 F.3d 1213, 1221 (11th Cir. 2016) ("[W]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

33

should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." (quotations and citation omitted)); <u>Singletary v. Vargas</u>, 804 F.3d 1174, 1183 (11th Cir. 2015) ("[W]hen the non-movant's assertion is 'so utterly discredited' by the record, no 'genuine' dispute of material fact exists sufficient to prompt an inference on behalf of the non-movant." (citing <u>Scott</u>, 550 U.S. at 380)).[20]

Moreover, there is no indication that Kiser responded to any known risk in an objectively unreasonable manner. To the extent Black contends that Kiser failed to intervene on his behalf, Black "has the burden to demonstrate that the defendant was in a position to intervene but failed to do so." <u>Ledlow v. Givens</u>, 500 F. App'x 910, 914 (11th Cir. 2012) (per curiam). Assuming all facts in the light most favorable to Black and drawing all inferences in his favor, Kiser acted reasonably under the circumstances in the few short minutes of the attacks, utilizing the options she had "from the control room to restore order to the dorm" consistent with protocol and training. Doc. 35-2 at ¶ 7; Doc. 35-3 at ¶ 9 (averring that Kiser's actions were "consistent with the training she

---

[20] To the extent there are other inconsistencies between the video evidence and Black's averments, the Court accepts the facts as demonstrated in the videos. For example, Black alleges that he and Scott were attacked on the morning of the incident because they were the only inmates who were awake. However, the videos plainly show that there were several other inmates who were outside their cells both before and during the chase.

received and given the situation alleged in the complaint, warranted to maintain her safety and the security of the institution"); Doc. 65-6 at ¶ 17 (stating that Kiser did everything within her power to timely render assistance to Black and Scott). According to Kiser's declaration, which is supported by Harrell's declaration, Kiser "immediately initiated [Incident Command System] and called for assistance." Doc. 35-2 at ¶ 4; see also Doc. 35-3 at ¶ 3.

Moreover, the evidence establishes that Kiser could not have physically intervened because it would have "taken considerable time" to leave the control room and pass through several doors to enter the wing, and also would have been contrary to "protocol and procedure because the officer's station must always house an officer." Doc. 35-2 at ¶ 5; see also Doc. 35-3 at ¶ 7 (averring that "leaving the officer's station would not only be a breach of protocol and training, but also [would have] put Sergeant Kiser's safety and the safety of the institution at risk, unnecessarily"). And Kiser also could not have left the control room because she was the only officer there who could unlock the doors for the responders to enter the dorm, which is precisely what she did for Teems, who appeared at the scene less than three minutes after the altercation began. See Doc. 35-2 at ¶ 6; Doc. 35-3 at ¶ 6 (averring that as "the sole person in the officer's station," Kiser was "the only one able to unlock the dorm to allow other

35

responders to enter the situation and take control of the dorm when they arrived").

Considering the sudden nature of the attack and the actions that Kiser took in line with her training and prison protocol, which ultimately resulted in a response by the security team within less than three minutes, no reasonable jury would conclude that Kiser acted unreasonably. Assuming, as Black suggests—albeit without any factual basis for such knowledge—that Kiser did not utilize the intercom system, he has not shown how Kiser's alleged failure could have affected the outcome.[21] Kiser's primary responsibility as the initial responder was communication rather than direct intervention. See Doc. 35-3 at ¶ 5 (averring that because Kiser was the initial responder to the incident, her primary role was not intervention, but communication). As such, it was not unreasonable for her to focus on communicating with the team of responders to ensure that the back-up team had the most up-to-date information it needed in order to intervene timely and effectively. See Doc. 65-6 at ¶¶ 12, 14 (stating

---

[21] In her declaration, Kiser states she utilized the intercom system to order the inmates to cease their disruptive behavior, but according to the incident report, which is memorialized in the complaint review report, she only "attempted to utilize the intercom" in order "to have all uninvolved inmates secure themselves in their assigned housing location." Doc. 35-1 at 1; Doc. 35-6 at 1. To the extent Black suggests Kiser's declaration is inconsistent with the reports, see Doc. 51-1 at ¶ 2, it does not appear to be so.

