UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DEVON CURRIE,

      Plaintiff,

vs.

MICHELLE MCKINNIE, *et al.*

      Defendants.

Case No. 5:23-cv-00183-TKW/MJF

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Devon Currie responds to Defendant Michelle McKinnie's motion for summary judgment. [ECF No. 78]. Sgt. McKinnie's denies that she failed to protect Plaintiff or intervene on his behalf, and focuses on the initial attack in the bathroom before Master Roster Count and the second attack after Master Roster Count (when Mr. Currie was stabbed). She ignores her role *during* Master Roster Count, where a jury would hear that she could see Mr. Currie's injuries (from the prior attack in the bathroom) when both she and officer Green performed their respective counts, that Mr. Currie asked her for protection against inmates whom she could hear yelling at Mr. Currie to "check in" during the count, that she had the ability to stop the count to intervene, and that she stated "Oh, he better fuck or fight. Ain't no checking in." [Deposition of Howard Chandler-Smith (Ch.-Sm.

Dep.") at 27:13-24, ECF No. 78-27].[1] Because McKinnie denies any

wrongdoing but the record clearly shows otherwise, these matters are in

dispute and must be resolved by a jury.

## Plaintiff's Opposing Statement of Facts

### *Bathroom*

On the evening of July 20, 2022 Mr. Currie was in a bathroom sink

area in P dorm, wing 2 ("P2") brushing his teeth.[2] [*See* Deposition of Devon

Currie ("Currie Dep.") at 14:24-15:3, 18:3-5, 19:13-21, ECF No. 78-2.][3] That

sink area was referred to as "the bird bath" [Ch.-Sm. Dep. at 14:20-23], but

Mr. Currie was not taking a bird bath (i.e., using a sink to bathe) [Currie

Dep. at 18:6-8]. The dorm was open bay with multiple bunks. [*See* Def. Ex.

D, Photo of dorm, ECF No. 78-4 (under seal)][4].

---

[1] "Checking in" is a prison term whereby an inmate asks prison staff for
protection against other inmates, and is removed from the housing area,
usually to protective confinement.

[2] Dorm P has two wings, wing 1 ("P1") and wing 2 ("P2"), separated by an
officer station. Mr. Currie resided in P2, where he was attacked.

[3] Some of Defendant's exhibits add an exhibit cover page, which adds an
extra page to the PDF. Citations to deposition pages herein ignore any
such cover page and refer to the actual page of the deposition.

[4] Defendant's exhibit photos of the dorm were taken in October 2024 by an
FDC employee to facilitate the litigation for both parties.

*Bathroom Description*

The bathroom is directly in front of the officer station. [Currie Dep. at 19:9-11]. The bathroom was open to the bay area, without doors, and directly across from the officer station. [*See* Def. Exs. I, J, dorm photos, ECF Nos. 78-9, 78-10 (under seal)].

*Bathroom Attack*

An inmate nicknamed "Pace," a member of the Latin Kings gang, was at a sink brushing his teeth, and another inmate was in the shower. [Ch.-Sm. Dep. at 12:1-8, 12:3-25, 12:16-25].

Mr. Currie is openly gay. [Deposition of Brandon Williams ("Will. Dep.") at 62:7-9, ECF No. 90-1]. Gang members did not want any gay people or even gay-friendly people in the dorm. [Deposition of Chad Shaw at 24:17-23, ECF No. 78-6]. Mr. Currie was "all the way out" (i.e., very openly gay). [*Id.* at 24].

A Latin Kings gang member nicknamed "YG" was talking with Mr. Currie and "putting him down" because of his sexual preference. [Ch.-Sm. Dep. at 13:5-10]. Mr. Currie was responding to the effect, "Why? I've been here so long and I'm not bothering nobody." [*Id.* at 13:21-14:2] Unprovoked, YG then swung at Currie, and missed. [*Id.* at 14:2-4] YG swung first. [*Id.* at 14:6-8]

3

Currie defended himself, and as they fought Currie was "getting the best of YG." [*Id.* at 14:12-14] Pace then started assisting YG, and hit Currie over the head with a broomstick. [*Id.* at 14:14-18]

Three to four other Latin Kings ran to the bathroom with locks, sticks (mop handles and broomsticks), and other weapons, and attacked Currie. [*Id.* at 14:18-19, 15:12-17]; [Currie Dep. at 18:18-20, 19:2-5]. Currie was hit so hard with a broom handle that the handle broke. [Currie Dep. at 20:25-21:4, 22:18-23][5]

---

[5] Defendant claims Mr. Currie punched inmate Richard Utria during the fight [ECF 78, MSJ, at 6], but Utria, shown Currie's photograph, testified that Currie looks like the guy who punched him, but that "they all look the same" so he wasn't sure Currie punched him, and by "they" he meant black people. [ECF 78-26, Ex. Z, 52:20-53:13]. Mr. Currie is black. (Mr. Utria, who suffers memory loss [ECF 78-26, Ex. Z, 12:2-6, 30:8-23], also testified that Mr. Williams subsequently hit him with a mop wringer at Charlotte C.I. [Utria depo 18:12-24], whereas Mr. Williams testified he was never at Charlotte C.I. [Will. Dep. at 47:21-25].)

Defendant cites Michael Marceau's deposition to show that Mr. Utria was in the bathroom during the initial attack. [ECF 78 at 5]. However, Marceau reviewed Mr. Utria's photo and did not remember anything about Mr. Utria. [ECF 78-7 at 40:22-25, 106:7-12]. Defendant also cites Ex. CC (presumably ECF doc 78-29, deposition of Anthony McCloud), to prove the same, but Mr. McCloud had no recollection of Mr. Utria either. [ECF 78-29, 20:24-21:7].

Mr. Utria did not recall any attack against Mr. Currie [ECF 78-26, Ex. Z, Utria depo., 53:14-19], but said he (Utria) was near the bathroom getting hot water when two individuals were arguing over a phone and one punched him. [ECF 78-26, Ex. Z, Utria depo., 15:11-23]. Mr. Utria never claimed to be inside the bathroom, and certainly not during the attack against Mr. Currie. [*See* Utria deposition.]

*Breaking Up The Fight*

The fight continued in the bathroom [Ch.-Sm. Dep. at 15:22-24].