36

that Kiser used her Walkie Talkie to call for assistance). Also, to the extent Black suggests that Kiser could have activated her personal body alarm, <u>see id.</u> at ¶ 16, he does not explain how that would have resulted in a speedier or more effective intervention by the responding team. Activating Kiser's body alarm would have suggested to the responding officers that it was Kiser, rather than the inmates, who needed immediate assistance, potentially delaying their response to the altercation.

Black also speculates that Kiser had the option of opening the door to allow the inmates who were under attack to escape, <u>see</u> Doc. 51-1 at 2, ¶ 3; Doc. 35-9 at 11, but the record shows that was not a viable option. <u>See</u> Doc. 35-3 at ¶ 8; Doc. 65-6 at ¶ 11. As Harrell explains in his declaration, opening the door would "have been a breach of protocol and training" as "it would have put the safety of the institution at risk." Doc. 35-3 at ¶ 8. Black has not provided any evidence other than his own unsubstantiated declaration to refute Kiser's evidence that such a course of action would have been a reasonable or appropriate response under the circumstances.

Upon review of the record, the Court finds that Kiser has presented sufficient evidence to demonstrate that there is no genuine issue of material fact with respect to Black's claim against her for failure to protect and/or intervene. Further, Black has not presented evidence sufficient to demonstrate

a genuine issue of material fact to defeat entry of summary judgment. The evidence Black offers in opposition to Kiser's Motion is either duplicative of Kiser's exhibits or immaterial to the issues on summary judgment.[22] See Doc. 51-1 at 9–10; Doc. 51-2 at 1–20, 23–45, 50–57, 59–82, 84, 86–91; Docs. 65-2, 65-3, 65-4, 65-5, 65-7, 65-8, 65-9, 65-10, 65-11, 65-12, 65-13, 65-14.

For example, Black contends that Fisher tried to sabotage this case and his other case (Case No. 3:22-cv-298-BJD-LLL) by keeping valuable documents from him. However, Black has been able to prosecute his cases without impediment by filing and opposing motions for summary judgment with supporting documentation. In fact, in Black's other case, the parties reached a settlement after the Court ruled on the parties' cross-motions for summary judgment. See Docs. 55, 79 in Case No. 3:22-cv-298-BJD-LLL. To the extent Black asserts that Fisher sabotaged him by falsely declaring that certain key facts in Black's case[23] have been embellished, in determining the merits of

---

[22] Some of the immaterial facts include: whether Fisher is/was a certified law clerk; whether Fisher is/was on drugs; whether Fisher contacted the Florida Office of the Attorney General; whether Fisher was transferred to another institution; whether the attack on Black was random; whether Black is/was involved in drug, gambling, and/or gang operations; whether Black attempted to intervene on Scott's behalf during the attack; whether Black had a knife in his cell; whether Black is/was indigent; and whether Black had any "beef" with Cashe and/or Scott. See Doc. 51-1 at 5–7; Doc. 65-1 at 1–4.

[23] It is wholly irrelevant to determining the merits of Kiser's Motion in this case whether Fisher embellished facts in Black's other case (Case No. 3:22-cv-298-BJD-LLL).

Black's constitutional claims on summary judgment, the Court views the facts in the light most favorable to Black.

Black also argues that Scott's declaration includes false information, suggesting he did so to reach a favorable settlement in his case that was based on the same incident (Case No. 3:22-cv-349-MMH-PDB). Doc. 65-1 at 1–4. Even accepting that Scott included some false statements in his declaration, the only relevant fact to which he attests is consistent with the uncontroverted video evidence—that only "shadow outlines of people moving around the control room" can be seen from outside the control room. Doc. 62-1 at 3. The rest of the statements in Scott's April 16, 2024 declaration are immaterial.[24]