Inmate Charles Gaddis (aka "Mississippi") and three other inmates tried to

break up the fight. [*Id.* at 17:2-5, 17:21-25, 18:12-14]. Gaddis and the

others were successful and the attack stopped. [*Id.* at 18:15-17]. Everybody

then went to their bunks. [*Id.* at 18:18-23, 20:20-24]. Mr. Gaddis helped Mr.

Currie to his bunk. [Will. Dep. at 20:22-24].

The attack lasted about 8 to 10 minutes [Ch.-Sm. Dep. at 16:21-24]

and happened right before Master Roster Count [*Id.* at 18:21-22]. After this

first fight ended, none of the officers came out onto the wing. [Will. Dep. at

40:7-13]. The officers in the booth (i.e., officer station) during the bathroom

fight were the same officers who conducted the Master Roster Count. [*Id.*

at 40:14-17]. McKinnie and Green did the Master Roster Count that night.

[*Id.* at 66:21-67:9]; [Ch.-Sm. Dep. at 22:17-23].

*Visibility into Bathroom*

From the officer station, one can see directly into the bathroom and

the showers. [Will. Dep. at 20:13-14]. From the booth, officers can see

down to the restroom, and can see sinks and showers. [Deposition of

Michelle McKinnie ("McK. Dep.") at 78:8-17, ECF No. 78-28]. The officers

(in the booth) could have seen the fight in the bathroom. [Will. Dep. at 39:3-

5

18]. During the 8-10 minutes, officers had clear vision the entire time. [Ch.-Sm. Dep. at 47:5-10]. Officers can still see even if inmates get up and block them; the "officer has a clear shot to see everything that's going on in both day rooms and to see the whole bed area of both sides." [*Id.* at 47:10-18].

If a fight were taking place near the bird bath sinks and the sheet was down, someone in the security booth should be able to see it. [McK. Dep. at 79:14-18].

Even were an officer on the P1 side of the booth, the officer could see from where they were positioned (P1) into P2. [Ch.-Sm. Dep. at 67:9-16]. Chandler-Smith testified that one could see all the way from the P2 bathroom to the P1 bathroom through the officer station: "But if you stand in the bathroom and you look, you could look straight through the officer's station to the other bathroom. So it's a clear view." [*Id.* at 67:19-21].

*Ability to Hear*

From inside the booth McKinnie could not necessarily hear conversations, but could hear inmates if they call and yell for someone. [McK. Dep. at 40:1-12]. If inmates are yelling in the dorm, that's generally something she could hear. [*Id.* at 40:25-41:9].

6

*Bathroom Injuries*

As a result of the attack, Mr. Currie (aka "Boots") was injured, with a busted lip, and was bleeding from his upper eye area. [Ch.-Sm. Dep. at 19:3-4, 19:9-11, 19:12-19].[6] There was blood all over the bathroom. [Currie Dep. at 21:6-8]. Mr. Currie had multiple bruises, cuts and gashes on his face, which was bleeding, and his shirt was bloody and ripped.[7] [*Id.* at 21:19-23, 22:6-11, 23:12]. Mr. Curry was bleeding from his nose and his mouth area. [Will. Dep. at 22:21-23].

*At the Bunks*

Back at the bunks, YG and the other Latin Kings started grabbing weapons and packing their property. [Ch.-Sm. Dep. at 19:20-24]. The Latin Kings packed their belongings because they knew they were going to "jail" (i.e., confinement) (as a result of what would happen next). [*Id.* at 19:25-20:7].

Mr. Currie went to his bunk and started to pack his property. [Currie Dep. at 24:4-6, 26:8-10].

---

[6] Currie was known as "Boots" [Will. Dep. at 61:1-12], and inmate deponents sometimes referred to Mr. Currie as "Boots."

[7] In his testimony, Mr. Currie preferred the word "gashes" to describe his injuries in this first attack, as he associated the word "cuts" with being stabbed by knives, as during the second attack. [Currie Dep. at 23:12-15].

The gang members were yelling out, saying, "Gays got to get on the door, got to […] check in, got to get out of here." [*Id.* at 26:11-17].[8] Being told to "get on the door" means that the inmate being told has to leave the dorm; the inmate is being forced out. [Will. Dep. at 67:10-14].

The inmate would have to go to "the police" (i.e., corrections officers) and tell the police that the inmate does not feel safe inside this dorm; then officers would have to send the inmate to confinement or somewhere else. [*Id.* at 67:15-19].

A couple of gay (or gay-friendly) inmates (Gaddis and Williams) came to Currie and were asking if he was okay, and trying to figure out what to do. [Currie Dep. at 26:17-27:1]. Meanwhile, the gang members were standing around yelling that Currie needed to get out of the dorm. [*Id.* at 27:25-28:3].

Meanwhile Sergeant McKinnie and Officer Green were in the officer station. [*Id.* at 28:13-20].[9] McKinney heard and saw everything going on. [*Id.* at 29:18-23].

---

[8] To "get on the door" is the same as to "check in"—i.e., to seek to leave the dorm for protective confinement.

[9] In his deposition, Mr. Currie was reluctant to identify Defendant/Officer Jane Doe as Officer Delisia Green without seeing a photograph of her. Pursuant to Court order [ECF 80], on January 14 Plaintiff's counsel were able to Zoom conference with Mr. Currie and show him FDC photos of Sgt. McKinnie, Sgt. Patterson and Officer Green. Mr. Currie confirmed that Sgt.

*McKinnie Did P-Dorm Count*

McKinnie was assigned to different dorms, and there was no dorm that she was predominantly assigned to. [McK. Dep. at 14:14-19]. She was assigned to M dorm (on the day of the incident) but could go out and check everywhere. [*Id.* at 18:12-19, 18:22-19:8]. McKinnie thought she was probably assigned to Security Nine the day of the incident. [*Id.* at 18:20-24]. As part of Security Nine (roving security officers) she would leave her dorm; if someone needed help she would help them. [*Id.* at 19:2-8]. On the day of the incident McKinnie went into P dorm to help count. [*Id.* at 23:19-24]. McKinnie stated in her interrogatories: "I remember conducting count in P-Dorm and leaving the dorm to conduct count in O-Dorm. While I was conducting count in O-Dorm, the incident began to occur. [McK. Interrog. 15-A, ECF No. 90-2].

*Master Roster Count*

Master Roster Count started at 10 pm. [McK. Dep. at 25:15-17]. The bathroom attack happened right before Master Roster Count. [Ch.-Sm. Dep. at 18:21-22]. Master Roster Count requires two officers to count.