Black also takes issue with the fact that in interrogatory responses, Kiser stated she did not observe Cashe "stab" Scott, but in her declaration, she stated she observed Cashe "attack" Scott and Black. See Doc. 35-2 at 1; Doc. 51-1 at 2, ¶ 1; Doc. 65-6 at 2. Notably, Black fails to mention that Kiser's interrogatory responses also reflect that she observed the "physical altercation" between Cashe, Scott, and Black. Doc. 65-6 at 2. As such, there is no inconsistency between Kiser's statements. She consistently states that she

---

[24] Also, contrary to Black's position, Scott's April 16, 2024 declaration provides different, but not necessarily conflicting, statements compared to his "sworn affidavit" attached to Black's Complaint. Compare Doc. 62-1 at 2–3 with Doc. 1 at 20.

observed the "attack" or "physical altercation" between the inmates, even if she may not have been able to observe the stabbing from her position. Indeed, in the incident report, Kiser stated she observed Cashe "striking" Scott "with what appeared to be his clenched fists." Doc. 35-1 at 1. It was only after the fixed wing camera footage was reviewed that Teems noted "Cashe can be seen striking" Scott and Black "with what appeared to be a homemade weapon." Id. Similarly, in the complaint review report, which Inspector Jordan prepared after reviewing the fixed video footage, he noted that Cashe "strikes" Scott "with his right hand (Inmate Cashe appears to have an unknown object in his right hand)." Doc. 35-6 at 2.

Upon review of the undisputed record evidence, Black fails to present evidence suggesting that Kiser responded unreasonably under the circumstances such that she knew her own actions or inactions "put [him] at substantial risk of serious harm." Wade, 106 F.4th at 1253. Indeed, drawing all inferences in favor of Black "to the extent supported by the record," Scott, 550 U.S. at 381 n.8 (emphasis omitted), no reasonable juror could find that Black suffered a violation of his Eighth Amendment rights. See generally Goodman, 718 F.3d at 1332 (recognizing that "to defeat a motion for summary judgment, [the plaintiff] must adduce specific evidence from which a jury could reasonably find in his favor; [t]he mere existence of a scintilla of evidence in

40

support of [his] position will be insufficient" (quotations and citation omitted));

Kesinger, 381 F.3d at 1247 (stating that "a mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment"); see also Bryant v. Rich, 530 F.3d 1368, 1382 (11th Cir. 2008) (Wilson, J., concurring in part, dissenting in part) ("A prisoner cannot defeat summary judgment by relying on sham affidavits, bare and self-serving allegations, or other evidence that is incredible as a matter of law. He must raise more than a mere scintilla of evidence in support of his position: in order to defeat summary judgment, there must be evidence on which the jury could reasonably find for the prisoner.").[25] Accordingly, Kiser's Motion is due to be granted with respect to Black's claim for failure to protect and/or intervene.[26]

Finally, because Kiser is entitled to judgment in her favor, Black's Motion must necessarily fail.

Accordingly, it is now

---

[25] At his deposition, Black testified that Scott was the only witness he planned to call at his trial. Doc. 35-9 at 27. However, in light of Scott's recent declaration, it appears that if this case were to proceed to trial, Black would have only his testimony to support his claims and even that is problematic because Kiser's exhibits support her version of the material facts.

[26] Because Kiser's Motion is due to be granted on the substance of Black's constitutional claim, the Court need not address Kiser's additional arguments with respect to qualified immunity, frivolousness/maliciousness, de minimis injury, and compensatory and punitive damages.

41

**ORDERED:**

1.      Black's Motion (Doc. 32) is **DENIED**.

2.      Kiser's Motion (Doc. 35) is **GRANTED**.

3.      The Clerk shall enter judgment in favor of Defendants Sergeant

Kiser and Warden Godwin,[27] and against Plaintiff Everette L. Black, Jr.

4.      The Clerk shall terminate all pending motions and close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 4th day of

December, 2024.

*Marcia Morales Howard*

**MARCIA MORALES HOWARD**
United States District Judge

Jax-11 11/4
c:      Everette Leon Black, Jr., #364497
        Counsel of Record

---

[27] On December 15, 2022, the Court dismissed Defendant Godwin from this action, but withheld judgment in his favor pending adjudication of this action as a whole. See Order (Doc. 20).

42