---

McKinnie was the same McKinnie he testified about, and that Jane Doe was Officer Green. *See* Declaration of Joshua Tarjan [ECF No. 90-3]; Declaration of Devon Currie (to be verified) [ECF No. 90-4].

[McK. Dep. at 46:25-47:5]. McKinnie and Green did the Master Roster

Count that night. [Ch.-Sm. Dep. at 22:17-23]; [Will. Dep. at 66:21-67:9].

*First Count*

Ofc. Green did the first count. [Ch.-Sm. Dep. at 23:24-24:3]. She

started doing count, counted the first couple of beds and came to Currie's

bed. [Currie Dep. at 33:3-6]. Green saw Currie and had to look at Currie to

make sure he was the same inmate in her pictures. [*Id.* at 35:9-7].

Green was standing right in Currie's face, talking to him. [*Id.* at 38:21-

22, 39:1]. Green saw that Currie was "beat up on bad" and that his wounds

were fresh. [*Id.* at 39:8-10]. Currie stopped Green while she was doing

count and spoke with her. [*Id.* at 30:6-8, 32:6-10]; [Ch.-Sm. Dep. at 25:4-

15]. Currie tried to tell her that he wanted to sign into protective custody,

that he was in fear for his life. [Currie Dep. at 31:12-21]. Green said to

Currie, "I'm busy. I'm not doing no paperwork." [*Id.* at 31:22-23]. She could

see all his bruises, blood all over his ripped clothes, and his property

packed right in front of her. [*Id.* at 31:23-32:1]. But she disregarded all that

and just kept doing the count. [*Id.* at 33:7-14].

Meanwhile McKinnie was standing in the doorway of the booth [*Id.* at

30:14-16], right outside the officer station [*Id.* at 30:17-20].

*Ruckus*

Master Roster Count is the most important count of the day, and all inmates know to be quiet during it. [Currie Dep. at 38:2-4]. But inmates were "disrespecting" the count. [*Id.* at 38:4-5]. Inmates are not supposed to be talking or standing up (during count), and doing so is a violation. [*Id.* at 34:3-6]. Inmates were supposed to be sitting (on their beds), quiet with IDs out, but instead the scene was rowdy, a ruckus, with tension, and people were yelling threats saying the gays "got to get off the compound." [*Id.* at 33:15-25, 39:17-18]. The Latin Kings were yelling, "You all gays got to get out and get on the door. You all got to get up out of here. You all got sign into protective custody." [*Id.* at 36:21-25, 37:1-6]. Nobody else was yelling. [*Id.* at 37:1-11].

The Latin Kings yelled (their threats) while McKinnie and Green were right there on the floor. [*Id.* at 37:21-25]. McKinnie and Green heard the yelling. [*Id.* at 37:15]. Green saw that rowdiness but kept doing count, acting like she didn't see anything. [*Id.* at 34:7-8].

The doorway to the officer station is in the dorm. [*Id.* at 35:7-12]. McKinnie was standing right there outside the officer station, in the doorway, seeing everything the inmates were seeing. [*Id.* at 34:19-35:1].

McKinnie testified that while an officer might not hear inmate conversations from inside the booth, inmates calling and yelling for someone can be heard. [McK. Dep. at 40:1-12, 41:7-9].

McKinnie was not far from Currie, as there were probably three or four beds between Currie's bed and the officer station. [Currie Dep. at 32:11-13]. McKinnie saw Currie bloody, and disregarded all of it, as if it were nothing, like she didn't care. [*Id.* at 34:9-13].

*Second Count*

McKinnie (after Green counted) did her count. [Ch.-Sm. Dep. at 24:4-10]. Currie spoke with McKinnie, saying that he was just attacked and that the Latin Kings want him to check in. [*Id.* at 26:5-27:2]. But McKinnie proceeded with count, nonchalant about what Currie had said. [*Id.* at 27:13-16]. McKinnie subsequently said, like a joke, "Oh, he better fuck or fight. Ain't no checking in." [*Id.* at 27:13-24]. McKinnie then went back to the booth. [*Id.* at 28:3-5]. Then she and Green went to other side of dorm to count Wing 1. [*Id.* at 28:6-9, 24:12-19].

*Could Have Stopped Count*

If count is taking place and someone is injured, has blood on them and is asking to check in, the officer probably should be calling emergency traffic and getting people down there (to the dorm). [McK. Dep. at 70:16-

12

21]. Emergency traffic can be called in the middle of count (for help). [*Id.* at 71:2-4]. Stopping count to remove an inmate is "not going to be a big problem" because once the inmate is removed the officer can just go back and do their count again. [*Id.* at 71:16-20]. In a situation where there's a fight between inmates, where there are injuries to inmates, count can be stopped, inmates can be moved, and then count is redone. [*Id.* at 93:24-94:10].

### *Second Attack*

YG then stood up and said "What's up? You, you getting on the door or let's rock out." [Ch.-Sm. Dep. at 28:23-29:7]. Other Latin Kings then got up. [*Id.* at 29:8-12]. The Latin Kings had their knives and other weapons "out in the open," unconcealed. [*Id.* at 29:12-14].

YG tried to stab Currie, but Gaddis said, "Watch out, Boots." [Ch.-Sm. Dep. at 30:17-24]. Currie "took a step to the left, causing YG to miss. [*Id.*] And that's when everything escalated." [*Id.*]

After YG missed, the Latin Kings attacked Brandon Williams. [*Id.* at 30:25-31:10]. Williams, Gaddis and Currie were being chased all over the dorm. [*Id.*] The Latin Kings were hitting them with broomsticks, locks in socks, and knives. [*Id.*] Chandler-Smith testified the scene was like WWE WrestleMania and "looked like a war zone." [*Id.* at 31:25-32:3].

13

8 or 10 Latin Kings were attacking at this point. [*Id.* at 32:10-12]. Three (gang members) were attacking Currie, four chased Williams around the dorm, and others were chasing Gaddis. [*Id.* at 32:22-33:2]. Currie saw four gang members chasing Williams and ran over to help him. [*Id.* at 38:16-20]. The Latin Kings encircled Williams and Currie right by the officer station. [*Id.* at 40:2-8].

The attack finally stopped, Currie went back to his bunk, and that's when officer Green finally called in the emergency. [*Id.* at 41:21-42:13].

Williams testified the second fight ended when Captain Heffner and other officers rushed into the dorm. [Will. Dep. at 28:21-29:4, 29:11-16].

Currie, Williams and Gaddis were never armed. [*Id.* at 68:5-10].

*Duty*

An officer (in the booth) is supposed to be paying attention to what's going on in the dorms at all times. [McK. Dep. at 82:9-14]. An officer in the booth focusing on one wing must not ignore the other wing and cannot neglect one side. [*Id.* at 82:15-18, 22-24].

Each Florida Department of Corrections employee's conduct "shall at all times maintain proper security and welfare of […] inmates […]." F.A.C. 33-208.002 Rules of Conduct. (eff. 6.3.21), § (3)(a). "No employee shall willfully or negligently treat an inmate in a cruel or inhuman manner […]."

*Id.* at § (8). "Every employee has the responsibility to protect and safeguard […] the person and property of inmates […]." *Id.* at § (24).

*Injuries after second fight*

After being stabbed, Mr. Currie became unconscious. [Currie Dep. at 57:16-24] and awoke in the medical unit, where he kept going in and out of consciousness. [Currie Dep. at 17:11-15]. He had been stabbed in the lung, was bleeding internally and couldn't breathe. [*Id.* at 17:17-22]. He was transported (by ambulance) to the hospital, where he spent five days [*Id.* at 17:23-24], during which they pumped and drained his lung [*Id.* at 57:1-6].

Mr. Currie almost died. [*Id.* at 67:8]. And Mr. Chandler-Smith believed Mr. Currie was dead, as much blood was on Mr. Currie's shirt, like the size of a bowling ball. [Ch.-Sm. Dep. at 66:22-24].

Latin Kings stabbed Williams in the left top shoulder and the right back shoulder. [Will. Dep. at 26:14-16, 21-24]. Williams received stitches and staples. [*Id.* at 36:7-11].

Gaddis's cheek was slashed from his ear to his mouth, long and deep. [*Id.* at 30:12-19, 22-25]. Williams testified he could see into Gaddis's mouth through the slash, which was "flopping." [*Id.* at 31:1-3].

*Close Management*

When he returned from the hospital, Mr. Currie was unfairly placed on Close Management for fighting during the July 20 incident, even though he always acted in self-defense. [Currie Dep. at 62:12-19]. Gaddis and Williams suffered the same treatment.

*Video*

Video from the incident was viewed by FDC staff [Ch.-Sm. Dep. 71:13-16], and downloaded and sent to the Office of the Inspector General ("OIG") [*See* MINS Incident Report 7/22/22 (redacted), ECF No. 91-1]. But FDC could not find the video in response to Plaintiff's subpoena. The disc turned over to the OIG's office was blank.

## Memorandum of Law

Summary judgment may be granted only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court considering a summary judgment motion must "draw all reasonable inferences in favor of the party opposing summary judgment." *Glasscox v. Argo*, 903 F.3d 1207, 1212 (11th Cir. 2018). Even when the parties agree on a set of facts, a court should deny summary judgment if "reasonable minds might differ on the inferences arising from undisputed facts." *Id.* (quotation omitted). If a

factfinder could draw more than one inference from a set of facts, and those multiple inferences create a genuine issue of material fact, summary judgment must be denied. *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1315 (11th Cir. 2007). Credibility determinations, weighing of evidence, and drawing of legitimate inferences are reserved for the jury, and a judge should not appropriate those functions when ruling on a motion for summary judgment. *Id.*

**I.    A reasonable jury could conclude that Sgt. McKinnie failed to intervene and protect Mr. Currie during count in violation of the Eighth Amendment.**

**A. Eighth Amendment standard.**

To establish a claim under 42 U.S.C. § 1983, Mr. Currie must establish (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under color of state law. *Holmes v. Crosby*, 418 F. 3d 1256, 1258 (11th Cir. 2005).

The Eighth Amendment requires that prison officials " 'take reasonable measures to guarantee the safety of the inmates[.]" ' *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984); citations omitted). Prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer*, 511 U.S. at 833.

The Eighth Amendment is violated by "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate [.]" *Farmer*, at 828. This standard requires first that an alleged deprivation be, objectively, "sufficiently serious." *Id.* at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); citations omitted. The deprivation must be "the denial of 'the minimal civilized measure of life's necessities.' " *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). In the situation where an inmate complains about being attacked by another inmate, the inmate must establish that the conditions under which he was incarcerated presented "a substantial risk of serious harm." *Farmer*, 511 U.S. at 834  (citation omitted).

"Prison officials have an obligation to protect prisoners from violence inflicted upon them by other prisoners." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). "It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates, and a prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment [only] if the official is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (citations and quotations omitted).

18

This standard also requires that the prison official be deliberately indifferent to the substantial risk of serious harm to the inmate. *Farmer,* 511 U.S. at 836. Specifically, deliberate indifference requires

> that a prison official cannot be found liable under the Eighth Amendment for denying an innate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id*. This element of an Eighth Amendment violation is subjective. *Id*. at 838. It is not required that a prison official know " 'precisely who will attack whom,' *id.*, but only that the prison official had subjective knowledge of a generalized, substantial risk of serious harm from inmate violence. See *Id*." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1583 (11th Cir.1995)(quoting *Farmer*, 114 S.Ct. at 1982). The failure to provide advance notice of an attack is relevant, but not dispositive. *Id*. (citing *Farmer*, 114 S.Ct. at 1984).

Thus, when an inmate is confronted with a defendant's properly supported summary judgment motion, the inmate, in order "to survive summary judgment on his section 1983, Eighth Amendment claim, [is] required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Hale*, 50 F.3d at 1582 (quoting *Farmer*, 114 S.Ct. at 1974, and

*LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir.1993), cert. denied, 510 U.S. 1164, (1994)). Causation is "a causal connection between the defendants' conduct and the Eighth Amendment violation." *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015).

The test for "deliberate indifference" under the Eighth Amendment is "subjective recklessness" as used in the criminal law. *Farmer*, 511 U.S. at 839-40; *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024). "Deliberate indifference has two components: one subjective and one objective." *Mosley v. Zachery*, 966 F.3d 1265, 1270 (11th Cir. 2020) (quotation omitted). A prisoner must establish "'both that [1] the defendant actually (subjectively) knew that an inmate faced a substantial risk of serious harm and that [2] the defendant disregarded that known risk by failing to respond to it in an (objectively) reasonable manner.'" *Cox v. Nobles*, 15 F.4th 1350, 1358 (11th Cir. 2021) (quoting *Mosley*, 966 F.3d at 1270). "[O]fficials must possess enough details about a threat to enable them to conclude that it presents a strong likelihood of injury, not a mere possibility." *Marbury*, 936 F.3d at 1227 (quotation marks omitted).

Likewise, "[p]rison correctional officers may be held directly liable under § 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence. However, in order for liability to attach,

20

the officers must have been in a position to intervene." *Terry v. Bailey*, 376 F. App'x 894, 896 (11th Cir. 2010) (citations omitted).

The Supreme Court has held that a "prison official's 'deliberate indifference to the serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.'" *Farrow*, 320 F.3d at 1243 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976) (quotation marks and citations omitted). In other words, because an inmate "must rely on prison authorities to treat his medical needs," prison officials have an "obligation to provide medical care" for inmates, and failure to meet that obligation can constitute a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 103, 97 S. Ct. at 290; *see West v. Atkins*, 487 U.S. 42, 56, 108 S. Ct. 2250, 2259 (1988) (noting that a state has "an affirmative obligation to provide adequate medical care" to prisoners).

Defendant McKinnie was confronted by the Plaintiff with actively bleeding wounds inflicted only minutes earlier, asking for protection. He had no way to reach safety and needed care except through her.

Deliberate indifference to a prisoner's serious medical need violates the Eighth Amendment, but not every prisoner's claim of inadequate medical treatment rises to that level. *Rhiner v. Sec'y, Florida Dep't of Corr.*,

696 Fed. Appx. 930, 931 (11th Cir. 2017) (citing *Estelle v. Gamble*, 429 U.S. 97 (1976)). "Analyzing an inmate's deliberate indifference claim involves two components: whether the inmate had a serious medical need, and whether the defendant's response to that need was deliberately indifferent." *Id.*

### B. Crediting Mr. Currie, Sgt. McKinnie's failure to intervene was deliberately indifferent.

#### 1. Mr. Currie faced substantial risk of serious harm.

"Prisons and jails are inherently dangerous places." *Nelson v. Tompkins*, 89 F.4th 1289, 1306 (11th Cir. 2024), *cert. denied sub nom. Sellers v. Nelson*, No. 23-1374, 2024 WL 4426712 (U.S. Oct. 7, 2024) (citing *Farmer*, 511 U.S. 825 at 858, (Thomas, J., concurring in the judgment) ("Prisons are necessarily dangerous places ....")); *Kincaid v. Williams*, ––– U.S. –––, 143 S. Ct. 2414 (2023) (Alito, J., dissenting) (referring to "the uniquely dangerous context of prison"); *United States v. Prevo*, 435 F.3d 1343, 1346 (11th Cir. 2006) ("Because of the character of prisoners and the nature of imprisonment, corrections facilities are volatile places, brimming with peril, places where security is not just an operational nicety but a matter of life or death importance.")

Dorm P wing 2 was dangerous, given that many of its inmates had convictions for violent crimes, including murder. See, e.g., FDC online profiles for:

- Rascual M Rentas (aka "Pace"), 2nd degree murder (sentenced to life), ECF 78.20, Def. Ex. T;

- Luis M Rodriguez (aka "Peru"), 2nd degree murder, kidnapping, robbery with gun or deadly weapon (20-year sentence), ECF 78.21, Def. Ex. U;

- Wilson A Rodriquez (aka "YG"), robbery with gun or deadly weapon (35-year sentence), ECF 78.22, Def. Ex. V;

- Cody Parker, aggravated battery (more than 5-year sentence), ECF 78.24, Def. Ex. X;

- Chad Shaw, "violent career criminal in possession of gun (sentenced to life), aggravated assault with intent to commit a felony (5-year sentence), robbery with gun or deadly weapon (15-year sentence) [ECF No. 90-5];

- Michael Marceau, kidnapping and armed burglary (30-year sentence) [ECF No. 90-6].

P2 housed over 50 inmates. [*See* Def. Ex. D, Photo of dorm, ECF No. 78-4 (under seal)]. Presumably many of those not listed above were also convicted of violent crimes. Given (i) the number of violent criminals in the dorm, some with homicidal histories; (ii) the loud, repeated, aggressive verbal threats by the Latin Kings to Mr. Currie to "check in"—which were heard by McKinnie and Green [Currie Dep. at 37:15]—and (iii) the fact that during count the officers could see that Mr. Currie had already been

injured, Mr. Currie clearly faced a substantial risk of serious harm, as underscored by the subsequent attack in which he was chased by multiple Latin Kings with knives and nearly died as he was repeatedly, viciously stabbed to the point of unconsciousness, suffered a punctured lung, and required a five-day hospital stay. Nothing in the record indicates that Mr. Currie did not face a substantial risk of serious harm.

### 2. Sgt. McKinnie was deliberately indifferent to the risk of harm to Mr. Currie.

With respect to the bathroom attack, a reasonable jury could conclude that given the 8 to 10 minute length of the attack, McKinnie observed the fight, given (i) the visibility of the bathroom from the officer station, (ii) the noise that must have occurred during the fight, and (iii) the fact that officers in the booth are supposed to be paying attention to what's going on in the dorms at all times, [McK. Dep. at 82:9-14], and that an officer in the booth focusing on one wing must not ignore the other wing and cannot neglect one side. [*Id.* at 82:15-18, 22-24]. McKinnie was in the officer station during the fight, [Currie Dep. at 28:13-20], [Will. Dep. at 40:14-17, 66:21-67:9], but neither she nor Green did anything to stop it. A reasonable jury could conclude that she was deliberately indifferent to the risk to Mr. Currie during that initial fight.

With respect to the Master Roster Count, McKinnie admits that she was present during Master Roster Count and conducted count. [McK. Interrog. 15-A]; [McK. Dep. at 23:19-24][10]. During the second count (conducted by Sgt. McKinnie), Mr. Currie spoke with Sgt. McKinnie, saying that he had just been attacked and that the Latin Kings wanted him to check in. [Ch.-Sm. Dep. at 26:5-27:2]. Sgt. McKinnie had heard the Latin Kings yelling for Mr. Currie to check in. [Currie Dep. at 37:15, 21-25]. McKinnie spoke with Currie [Ch.-Sm. Dep. at 26:5-27:2], and was required to look at Mr. Currie and his photo to match him with the photo on her roster.[11] A reasonable jury could believe that she was close enough to see his wounds, the blood on his face, and his bloody and ripped shirt.

McKinnie admits that she can stop a count to move an injured inmate seeking to check in. [McK. Dep. at 93:24-94:10]. Here, she could have stopped the Master Roster Count to move Mr. Currie to a safe location

---

[10] Asked if she participated in the Master Roster Count in Dorm P, McKinnie slightly backtracked from her Interrogatory and testified, "I believe so, but I'm not sure. I don't know if I went there to help with the master roster or pick up count slip or what. But I know I did go in the dorm." [McK. Dep. at 24:20-24].

[11] Inmate Chad Shaw described Master Roster Count: The officer has a master roster sheet with every bunk number, with every inmate's name. When the officer comes to your bunk you have to show your ID and say your name and DC number. The officer then matches that with the master roster sheet. The officer goes from bunk to bunk doing this, from bed to bed, all the way around the whole dorm. [*See* Shaw Dep. at 102:17-103:3].

(e.g., protective confinement) and obtain medical treatment for him. Instead, she deliberately ignored the Latin Kings' shouted threats; deliberately ignored the fact that the Latin Kings were violating the rules and standing and yelling during the count (i.e. disrespecting the count) [*see* Currie Dep. at 33:15-25, 36:21-25, 37:1-6, 39:17-18]; and deliberately proceeded nonchalantly with the count, ignoring Mr. Currie's plea for help. [Ch.-Sm. Dep. at 27:13-16]. The subjective recklessness of McKinnie's deliberate indifference and her culpable state of mind are underscored by her subsequent, utterly callous statement referring to Mr. Currie: "Oh, he better fuck or fight. Ain't no checking in." [*Id.* at 27:13-24]. *See Brown v. Hughes*, 894 F.2d 1533, 1537-38 (11th Cir. 1990) (to state a claim of cruel and unusual punishment under § 1983 the courts have required that a prisoner must allege a conscious or callous indifference to his rights by prison officials). Sgt. Currie was reckless when she deliberately ignored Mr. Currie, leaving him with two prohibited, dangerous options (i.e., fighting and sexual assault).

Finished with her round, McKinnie went back to the booth. [Ch.-Sm. Dep. at 28:3-5]. She and Green then went to other side of dorm to count Wing 1. [*Id.* at 28:6-9, 24:12-19]. Nothing in the record shows McKinnie

ever attempted to help Mr. Currie leave for safety or obtain medical treatment for him.[12]

Sufficient evidence exists to show a jury that Sgt. McKinnie was deliberately indifferent to the risk of harm to Mr. Currie.

### 3. With respect to causation, Sgt. McKinnie's deliberate indifference directly resulted in Mr. Currie's life-threatening injuries.

"A causal connection may be established by proving that the official was personally involved in the acts that resulted in the constitutional deprivation." *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986). Personal participation is only one of several ways to establish the requisite causal connection. *Id.* Here. Sgt. McKinnie was personally involved in this incident.

Sgt. McKinnie was in a position to personally intervene and protect Mr. Currie. Sgt. McKinnie testified she had the power to the stop the count, call emergency traffic, and move an injured, bloody inmate asking to check in. [McK. Dep. at 70:16-21, 71:2-4, 93:24-94:10]. She testified that stopping count is "not going to be a big problem" because once the inmate is

---

[12] Later that night, after she returned to P dorm with the emergency response team, Sgt. McKinnie escorted one of the injured inmates to the hospital, but could not remember who. [McK. Dep. 43:8-10].

removed the officer can just go back and do their count again. [*Id.* at 71:16-20].

Moreover, Florida Department of Corrections ("FDC") regulations required Sgt. McKinnie to protect Mr. Currie. As per FDC's Rules of Conduct (F.A.C. 33-208.002, eff. 6.3.21), each FDC employee's conduct "shall at all times maintain proper security and welfare of […] inmates […]." § (3)(a). "No employee shall willfully or negligently treat an inmate in a cruel or inhuman manner […]." *Id.* at § (8). "Every employee has the responsibility to protect and safeguard […] the person and property of inmates […]." § 24.

Sgt. McKinnie's violation of FDC policies—her failure to protect and safeguard Mr. Currie—is evidence of her deliberate indifference. *See Stewart v. Johnson*, No. 5:18-CV-37, 2021 WL 3081882, at *3 (S.D. Ga. July 21, 2021) ("evidence of a policy violation may be evidence of deliberate indifference"); *Hope v. Pelzer*, 536 U.S. 730, 743-44 (2002) (holding that official's disregard of prison regulation "provides equally strong support for the conclusion that they were fully aware of the wrongful nature of their conduct.").

Had Sgt. McKinnie done what she was required to do—intervene, stop count, and help Mr. Currie check in to protective confinement—Mr.

28

Currie would have been away from Dorm P2—as both the Latin Kings and Mr. Currie wanted—and the Latin Kings would not then have attacked and stabbed Mr. Currie. But for Sgt. McKinnie's deliberate indifference, Mr. Currie would not have ended up in the hospital with life-threatening injuries.

### C. Defendant is not entitled to qualified immunity.

Defendant asserts that the allegations do not show any violations of clearly established law. She is wrong.

The Eleventh Circuit has stated that a plaintiff may establish that a right is clearly established if she shows: (1) "that a materially similar case has already been decided, giving notice to the police;" (2) "that a broader, clearly established principle should control the novel facts in this situation;" or (3) "this case fits within the exception of conduct which so obviously violates [the] constitution that prior case law is unnecessary." *Mercado v. City of Orlando*, 407 F. 3d 1152, 1159 (11th Cir. 2005). The "relevant facts are construed in the light most favorable to the non-movant—*i.e.*, the plaintiff—and the court should decide the issue based on those facts." *Simmons v. Bradshaw*, 879 F.3d 1157, 1163–64 (11th Cir. 2018).

The Supreme Court has stressed that the qualified-immunity cases "illustrate the importance of drawing inferences in favor of the nonmovant." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

Qualified immunity is the Defendant's initial burden. *Singleton v. Dep't of Corr.*, 277 F. App'x 921, 923 (11th Cir. 2008) ("the burden of establishing an affirmative defense lies on the defendant, not on the plaintiff").

Application of the doctrine of qualified immunity involves a two-part test. *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983). First, in order to show that his or her actions were within the scope of discretionary authority, the government official must demonstrate "objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988), citing *Barker v. Norman*, 651 F.2d 1107, 1121 (5th Cir. 1981); *Douthit v. Jones*, 619 F.2d 527 (5th Cir. 1980). Once the government official has satisfied his or her burden, the burden shifts to the plaintiff to show lack of good faith on the part of the government official by demonstrating that the official's actions clearly violated constitutional law. *Zeigler*, 716 F.2d at 849.

Because Defendant presents no argument to "demonstrate 'objective circumstances which would compel the conclusion that [her] actions were undertaken pursuant to the performance of [her] duties and within the scope of [her] authority,'" *Rich*, 841 F.2d at 1558, the Court should decline to consider Defendant's invocation of qualified immunity.

30

Even so, Defendant's efforts to hide behind qualified immunity should be rejected for two reasons. First, the law was clearly established at the time that her conduct violated the Eighth Amendment. And second, the statutory text of the 1871 Civil Rights Act expressly excludes common-law immunity.

It was clearly established at the time that if any officer actually knew about a condition that posed a substantial risk of harm, and failed to address it, they have violated the Constitution. *See Patel v. Lanier County Georgia*, 969 F.3d 1173, 1190 (11th Cir. 2020) (the "broad [deliberate indifference] principle[s] ha[ve] put all law-enforcement officials on notice that if they actually know about a condition that poses a substantial risk of serious harm and yet do nothing to address it, they violate the Constitution."); *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) ("[I]t is well settled that a prison inmate has a constitutional right to be protected ... from physical assault by other inmates."); *Cottone v. Jenne*, 326 F.3d, 1352 at 1358–60 (11th Cir. 2003); *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1584 (11th Cir.1995); *LaMarca v. Turner*, 995 F.2d 1526, 1536–38 (11th Cir.1993); *Farmer*, 511 U.S. at 832. Because the record shows that the Defendant knew of the serious risk and was deliberately indifferent

31

to it by failing to protect Plaintiff and by failing to intervene to remove him to protective confinement, the Defendant violated clearly established law.

Plaintiff need not find a factually identical case describing a corrections officer's failure to interrupt count to protect an injured, bloody inmate against loud, verbal threats by other inmates, and where the officer knows that the outcome is to "fuck or fight," and so forth, because "a broader, clearly established principle should control the novel facts," *Mercado*, 407 F. 3d at 1159, and the Eleventh Circuit and Supreme Court have held that the right is broadly clearly established when there are circumstances showing that nothing is done to address a serious risk of harm to which an officer is deliberately indifferent. *See*, *e.g.*, *De Veloz v. Miami-Dade Cnty.*, 756 Fed. Appx. 869, 880 (11th Cir. 2018) (every reasonable prison officer and medical personnel would have known that wrongfully misclassifying a biological female as a male inmate and placing that female in the male population of a detention facility was unlawful; "the unlawfulness of placing a female detainee within the male population was readily apparent to any prison officer or medical personnel").

Even without such clear guidance from the Eleventh Circuit, direct caselaw on point is unnecessary because it was obvious that McKinnie's conduct violated the constitution:

32

"[T]he Eighth Amendment imposes duties on prison officials to, inter alia, "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832.

Here, stopping count to protect an injured Mr. Currie facing threats would have been a reasonable measure, as McKinnie testified that stopping count to remove an inmate was not a big problem because once the inmate is removed the officer can just go back and do their count. [McK. Dep. at 71:16-20]. McKinnie agreed that if count is taking place and someone is injured, has blood on them and is asking to check in, the officer "probably should be calling emergency traffic" and getting people down there (to the dorm). [*Id.* at 70:16-21]. McKinnie knew that the reasonable action in Mr. Currie's case was to stop count and deal with his situation.

*Farmer* imposed a duty on Sgt. McKinnie to protect Mr. Currie from violence at the hands of other prisoners. 511 U.S. at 833. It is obvious that an officer should not ignore an injured inmate's pleas for protection when other inmates are yelling for that inmate to be removed, and leave the injured inmate with two bad choices: "fight" the other inmates or "fuck." McKinnie's comment—"Oh, he better fuck or fight. Ain't no checking in." [Ch.-Sm. Dep. at 27:13-24]—reveals that she knew that failing to stop count and remove Mr. Currie to protective confinement left Mr. Currie with

33

two possible outcomes: fighting or sex, both of which are prohibited conduct for inmates. *See* F.A.C. 33-601.314, Rules of Prohibited Conduct and Penalties for Infractions (eff. 1.18.21), § 1-18 (battery or attempted battery on an inmate); § 1-22 (assault or attempted assault on an inmate); § 1-5 (sexual battery or attempted sexual battery); § 9-7 (sex acts). McKinnie had a duty to know the rules regarding inmate battery (and sex). *See* F.A.C. 33-208.002 Rules of Conduct (eff. 6.3.21) (requiring all FDC employees "to familiarize themselves with all rules and regulations pertaining to their positions and duties […].") A reasonable person (i.e., officer) would know the rules and the duty to protect. The record shows that McKinnie knew that her refusal to protect Mr. Currie was unreasonable and obviously violated her constitutionally imposed duty.

To summarize, McKinnie's own statement "fuck or fight" shows that she knew her response—i.e., lack of response to Mr. Currie's plea to check in—was unreasonable.

There was an objective and subjective basis for the belief that Plaintiff was at a substantial risk of harm, as Mr. Currie was in a large dorm with homicidal and violent criminals, in a prison which is an inherently dangerous place. Inmates were shouting at Mr. Currie to leave, which Sgt. McKinnie could hear. Sgt. McKinnie had to go to Mr. Currie's bunk to check

his ID for count, and had to look at his face, on which she had to see his blood and busted lip. She was also close enough to see the blood on his ripped shirt. Moreover, he asked her to check in, so she knew he was seeking safety. She and Green then left the dorm to do count in the other P dorm wing, without taking any steps to protect Currie from inmates who had already attacked him and were threatening to continue the violence.

Sgt. McKinnie's own statement "fuck or fight" demonstrates that she knew not removing Mr. Currie from the dorm would lead to bad outcomes—fighting or sexual conduct—which were not only prohibited by FDC rules (i.e., F.A.C. regulations) but contrary to her duty to protect Mr. Currie against inmate-on-inmate violence as clearly established by *Farmer* and its progeny. *See*, *e.g.*, *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) ("[I]t is well settled that a prison inmate has a constitutional right to be protected ... from physical assault by other inmates.").

Also, given her duty to safeguard the welfare of inmates and the bloody, injured state Mr. Currie was in after being attacked in the bathroom, it was also obvious that she should have obtained medical treatment for him. But she never at any point took any initiative to get him such help.

McKinnie's conduct so obviously violated the constitution that prior case law is also unnecessary.

As a parting note, Plaintiff questions the availability of common-law immunity in this context. The plain text of the 1871 Civil Rights Act, which was codified into section 1983 (which is only prima facie evidence of the law), expressly precludes qualified immunity. *See Sosa v. Martin Cnty.*, Fla., 57 F.4th 1297, 1303 (11th Cir. 2023) (Jordan, J., concurring). *Rogers v. Jarrett*, 2023 WL 2706752, at *7 (5th Cir. Mar. 30, 2023) (Willett, J., concurring) ("All to say, the Supreme Court's original justification for qualified immunity—that Congress wouldn't have abrogated common-law immunities absent explicit language—is faulty because the 1871 Civil Rights Act *expressly included such language*.") (emphasis in original), cert. denied sub nom. *Rogers v. Jarrett*, 2023 WL 6378558 (U.S. Oct. 2, 2023). The Court should deny Defendant's invocation of immunity because it is contradicted by the statutory text of the 1871 Civil Rights Act.

### D. Defendant is not entitled to dismissal of Plaintiff's request for punitive damages.

Defendant relies on her previously filed Motion To Dismiss to quash Plaintiff's request for punitive damages. [ECF No. 58 at 12]. Plaintiff previously responded [ECF No. 64] and reiterates his arguments:

Defendant's argument that punitive damages as barred by 18 U.S.C. § 3626(a)(1)(A) lacks merit for reasons explained in many opinions. *See Smith v. Williams*, 3:23CV5661/TKW/ZCB, 2024 WL 4438320, at *5 (N.D.

36

Fla. Sept. 9, 2024), *report and recommendation adopted*, 3:23-CV-5661-

TKW/ZCB, 2024 WL 4434798 (N.D. Fla. Oct. 7, 2024) (citing *Blake v.*

*Ortega*, No. 3:23-cv-8553/LC/HTC, 2024 WL 2000107, at *4 (N.D. Fla. Mar.

18, 2024), *adopted by* 2024 WL 1996014 (May 6, 2024); *Santiago v.*

*Walden*, No. 3:23cv741/MMH/JBT, 2024 WL 2895319, at *9 (M.D. Fla.

June 10, 2024); *Walker v. Bailey*, No. 3:23-cv-511/MMH/MCR, 2024 WL

3520868, at *8 (M.D. Fla. July 24, 2024)).

As Judge Hope Thai Cannon reasoned in *Blake v. Ortega*, at *4,

Defendant's argument is that Plaintiff's request for punitive damages is

barred by section 3626 of the PLRA, which states as follows:

> Prospective relief in any civil action with respect to prison
> conditions shall extend no further than necessary to correct the
> violation of the Federal right of a particular plaintiff or plaintiffs.
> The court shall not grant or approve any prospective relief
> unless the court finds that such relief is narrowly drawn,
> extends no further than necessary to correct the violation of the
> Federal right, and is the least intrusive means necessary to
> correct the violation of the Federal right. The court shall give
> substantial weight to any adverse impact on public safety or the
> operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A). But, as Judge Cannon opined, "Punitive

damages are included within the definition of 'prospective relief' used in the

statute." *Blake* at*4 (citing *Johnson v. Breeden*, 280 F.3d 1308, 1325 (11th

Cir. 2002), *abrogated on other grounds by Kingsley v. Hendrickson*, 576

U.S. 389, 395 (2015)).

Here, as in *Blake* at *4, Defendant attempts to argue punitive damages categorically cannot satisfy the requirements of 18 U.S.C. § 3626(a)(1)(A) because: (1) " 'correction' of [a] violation [of a federal right] is accomplished through compensatory damages and punitive damages are, by their nature, never corrective" [ECF No. 58 at 13]; and (2) punitive damages cannot be "narrowly drawn," "extend no further than necessary," or be the "least intrusive means," to correct the violation of a federal right [*Id.* at 13]. However, as in *Blake*, Defendant cites "no binding precedent which holds that section 3626 prohibits the assessment of punitive damages in prison conditions cases." *Blake* at *4 (quoting J. Cannon). And the Eleventh Circuit case Defendant does cite, *Johnson*, indicates punitive damages are permitted in prison conditions cases. *See Blake* at *4 (citing 280 F.3d at 1325 (finding section 3626's "requirements mean that a punitive damages award must be no larger than reasonably necessary to deter the kind of violations of the federal right that occurred in the case" and "that such awards should be imposed against no more defendants than necessary to serve that deterrent function and that they are the least intrusive way of doing so")). As Judge Cannon concluded: "Thus, the current state of the law does not support the conclusion that section 3626 imposes a categorical prohibition on an award of punitive damages." *Blake*

at *4 (citing *Benton v. Rousseau*, 940 F. Supp. 2d 1370, 1379–80 (M.D.

Fla. 2013) (finding prisoner was entitled to $15,000 in punitive damages for

violations of his First and Fourteenth Amendment rights)).

Here, because the current state of the law does not support the

conclusion that section 3626 imposes a categorical prohibition on an award

of punitive damages, Defendant's motion to dismiss Plaintiff's request for

punitive damages must be denied.

## II.    Conclusion

Mr. Currie's claims must be resolved by a jury, and his request for

punitive damages must not be dismissed.

Respectfully submitted on January 17, 2025,

> */s/ James V. Cook*
> JAMES V. COOK, ESQ.
> Florida Bar Number 966843
> Law Office of James Cook
> 314 West Jefferson Street
> Tallahassee, FL 32301
> (850) 222-8080; 561-0836 fax
> cookjv@gmail.com
>
> */s/ Joshua Tarjan*
> Joshua Tarjan (FBN 107092)
> THE TARJAN LAW FIRM P.A.
> 12372 SW 82 Avenue
> Pinecrest, FL 33156
> (305) 423-8747
> (323) 243-3186 (cell)
> (786) 842-4430 (fax)
> josh@tarjanlawfirm.com

*Attorneys for Plaintiff*

**CERTIFICATION PURSUANT TO L.R. 7.1(F)**

Pursuant to Local Rule 7.1(F), I hereby certify that the foregoing

document contains 7,887 words, inclusive of headings, footnotes, and

quotations, but exclusive of the case style, signature block and certificates.

*/s/ Joshua Tarjan*