Exhibit A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

CASE NO.: 5:23-cv-183-TKW/MJF


DEVON CURRIE,

     Plaintiff,

vs.

MICHELLE MCKINNIE, et al.,

     Defendants.
_____/




DEPOSITION OF DELISIA GREEN
TAKEN ON BEHALF OF THE PLAINTIFF

MAY 13, 2025
10:02 A.M. TO 12:06 P.M.

ALL PARTIES APPEARED REMOTELY
PURSUANT TO
FLORIDA SUPREME COURT ORDER AOSC20-23




REPORTED BY:
KEVIN ARBOLEDA, CER, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

```
01                    APPEARANCES OF COUNSEL

02   ON BEHALF OF THE PLAINTIFF:

03        JAMES V. COOK, ESQUIRE
          LAW OFFICE OF JAMES COOK
04        314 WEST JEFFERSON STREET
          TALLAHASSEE, FLORIDA 32301
05        (850) 222-8080
          COOKJV@GMAIL.COM
06        (REMOTELY VIA ZOOM)

07   CO-COUNSEL ON BEHALF OF THE PLAINTIFF:

08        JOSHUA TARJAN, ESQUIRE
          THE TARJAN LAW FIRM P.A.
09        12372 SOUTHWEST 82 AVENUE
          PINECREST, FLORIDA 33156
10        (850) 222-8080
          JOSH@TARJANLAWFIRM.COM
11        (REMOTELY VIA ZOOM)

12   ON BEHALF OF THE DEFENDANT:

13        ERIK KVERNE, ESQUIRE
          FLORIDA OFFICE OF THE ATTORNEY GENERAL
14        PL-01 THE CAPITOL TALLAHASSEE
          FLORIDA 32399-4120
15        (850) 717-3300
          ERIK.KVERNE@MYFLORIDALEGAL.COM
16        (REMOTELY VIA ZOOM)

17

18

19

20

21

22

23

24

25
```



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

```
01                    INDEX OF EXAMINATION

02   WITNESS:  DELISIA GREEN
                                                 PAGE
03   DIRECT EXAMINATION
          BY JAMES V. COOK, ESQUIRE                6
04
     CROSS EXAMINATION
05        BY ERIK KVERNE, ESQUIRE                 66

06

07

08

09

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01                    INDEX OF EXHIBITS

02 EXHIBIT                DESCRIPTION                PAGE

03 (NO EXHIBTIS WERE MARKED)

04

05

06

07

08

09

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

```
01              DEPOSITION OF DELISIA GREEN

02                    MAY 13, 2025

03      Thereupon:

04                    DELISIA GREEN,

05      was called as a witness, and after having

06      been first duly  sworn, testified as follows:

07      THE COURT REPORTER:  The Court Reporter is

08      Kevin Arboleda with Universal Court Reporting.

09      I'm a nationally certified Court Reporter

10      through AAERT.  My CER Certification Number is

11      3260.

12      I can affirm that no AI is used in the

13      recording or reporting of this proceeding.

14      Would the Counsels please introduce themselves

15      for the record?

16      MR. COOK:  James Cook for the Plaintiff, I

17      attest -- appearing by Zoom from Tallahassee,

18      Florida.

19      MR. TARJAN:  Josh Tarjan on behalf of the

20      Plaintiff, appearing from Miami.

21      MR. KVERNE:  Erik Kverne on behalf of

22      Mrs. Green, appearing from Tallahassee.  And then,

23      I also have an intern with me, Gabriel Smith, who

24      is also here in Tallahassee.  He's appeared

25      separately on this, but he will not be asking any
```



UNIVERSAL Court Reporting

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

```
01        questions or anything.
02              MR. TARJAN:  No objection.
03              THE COURT REPORTER:  Thank you.  You may
04        proceed.
05                        DIRECT EXAMINATION
06    BY MR. COOK:
07        Q.   Ms. Green, can you give me your full name,
08    middle name as well?
09        A.   Delisia Redesia Green.
10        Q.   Okay.  Thank you.  And how are you employed
11    currently?
12        A.   I work with the Consolidated Dispatch Agency
13    in Tallahassee, Florida.
14        Q.   I'm sorry, what's the company?
15        A.   Consolidated Dispatch Agency in Tallahassee,
16    Florida.
17        Q.   What is that?
18        A.   It's a dispatching agency for 911, EMS and
19    fire department, fire department agency.
20        Q.   So -- all right.  Are you a dispatcher?
21        A.   Yes.
22        Q.   Okay.  And is that -- what county is that?
23        A.   Leon County.
24        Q.   Leon.  Okay.  All right.  Have you ever had
25    your deposition taken before?
```



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

```
01        A.    No, sir.
02        Q.    Okay.  Well, I don't anticipate this is going
03    to take a real long time.  I want you to be comfortable.
04    And so --
05        A.    Yes, sir.
06        Q.    -- if you need to take a break, as long as
07    there's not a question that I've asked that hasn't been
08    answered, then we can take a break.  And some of us may
09    need to get a drink of water or go to the bathroom or
10    something like that.
11              Anybody can ask for a break and we'll take it
12    and go back on the record and continue.  I want to give
13    you some kind of basic principles that we operate on.
14              First of all, it's important that when you
15    answer a question, that you answer with a word and not a
16    gesture or a sound like "uh-huh" or "uh-uh", but "yes"
17    or "no" or "I don't know" or "I don't remember" or, you
18    know, whatever the answer is, phrase it in in regular
19    words so that the Court Reporter doesn't have a real
20    hard time writing it up.
21              We need to be careful not to talk over each
22    other, which means that I have to wait until you finish
23    your answer before I ask the next question, and you
24    should wait until I've finished my question before you
25    start to answer it even though you may know what I'm
```



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01  about to ask.

02      If you -- if I ask you a question that you

03  find confusing, just ask me to clarify it and I will.  I

04  will give you an explanation of what I mean, and if you

05  don't tell me that you're still unclear, then, I'll

06  assume the answer is truthful and responsive.

07      Your Attorney may object from time to time,

08  and if he does so, it is just for purposes of the record

09  and it doesn't mean that you shouldn't answer the

10  question.

11      A.   Yeah.

12      Q.   If your Attorney instructs you not to answer,

13  that's an entirely different matter, but just making an

14  objection, you still answer the question as best you

15  can.

16      I'd like to start by asking you to give your

17  education history, starting with high school graduation

18  and, you know, specifying where and when it occurred.

19      A.   Yes, sir.  I graduated high school from

20  Florida State University schools here in Tallahassee,

21  Florida in 2018.  And then, I went to -- well, while

22  doing enroll, I'm sorry, it's a motion censored, like -

23  - I'm sorry, I have to stand up from time to time

24  because it's motion censored.

25      But I was doing enroll at Tallahassee



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01  Community College in Tallahassee while also in high

02  school, so I graduated from there in 2021.  Then, I went

03  on -- well, I graduated with my associates of arts, then

04  I went on to Full Sail University in Sep -- September --

05      **Q.   I'm sorry, what university, Florida State?**

06      A.   Full Sail University in Winter Park, Florida.

07      **Q.   Oh, okay.**

08      A.   In septem -- I want to say September 2021 that

09  I graduated with my associates of information technology

10  in October 2022.  Then, I went back to Full Sail

11  University in Winter Park, Florida from November 2022 to

12  July 2024, and I graduated with my bachelor's of science

13  in cyber security.

14      **Q.   Okay.  Could you spell the name of that**

15  **university?  I didn't quite get it, I think.**

16      A.   Full, F-U-L-L, then it's a space, then it's

17  Sail, S-A-I-L, and then university.

18      **Q.   Oh, okay.  Full Sail, like a sailboat with the**

19  **one the wind is blowing?**

20      A.   Yes, sir.

21      **Q.   Okay.  Got it.  All right.  So, now you have a**

22  **bachelor of science in cyber security.  Is that correct?**

23      A.   Yes, sir.

24      **Q.   Okay.  And other than your academy for**

25  **corrections certification, is that the extent of your**



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01  education?

02      A.    Yes, sir.  Besides basic academy, you're

03  talking about the basic academy with DOC, correct?

04      Q.    Correct.

05      A.    Yes, that's the only education outside of the

06  basic academy that I've attended to.

07      Q.    Okay.  Did -- it seems to me like I remember

08  that you had a connection with the U.S. Army Reserve.

09  Is that correct?

10      A.    Yes, I enlisted in February 2020 -- I

11  apologize, I enlisted in February 2018.  My contract

12  expires February 2026.

13      Q.    Okay.  Okay.  Now, if you would give me your

14  employment history, and again, just starting with your

15  graduation from high school.

16      A.    Okay.  I went to basic training with the

17  military, and when I -- two months after I graduated

18  from high school, I went to basic training.  I went AIT,

19  I think I arrived back in November 2018, and I started

20  working with DOC in August 2019.

21          I've been working with DOC for -- I was

22  working with DOC for five years.  I resigned in August

23  2024, so last year.  Now, and I started working with

24  Consolidated Dispatch in May 2025 -- I mean, sorry, my

25  apologies, in March 2025, and I'm currently still



**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01  working here.

02      Q.    Okay.  So, you started at -- with the

03  Department of Corrections before you actually had your

04  certification.  Is that correct?

05      A.    That's correct.

06      Q.    Okay.  And that's a trainee position?

07      A.    Correct.

08      Q.    Did the Department of Corrections sponsor your

09  certification training?

10      A.    Yes, sir.

11      Q.    Is that part of their recruitment program that

12  they offer to pay?

13      A.    Well, I was employed with the Department of

14  Corrections, so as part of being employed there, when

15  you go to -- when you first start working there, it's

16  like, I think they have like six months to send you to

17  training, so that's how they provide the training.

18      Q.    Okay.  Did you also get a signing bonus?

19      A.    Yes, sir.

20      Q.    How much was that?

21      A.    That was $1,000.

22      Q.    Okay.  The incident that we're here on, as I

23  understand it, and you can correct me at any time if I

24  make a mistake, was the third shift on Wednesday, July

25  20th, 2022, does that comport with your memory?



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01        A.    Yes, sir.

02        Q.    Okay.  And as we sit here today, do you have a

03    current memory of these events, or are you just relying

04    on reports of things you've read from that time?

05        A.    I have a certain amount of recollection from

06    that day, yes.

07        Q.    Okay.  If you would just let us know that this

08    is something that you have in your memory and not

09    something that you read or someone told you that will be

10    helpful, and I may ask you about that from time to time.

11        A.    Yes, sir.

12        Q.    Do you remember Captain Eric Heffner?

13        A.    Yes, sir.

14        Q.    Was he the OIC on that date?

15        A.    I do not recall the OIC that was on shift.

16        Q.    Okay.  And of course I'm talking about officer

17    in charge or people who aren't familiar with the

18    terminology.  But you're not sure whether he was on that

19    shift?

20        A.    I can't recall.

21        Q.    Okay.  Was Antoinette Patterson the dorm

22    sergeant for P-Dorm?

23        A.    Yes, sir.

24        Q.    Okay.  And you were assigned to P-Dorm as

25    corrections officer.  Is that correct?



UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

```
01        A.   Yes, sir.

02        Q.   Now, Sergeant Patterson was going to be

03   leaving in a couple of days.  Is that correct?

04        A.   I do not recall.

05        Q.   Okay.  Was she working her full shift?

06        A.   Yes.

07        Q.   Okay.  So, she was actually physically present

08   from the beginning to the end of her shift?

09        A.   Yes.

10        Q.   Well, what was -- at that time there were

11   three shifts, weren't there?

12        A.   First and second -- yes.

13        Q.   Okay.  And let's see, that was third shift

14   starts at 04:00 P.M. and goes to 12:30 A.M.  Is that

15   correct?

16        A.   That's correct.

17        Q.   Okay.  And so, she is the dorm sergeant on

18   that date.  Is that right?

19        A.   Correct.

20        Q.   And you are the dorm corrections officer,

21   right?

22        A.   Yes, sir.

23        Q.   Was there anybody else that was working in

24   Dorm P at that time?

25        A.   Not as far as I recall.
```



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01     Q.   Okay.  Did sometimes people come from other

02   dorms to help out if you needed help?

03     A.   Yes, when staff shortages on the compound or

04   in case of a security breach or emergency.

05     Q.   Okay.  Were you usually working in Dorm P at

06   that time?

07     A.   I do not recall.  I worked everywhere from my

08   knowledge.

09     Q.   Okay.  So, you might work in different dorms

10   every time you come in every shift?

11     A.   Yes, sir.

12     Q.   How about Sergeant Patterson, was she

13   typically working in Dorm P, if you know?

14     A.   I do not recall what she was working at.

15     Q.   Would you frequently work with Sergeant

16   Patterson?

17     A.   Yes, sir.

18     Q.   In different dorms?

19     A.   Yes, sir.

20     Q.   Did they move her around like they did you?

21     A.   I do not recall.

22     Q.   What time is lights out at that time in Dorm

23   P?

24     A.   We're talking about weekday, correct?

25     Q.   Let's see.  This is July 20th.  Let me see if



**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01  I can answer that question.  We might have to come back

02  to that.  I don't have a calendar here for that

03  timeframe.  But say it is a weekday, what time is lights

04  out on weekday?

05      A.   So, it usually would be at the master roster

06  count, which is 11:00  P.M.

07      Q.   The lights out is 11:00  P.M.?

08      A.   Yes.

09      Q.   When does master roster count start?

10      A.   10:00  P.M.

11          MR. KVERNE:  Just to interject, July 20th was

12      a Monday.

13          MR. COOK:  It was a Monday?  Thank you.

14          MR. KVERNE:  Yes, Monday.

15  BY MR. COOK:

16      Q.   Okay.  So, this would have been a weekday, and

17  master roster count is at 10:00 and lights out is going

18  to be at 11:00, right?

19      A.   Yes, sir.  It just depends on when master

20  roster count clears, because we can't really cut out the

21  lights unless the count is clear, so --

22      Q.   Now, is master roster count the most important

23  count of the day?

24      A.   Yes, sir.

25      Q.   Is there just one master roster count in a



**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01  day?

02      A.   Yes, sir.

03      Q.   **Or is there one on every shift?**

04      A.   No, it's only one master roster count a day.

05      Q.   **Okay.  And that would happen at that time on**

06  **the third shift?**

07      A.   Yes, sir.

08      Q.   **Okay.  So, as I understand it, does count**

09  **clearing mean that, you know, the two people who are**

10  **doing the master roster count, both end up with the same**

11  **number?**

12      A.   Yes and no, because it doesn't really base off

13  if we get the same numbers based off the institutional

14  count.  So, if the institutional count is not correct,

15  the count is not clear.

16      Q.   **Okay.  So, if Dorm P, you know, everything**

17  **checks out, but some other dorm doesn't, did -- does**

18  **that mean you have to do it over again or you just have**

19  **to wait until the dorm that somebody made a mistake**

20  **resolves that mistake?  Is that what happens?**

21      A.   Within, like a certain period, we have to do

22  it all over again, but it's not like -- it's just a

23  check the count, so we have different people going to

24  different dorms checking the count and making sure the

25  count is correct.


**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01    Q.    Okay.  So, people will go from dorm to dorm

02   and they'll get the numbers and see if they -- see if

03   they total the proper population?

04    A.    Correct.

05    Q.    Everybody is accounted for, right?

06    A.    Correct.

07    Q.    Okay.  Now, I'm going to skip ahead and talk

08   about what happened after the incident, and I understand

09   that an emergency response team had to come to Dorm P.

10   Is that your understanding?

11    A.    Yes, sir.

12    Q.    Were you there at that time when they came?

13    A.    Yes, sir.

14    Q.    Do you happen to know if that was what they

15   called a DART team?

16    A.    I do not recall the exact response, but I know

17   it was -- they did.  Some personnel did respond to the

18   incident.

19    Q.    Okay.  I saw that there is a DART team that

20   included Captain Heff -- this is on the security roster,

21   Captain Heffner, Sergeant Hatcher, Sergeant Valter,

22   Sergeant Jackson and Officer Ammons.  Do you recall

23   whether any of those persons responded to Dorm P after

24   the incident?

25    A.    I don't know -- I don't know who responded,



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01  but I know personnel responded.  I don't know if they

02  responded -- I don't think it was a DART, but I cannot

03  give you something that I don't know.

04       **Q.   Do you know how many officers responded?**

05       A.   No, sir.  I do not recall the exact count of

06  how many people responded.

07       **Q.   Could it have been four or five?**

08       A.   It probably could have been more than that

09  because you got a west unit attached, you have different

10  staff personnel.  If -- within this situation, it was

11  big, so as many personnel as we can possibly get, all

12  hands on deck, we're responding to this incident.

13       **Q.   Okay.  Is there something that they say over**

14  **the radio that people know that anybody who can come**

15  **should come?**

16       A.   No, you just provide details of the incident,

17  and I guess based off the information provided from the

18  dorm, then that's -- that gives you a response.  I guess

19  I'm trying to see how to put it.

20            It gives you idea of how many personnel should

21  respond, but in most cases everybody that's able to

22  respond will respond.

23       **Q.   Okay.  And are these officers or are any of**

24  **the officers that respond dressed out in the kind of**

25  **padded clothing and helmets and gloves and that sort of**



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01    thing that you see with the cell extraction teams?

02        A.    I do not recall what they were wearing.

03        Q.    Okay.  Do you remember if the inspector --

04    Inspector Winterburn came with that group?

05        A.    I do not recall if he came.

06        Q.    Now, looking at that -- at the log, the

07    roster, the security roster, it looks like Michelle

08    McKinnie was on the emergency response team too.  Do you

09    happen to know whether that's true or not?

10        A.    Yes, she was on the air response team that she

11    responded to the incident.

12        Q.    Okay.  Now, she was the sergeant for Dorm M,

13    wasn't she?

14        A.    I don't know what dorm she was a sergeant of,

15    but I know she wasn't the dorm sergeant of P-Dorm.

16        Q.    Right.  Do you know that she was a sergeant?

17        A.    Yes, I know she was a sergeant.

18        Q.    Okay.  And what do you recall about when she

19    showed up?  Did she -- was she part of the master roster

20    count?

21        A.    Yes, she -- after everything took place, we

22    got scene safety, Ms. McKinnie stayed back, and assist

23    me with count.

24        Q.    Okay.  So, after the whole thing was over,

25    then the count was completed?



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01      A.   Yes.

02      Q.   And so, that would have been after the

03 response team came, right?

04      A.   Correct.

05      Q.   In your experience, let's see, you -- when did

06 you leave Appalachee CI?

07      A.   I left Appalachee CI in May of 2024.

08      Q.   And where do you go from there?

09      A.   Jackson Correctional Institution.  I promoted

10 to Lieutenant.

11      Q.   Okay.  Was your movement at the same time as

12 your promotion?

13      A.   Yes, I promoted to Jackson CI as a Lieutenant.

14      Q.   Okay.  So, they needed a Lieutenant, and you

15 transferred as a Lieutenant.  Is that correct?

16      A.   Can you say the question again?

17      Q.   Sure.  I'm trying to understand how things

18 work, but as I understand it if somebody has a position

19 that they need filled, and they need a certain, you

20 know, level of a certain rank and there is someone who

21 is approved for promotion to that rank, then they might

22 leave one place as a sergeant and go to the next place

23 as a Lieutenant.  Is that a correct assumption?

24      A.   Yes, sir, that's correct.

25      Q.   Okay.  And what was your job assignment as a



**UNIVERSAL COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01  Lieutenant at Jackson?

02      A.    I was a supervisor over a dormitory we had.

03          So, we had setup as a Lieutenant, Sergeant and

04  a couple of officers.  I can't really think of the right

05  terminology of what the dorm is called, but it was a

06  dorm with doors.  They had to roll them.  It was like a

07  controlled movement.

08      **Q.    Was that a dorm where they just rolled the**

09  **doors at -- at nighttime?**

10      A.    It's kind of -- it's more of a secure

11  structure than ACI.  Like, they have, like, rolling

12  doors.  I can't think of the terminology that's used.

13  It's not coming to mind.

14      **Q.    I've seen something called secure cell, where**

15  **they -- people can move around during the day.  They can**

16  **be in the common area and other places.  But at 10**

17  **o'clock or thereabouts, they go in the cell and the cell**

18  **doors are locked for the overnight.  Is that what this**

19  **was?**

20      A.    Yes, sir, secure housing.

21      **Q.    Okay.  And you were a Shift Supervisor?**

22      A.    Well, they had -- they have captains as shift

23  supervisors, so I wasn't a Shift Supervisor.  I was just

24  a Lieutenant over the dormitory.

25      **Q.    Okay.  Okay.  Well, you -- did you have more**



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01    than one dormitory that you were in charge of?

02        A.    Yes, I had -- it depends on what day, really,

03    but I had Golf and Foxtrot.

04        Q.    Okay.  G and F?

05        A.    Correct.

06        Q.    Okay.  Now, was there any reason that you

07    wanted to leave Appalachee?

08        A.    I didn't have a reason.  I just saw the

09    promotion and wanted to expand my career.  That's it.

10        Q.    Okay.  I'm going to ask you some questions

11    about the work conditions, where you worked in the

12    Department of Corrections.  And the first thing I want

13    to ask you about is prejudice, racial prejudice, gender

14    identity prejudice, those kinds of things.  Did you see

15    that as a problem?

16        A.    No, I didn't have that problem.

17        Q.    No, I didn't mean that you do.

18        A.    Oh, you're just saying in general?

19        Q.    Did -- did you observe it?  For instance, did

20    you ever see -- did you ever hear officers use the N

21    word?

22        A.    No, sir.

23        Q.    Never?

24        A.    No, sir, I never heard it.

25        Q.    How about attitude toward gay inmates?  Did



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01  you see any kind of prejudice in that attitude?

02      A.    Not me personally, I haven't seen it.

03      Q.    Okay.  Now, I'm not -- again, I'm not talking

04  about anything that is -- that occurred to you or even

05  in your presence.  I mean to say, did you hear people

06  talking like that in a prejudiced way?

07      A.    Yes, sir, I get what you're -- I get what

08  you're saying.  I just haven't witnessed it or heard it

09  or seen it.

10      Q.    Okay.  People would use that kind of language?

11      A.    It's possible.

12      Q.    Okay.

13      A.    But I just may not have been in the room or

14  something of that nature.

15      Q.    Okay.  Did you do any social media or post on

16  anybody else's social media about what was happening at

17  the Department of Corrections facility where you worked?

18      A.    I don't think I made a post about Apalachee.

19      Q.    How about the profession of corrections?

20      A.    It might be possible.  I can't really recall,

21  but maybe.

22      Q.    Okay.  Were any, like chat rooms or anything

23  like that where Florida Corrections Officers discussed

24  what was happening?  Did you engage in -- were you

25  involved in any of those?



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

```
01        A.   Not as far as I can recall.
02        Q.   Okay.  While you were at the Department of
03   Corrections, do you recall seeing any behavior that you
04   considered unprofessional?
05        A.   Yes.
06        Q.   Okay.  And what was that?
07        A.   Can you say it again?  You said what was it?
08        Q.   Yeah.  What was the unprofessional behavior?
09        A.   I mean, we had a problem with -- there was
10   staff members bringing in contraband, sliced up of that
11   nature.
12        Q.   Okay.  Were you aware of anybody being fired
13   for bringing in contraband or even prosecuted?
14        A.   You said what -- you said, was I aware of
15   anybody?
16        Q.   Aware of any incidents of that while you were
17   there.
18        A.   Yes, sir.
19        Q.   Do you remember who that was?
20        A.   I don't remember who, but I know it has been
21   done while I was there.
22        Q.   Okay.  Does that just talk among the officers?
23        A.   That's as far as like the Sheriff's
24   Department, somebody coming to pick them up from the
25   institution and escorting them off the premises.
```


UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01      Q.   I see.  Okay.  How about excessive force?

02           Did you see any force that you considered

03 excessive, any force on inmates?

04      A.   No, sir.  Not from what I can recall.

05      Q.   Was there any unprofessional or abusive

06 behavior where you felt that you had to intervene and

07 that you said something?

08      A.   No, sir, not from my experience.

09      Q.   Did you ever report any unprofessional or

10 abusive behavior?

11      A.   No, sir.

12      Q.   Okay.  Are you familiar with any kind of

13 prejudice by officers against inmates who frequently

14 wrote grievances or filed lawsuits?

15      A.   No, sir.

16      Q.   Do you know what the term writ writer means?

17      A.   I don't have like a clear definition, but it's

18 like something I've heard before.

19      Q.   Okay.  So, you've heard people use the term

20 writ writer?

21      A.   Not often, but I just heard that.  I don't

22 know who used it.  I just heard it, like --

23      Q.   Okay.

24      A.   -- in general.

25      Q.   Have you ever heard of an officer call an



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01  inmate a snitch?

02      A.   No, sir.  I haven't heard anybody call anybody

03  a snitch.

04      Q.   How about among inmates between the gangs?

05           Do you know what the outcast gang is,

06  Sometimes called OK, I think.

07      A.   Yeah, I know the OKs.

08      Q.   Okay.  And what are the OKs?

09      A.   From my understanding?

10      Q.   Yes.

11      A.   It's just a group of inmates that classifies

12  themselves as gays from my understanding of the term.

13      Q.   Is it considered a gang?

14      A.   Yes.

15      Q.   Okay.

16      A.   It's STG.

17      Q.   STG, does that stand for Strategic Threat

18  Group?

19      A.   Correct.

20      Q.   And as for other gangs like the Bloods or the

21  Latin Kings, did they have a prejudice against gay

22  inmates?

23      A.   Are you talking about as far as like inmates,

24  the other inmates, that group of inmates?  It's

25  possible.  All the -- as far as I know, all the STG


UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01    gangs have a problem with each other, so that's why it's
02    important to, you know, practice safety.
03        Q.    Okay.  Now, I have sometimes heard that if you
04    try to put a gay inmate in a cell with a gang member
05    like the Latin Kings that they would not -- that they
06    would try to get rid of that inmate, get that inmate out
07    of there.  Have you ever heard that?
08        A.    Yes.
09        Q.    Have you ever heard that one of the issues
10    that you have to look at when you put two inmates
11    together is whether one of them is a gang member and
12    whether one of them is gay?
13        A.    No.
14        Q.    Would there be any kind of rule or, you know,
15    kind of general principle among the officers that you
16    don't put gay inmates in the cell with anti-gay gang
17    members?
18        A.    Well, I guess that it comes with personal
19    preference because we don't really place inmates based
20    off their sexuality, so --
21        Q.    You don't have compatibility standards that
22    indicate all those kinds of issues?
23        A.    As far as, like, sexuality and stuff like
24    that?
25        Q.    Yeah, when they made -- decide where -- when


UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01  they're putting two inmates together, their relative

02  weight, their relative criminal background, their level

03  of violence, things like that.

04      A.   Yes, sir, we have things like that, but

05  sexuality is not one of the criterias on the actual, you

06  know, compatibility form.

07      Q.   Okay.  So, as far as you know, that's not an

08  issue?

09      A.   I would say that an inmate that's perceived as

10  gay will not have an issue with an inmate, but what I'm

11  saying is we don't base our compatibility off an inmate

12  being gay because sexuality is not in the compatibility

13  standards.

14          It's based off height, weight, how much time

15  they're serving, do they have any -- it's security

16  features.  It doesn't base off sexuality.

17      Q.   Are there codes for probable predators and

18  probable victims?

19      A.   Yes, I think they have -- it's called the --

20  something about a death in prison or something like

21  that, that's form is on there.  Like, if they have been

22  involved with an inmate, inmate death in prison,

23  something like that.

24      Q.   Okay.  Do you have any idea what the attitude

25  of the Latin Kings is toward gay inmates?



**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01      A.   No, sir.

02      **Q.   You've never heard or seen anything that helps**

03 **you to understand what their attitude is?**

04      A.   No, sir, because the gang is going against

05 each other, so it's no real difference between who like

06 who and who don't like who.  Everybody just seems like

07 they don't like everybody because that's the part of

08 their gang initiation, I guess.  I don't know.

09      **Q.   Do you know what it means to check in?**

10      A.   Yes, when an inmate asks for a protective

11 custody.

12      **Q.   Right.  Do you know what it means when inmates**

13 **tell another inmate to get on the door?**

14      A.   That's -- yes.

15      **Q.   What does that mean?**

16      A.   Kind of like, I guess they kick them out the

17 dorm.  That's where I get from it.

18      **Q.   Okay.  Get out of the dorm?**

19      A.   Yes.

20      **Q.   Okay.  And checking in would be one way to get**

21 **out of the dorm?**

22      A.   Yes.

23      **Q.   Okay.  Checking in involves some paperwork,**

24 **doesn't it?**

25      A.   Correct.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01      Q.   I'm going to ask you some questions about

02  master roster count procedure.  Could you describe what

03  the -- when they talk about the master roster, what does

04  the master roster look like?

05      A.   The master roster has pictures on the side

06  used for -- it has pictures on the side used for like

07  inmate identification, so that probably shows their

08  state ID picture on the paper.

09      Q.   Okay.

10      A.   Has a full roster, got DC number, race and

11  stuff like that to verify.  So, what we do is, we have

12  them take out their inmate identification card.  Which

13  should be on them at -- that's the kind of master roster

14  procedure, so they should have it.

15           And then, we verify their -- that it's them

16  with their physical person, their identification card

17  and the master roster sheet.

18      Q.   So, you have a photograph and a name and I

19  guess a DC number for each inmate on this paper?

20      A.   Correct.

21      Q.   And you go, what, from bunk to bunk and check

22  the inmate against the picture and the picture -- the

23  name of the inmate against the roster --

24      A.   Correct.

25      Q.   -- who's supposed to be in the bunk?



UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

```
01        A.    Correct.
02        Q.    Okay.  How many officers does it take to do a
03   master roster count?
04        A.    Two.
05        Q.    Okay.  What are the roles of the two officers?
06        A.    One person does the actual master roster
07   sheet.  I'm sorry, my -- okay.  One person do the actual
08   master roster sheet, and then the other one verifies the
09   count.
10              Okay.  Let me take a step back.  One person
11   does the master roster sheet, and they also do a
12   physical count of the dorm without the master roster
13   sheet.
14              Then, a second person comes in, and they just
15   do a physical count of all the inmates in the dormitory.
16   They don't have to use the master roster sheet.
17        Q.    Okay.  So, does the officer who does -- who
18   has the master roster sheet go from inmate to inmate?
19        A.    Correct.
20        Q.    What are the inmates supposed to be doing
21   around that time?
22        A.    Nothing.  Sitting up on their bunk.
23        Q.    Okay.  They're supposed to be sitting on their
24   bunk?
25        A.    Yes.
```



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01       Q.   Okay.  Not moving around?

02       A.   Correct.

03       Q.   Okay.  Of the two prison staff members that do

04   the master roster count, is one of the staff supposed to

05   be a sergeant?

06       A.   From my understanding, it doesn't have to be a

07   sergeant as long as you are a certified correctional

08   officer.

09       Q.   Okay.  But do the rules or the procedures

10   state a preference that one of them be a sergeant

11   without being a necessity?

12       A.   Yes.

13       Q.   Okay.  What kind of paperwork is involved in

14   somebody checking in?

15       A.   Do an incident report, and bunk assignment,

16   property sheet, I think that's it.  Witness statement,

17   you have to give them a witness statement so that you

18   can get information about why they're checking in, but

19   as far as I know.

20       Q.   Okay.  So, you give them a witness statement

21   and they're supposed to write the reason for their

22   wanting to check in?

23       A.   Correct.

24       Q.   Okay.  So, you've got a property sheet.

25   Where do you get the property sheet?


**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01          A.    They use it in the dormitory.

02          Q.    Okay.  So, is that in the inmate's possession

03    or in the dormitory possession?

04          A.    It's in the officer station.

05          Q.    Okay.  So, you get a property sheet, get a

06    witness statement, the inmate fills it out.  Anything

07    else?

08          A.    And you got an incident report.

09          Q.    Okay.  You have to do an incident report?

10          A.    Yes.

11          Q.    Is that -- that's something you type up or is

12    it handwritten?

13          A.    They prefer -- I think, they prefer it typed

14    up because it's official documentation.

15          Q.    Okay.  So, property sheet, witness statement,

16    incident report, anything else?

17          A.    Not that I can recall.

18          Q.    Okay.  And is the inmate moved to a holding

19    cell in a different area?

20          A.    Yes.

21          Q.    Okay.  And then, does the same person who

22    takes the original statement have to do the follow up?

23          A.    I don't know.

24          Q.    And you've never had to do that?

25          A.    No, sir.



**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01      Q.   So, the other person who was involved in the
02  master roster count on the night of July 20th, 2022 was
03  Sergeant Michelle McKinnie?
04      A.   Correct.  She assisted me with count.
05      Q.   Okay.  And that was after the backup team, the
06  response team came to the dorm and the victims who were
07  stabbed were moved to medical?
08      A.   Correct.
09      Q.   Okay.  Now, after the roster count, the master
10  roster count is done, is a copy of the roster kept?
11      A.   You're talking about inside of the dormitory?
12      Q.   Well, anywhere.  Is it preserved?  Is it
13  thrown away?  Is it shredded?  Is it put on file so that
14  you can go back and look?
15      A.   Yeah, it used to be in the dormitories.
16      Q.   Okay.  Now, I think in your Request for
17  Admissions, you said that you didn't -- that the
18  Plaintiff in this case, Devon Currie did not receive
19  life threatening injuries.  Is that correct?
20      A.   I don't recall saying that.
21      Q.   Okay.  Before we finish, I'll put some
22  exhibits up, and I think I've got that.  I think that's
23  what it shows, but we'll take a look.  Now, during the
24  master roster count, one person, I think you said, moves
25  from inmate to inmate, checking IDs, and the inmate are



**UNIVERSAL COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01    supposed to be on their bunk.  Is that correct?

02         A.   Correct.

03         Q.   And what does the second person do while the

04    first person is going from inmate to inmate?

05         A.   They're actually watching the officer that's

06    on the floor.

07         Q.   Okay.  Are they supposed to be in an area

08    where they can see everybody?

09         A.   Yes.

10         Q.   And at all times, one prison staff person has

11    to be in the officer's station.  Is that correct?

12         A.   Correct.

13         Q.   Who was in the officer's station while you and

14    Ms. McKinnie were doing the count?

15         A.   I do not recall who was in the officer's

16    station.

17         Q.   Were you in the officer's station at any time

18    that night?

19         A.   Yes, I was the officer that was assigned the

20    officer's station.

21         Q.   Oh, okay.  And when you left the officer's

22    station, you don't know who took your place?

23         A.   Yes, I do not recall.

24         Q.   Okay.  Are the inmates required to say

25    anything as you go from one to the next?



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01         A.    They state their name, DC number.

02         Q.    Okay.  So, are there two phases to the master

03    roster count where different people play different

04    roles?

05         A.    I don't think I understand what you're saying.

06         Q.    Okay.  Let me see if I can describe it better.

07    Is there a procedure where after one person goes through

08    from person to person and does a count that way and the

09    other person does a count from, you know, wherever

10    they're standing, do they switch places and each --

11    well, each person makes a count independently.  Is that

12    correct?

13         A.    Correct.

14         Q.    And then, the numbers are compared?

15         A.    Correct.

16         Q.    And if the numbers are the same, then you've

17    cleared count for your dorm, right?

18         A.    Correct.  Just for the dormitory.

19         Q.    Okay.  And you have two wings, so you would

20    have to go and do that with the other wing as well,

21    right?

22         A.    Correct.

23         Q.    Do you know if you started with Dorm 2 that

24    night?

25         A.    I don't really recall which side, but I


**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01  believe I started with side two.

02      Q.   Okay.  And if you started with side two, then

03  after master roster count was completed for side two,

04  then you would have moved to side one?

05      A.   Correct.

06      Q.   And would Sergeant McKinnie have moved with

07  you?

08      A.   Well, Sergeant McKinnie was -- Sergeant

09  McKinnie came after the incident.  We was already

10  counting when the incident occurred, so you have to go

11  back and do the process again because, like after the

12  incident, we had inmates moving everywhere.

13  So, we cannot go out the last count that we had.

14          We have to count again to make sure the counts

15  add up again.

16      Q.   Okay.  So, you had already started count

17  before McKinnie came?

18      A.   Correct.  We was in the middle of count.

19      Q.   Who was the second officer before McKinnie

20  came?

21      A.   It was my sergeant in the dorm, Sergeant

22  Patterson.

23      Q.   Okay.  So, Sergeant Patterson and you were

24  doing count.  Had you completed count at that point?

25      A.   Are you asking within the incident or like



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01  well before the incident or like --

02      Q.   Yeah.

03      A.   No, we had -- we wasn't able to complete the

04  count.  We were in the middle of counting because of the

05  incident.

06      Q.   Because of the incident.  Okay.  But you had

07  already started going from inmate to inmate and checking

08  their ID and so forth?

09      A.   Correct.  We started with P2 side.

10      Q.   Okay.  And I think in your response to Request

11  for Admissions, you said that you did count Mr. Currie.

12  Is that your recollection?

13      A.   All inmates was counted for.

14      Q.   Okay.  But you said you did count him?

15      A.   Yes, he was in the dormitory.

16      Q.   Okay.  When you counted him, do you remember

17  what he looked like in terms of his clothing or any

18  injuries that he showed?

19      A.   No, sir.

20      Q.   While you were counting, you say that the

21  count was interrupted by the incident?

22      A.   I believe we made it through P2 side already.

23           So, P2 side wasn't interrupted.  We got a full

24  count on P2 side, but we had moved to P1 side because

25  like you stated, we had to do both sides.



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01          So, I think in the middle of P1 side, that's

02    when it got interrupted and then, that's when the

03    situation happened.  We were on the other side of the

04    dormitory.

05          Q.    I see.  So, you had already completed P2 side

06    and you were in the process of doing P1 side with

07    McKinnie, right?

08          A.    With Sergeant Patterson because that was the

09    first time we were conducting the count.

10          Q.    Okay.  What count did Michelle McKinnie,

11    Sergeant McKinnie take part in?

12          A.    After the incident occurred, she assisted me

13    with count.

14          Q.    In which dorm -- in which wing?

15          A.    We had to do both sides because, again, if

16    emergency traffic happens, you have to get

17    accountability of all inmates, whether they're removed

18    or not.  The dormitory count changed, so you have to do

19    it all over again.

20          Q.    Okay.  So, you had already counted P2, Dorm P

21    Wing 2, but you had to do it again after the incident.

22    Is that --

23          A.    Correct.

24          Q.    And when you did it again with -- after the

25    incident, it was with Sergeant McKinnie?



UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01     A.   Correct.

02     Q.   So, you'd actually done master roster count

03 twice, first with Sergeant Patterson and second with

04 Sergeant McKinnie?

05     A.   Correct.

06     Q.   Okay.  And it was on the first pass, or was it

07 on the first pass that you counted Mr. Currie?

08     A.   That would have been on the first pass because

09 the incident had not occurred yet.

10     Q.   Okay.  And you didn't remember him having

11 bloody gashes on his face or torn clothing?

12     A.   No, sir, I do not recall.

13     Q.   You don't recall?

14     A.   No, sir, I do not recall --

15     Q.   Okay.

16     A.   -- that he had injuries.

17     Q.   And do you recall him saying that he wanted to

18 check in?

19     A.   I do not recall talking to this inmate at all.

20     Q.   You don't recall Mr. Currie?

21     A.   Correct.

22     Q.   Okay.  Do you think that you recalled him at

23 the point that you did your responses to Request for

24 Admissions?

25     A.   Can you say that again?



UNIVERSAL COURT REPORTING

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01      Q.   I say, although you don't -- although you

02  don't recall -- although you don't recall Mr. Currie at

03  this moment, did you recall him when you did -- when you

04  answered the Request for Admissions?

05      A.   Not from my knowledge because I don't recall

06  any injuries.

07      Q.   Okay.  Later when we do some -- look at some

08  exhibits, I will show you Mr. Currie and ask you again

09  if you remember -- remember him.  So, why was it that

10  Sergeant Patterson didn't do the recount with you since

11  she had done the original count?

12      A.   Because we had emergency tracking.  So, if she

13  wasn't in the dormitory that means that she was taking

14  off inmates and escorting them, or she just wasn't in

15  the dormitory.

16      Q.   Okay.  Now, were you aware that it was

17  actually Michelle McKinnie who went with Mr. Currie to

18  the emergency room?

19      A.   I don't know who went.

20      Q.   Okay.  Now, would it be correct to say that

21  any irregularities with the inmates during count would

22  be reported to the shift supervisor immediately?

23      A.   Can you provide an example of what you're

24  talking about?

25      Q.   Well, I just know that statement.  I don't



**UNIVERSAL COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01    know if I could give you an example from real life, but

02    is it part of the procedure to your understanding is if

03    you're doing -- if you're doing master roster count, and

04    there is some irregularity, which I would assume means

05    something that happened that wasn't supposed to happen,

06    that you would call the shift supervisor?

07        A.   I would more than likely consult with my

08    sergeant first because I wouldn't skip over my chain of

09    command.

10        Q.   Okay.  But is it your understanding that

11    somebody has to call the shift supervisor?

12        A.   Yes.

13        Q.   And in fact, when the fighting broke out and

14    the backup came, do you know if Captain Heffner, the OIC

15    was among the group that came?

16        A.   Yes, he was the shift supervisor.

17        Q.   Okay.  Now, as the incident broke out, as the

18    hostilities broke out, do you not remember people

19    getting up out of their bunks and yelling for gays to

20    get on the door or gays to check in?

21        A.   I don't remember what was said.  I just know

22    it was an altercation on the dormitory floor.  So,

23    that's when I call emergency traffic when things started

24    happening.

25        Q.   You see people being cut?



UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01      A.   I've seen a lot -- yes.

02      **Q.   Okay.  Did you ever get a chance to see the**

03  **video clips of the incident?**

04      A.   Yes, I did see video clips of the incident.

05      **Q.   Okay.  Were they on somebody's phone or did**

06  **you see them on a monitor?**

07      A.   It was on the video's monitoring screen in the

08  site office station.

09      **Q.   Okay.  Were you able to identify any of the**

10  **persons who took part in the events?**

11      A.   I do not recall the quality of that camera

12  footage.

13      **Q.   Do you think it was the monitor or was it the**

14  **footage itself?**

15      A.   I don't know.

16      **Q.   Okay.  Do you remember who you were with when**

17  **you saw the video?**

18      A.   I don't know who was in the office station

19  when I seen it.

20      **Q.   After the incident, were you interviewed by**

21  **the inspector or by Captain Heffner?**

22      A.   I don't recall.

23      **Q.   You think you might've been interviewed?**

24      A.   I don't know --

25      **Q.   Okay.**



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01      A.   -- if I was interviewed.

02      Q.   I'm not sure if I have the right form, but a

03  230A, is that a witness form?

04      A.   I don't know what that form is.  I haven't

05  been with DOC, so I don't know.

06      Q.   Okay.  Do you know that there -- when you

07  witness something like that, that you're supposed to

08  fill out a witness statement?

09      A.   Yes.

10      Q.   Do you remember if you did fill out a witness

11  statement?

12      A.   Yes, I think so.  I can't really recall.

13      Q.   Is it your understanding that the witness

14  statement is supposed to be filled out?

15      A.   No, it's in the report.  I'm not sure.  I

16  don't know.

17      Q.   Okay.  How long does it usually take you to do

18  master roster count?

19      A.   Maybe about 20 minutes.

20      Q.   So, if there's no problem with clearing count

21  in any of the dormitories, then you can easily make

22  that, finish that before lights out, correct?

23      A.   Correct.

24      Q.   And so -- well, you had to do two wings.  So I

25  guess, are you saying 20 minutes per wing?



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01        A.    Well, it doesn't to count inmates because

02   you're just going down each row with a sheet.  So, I

03   can't say -- I can't really give you a time exactly how

04   long it takes because it can vary from dorm to dorm, so

05   --

06        Q.    Okay.  But would it be your experience that

07   you could generally conclude master roster count well

08   before lights out normally?

09        A.    Yes, on a good day.

10        Q.    What did you do after you finished master

11   roster count that night?

12        A.    We did property and we reviewed the camera

13   footage of the incident.

14        Q.    Okay.  Is that until downloading?

15        A.    Correct.

16        Q.    Okay.  Did you download the video?

17        A.    I didn't burn it.  Somebody else did.

18        Q.    Do you remember who it was?

19        A.    No, sir.

20        Q.    Would that normally be the job of the

21   inspector?

22        A.    I don't know.

23        Q.    Do they burn it onto a CD or DVD?

24        A.    It's like a flash drive.

25        Q.    Oh, okay.  Like what, some of us call a thumb



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01  drive?

02      A.   Correct.

03      Q.   Okay.  Do you know if some people had it on

04  their phones?

05      A.   I do not know.

06      Q.   Okay.  Now, when an incident like this

07  happens, and I guess theoretically, at least there could

08  be prosecutions.  Does somebody come and photograph the

09  scene like the blood or the debris?

10      A.   I don't know.

11      Q.   Have you ever seen a situation where they have

12  inmates clean up the blood before anybody comes to

13  investigate?

14      A.   I don't know what they do.

15      Q.   When an incident like that happens, a gang

16  incident, is it typical to do interviews with witnesses?

17      A.   Yes, I guess so, because you have to conduct

18  an investigation.

19      Q.   Okay.  About the video, is it common for a

20  video like that to be downloaded and shared with other

21  staff?

22      A.   I don't know.

23      Q.   Do you know who Lieutenant Cochran is?  I

24  think he might be Major Cochran now.

25      A.   I don't know Lieutenant Cochran.  I know a



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01    Captain Cochran.

02         Q.    Okay.  Is that at Appalachee?

03         A.    Yes.

04         Q.    Okay.  Do you know if he ever got involved

05    with those kinds of investigations?

06         A.    I don't know.

07         Q.    Do you know anything about Devon Currie?

08         A.    No.  They say he was in the Appalachee

09    Correctional Institution.

10         Q.    Do you think you could identify him?

11         A.    Maybe.  I'm not really too sure, probably.

12         Q.    How about, there were another two guys who had

13    to be taken to the hospital that night, one of them was

14    Brandon Williams.  Do you remember him?

15         A.    No, sir, I don't remember that inmate.

16         Q.    How about Charles Gaddis?

17         A.    Yes, I remember him.

18         Q.    Okay.  So, were you in the dormitory when the

19    backup got there?

20         A.    Yes.

21         Q.    Were you in the dormitory actually or in the

22    officer's station?

23         A.    Officer's station.

24         Q.    Okay.  So, you just saw it through the glass?

25         A.    Correct.



UNIVERSAL
COURT REPORTING

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01     Q.   Okay.  I understood that Mr. Currie actually

02  passed out on his bunk.  Do you recall that?

03     A.   No, sir.

04     Q.   In your Request for Admission responses, you

05  admitted that Devon Currie had bleeding wounds and torn

06  clothing on that night.  Is that your -- still your

07  recollection?

08     A.   I don't know what you're talking about.  I

09  don't know that statement.  I don't know what you're

10  talking about.

11     Q.   We'll go over them one by one and maybe that

12  will help you remember.  What do you know about Captain

13  Heffner?

14     A.   That he is a captain at Appalachee

15  Correctional Institution.

16     Q.   Is he a pretty strict guy?

17     A.   He knows his job, yes.

18     Q.   Okay.  Have you ever heard it said of him that

19  he doesn't like to let people check in?

20     A.   No, sir.

21     Q.   Have you ever heard it said of him that he's

22  pretty rough with the inmates?

23     A.   No, sir.

24     Q.   How about Inspector Winterburn?  Do you know

25  him?



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

```
01        A.    I don't know who that is.

02        Q.    You don't?

03        A.    No, sir.

04        Q.    Okay.  You don't remember seeing an inspector

05   that night investigating?

06        A.    I don't know who he is and I don't know who

07   came to the dormitory that night.

08        Q.    Okay.  So, the people who came, could you

09   identify some of them?

10        A.    It's possible depending on who they are.

11        Q.    Okay.  Can you remember any names as we sit

12   here today?

13        A.    No, sir.  I don't know who responded.

14        Q.    Now, when you were in the officer station

15   after the event, Sergeant Patterson, was she in there

16   with you?

17        A.    Yes.

18        Q.    Do you know why she left FDC?

19        A.    I do not know.

20        Q.    Did you keep in touch with her at all?

21        A.    No.

22        Q.    What do you know about Sergeant McKinnie?

23        A.    She was a sergeant at Appalachee Correctional

24   Institution.

25        Q.    Okay.  She was a dorm sergeant?
```



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01      A.   Yes.

02      **Q.   Was it a usual thing that people would come**

03 **from other dorms to help with master roster count?**

04      A.   If need be.

05      **Q.   Okay.  Was that a special circumstance or**

06 **would that be something that would typically happen?**

07      A.   It depends on if you need to verify or if

08 there's a staff shortage and stuff like that.

09      **Q.   Okay.  Wasn't there always a staff shortage at**

10 **the Department of Corrections?**

11      A.   Well, I don't know because I don't deal with

12 staffing of institutions.

13      **Q.   Okay.  But I think the day prior you had a**

14 **couple hours overtime, didn't you?**

15      A.   I don't know.

16      **Q.   Did you sometimes have to work overtime**

17 **because people didn't show up?**

18      A.   It's possible.

19      **Q.   You say it's possible.  Do you think it**

20 **happened?**

21      A.   Yes.  I had worked overtime.

22      **Q.   Was it because of short staffing?**

23      A.   Yes, or if I just wanted to get extra hours,

24 so it's -- that's why I said it's possible.  It could be

25 a staff shortage or I could just be wanting to do



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01  overtime, so --

02       Q.   Okay.  Do you happen to know who hit the panic

03  button that night?

04       A.   No.

05       Q.   Do you know if there's any record of who might

06  have made the call?

07       A.   You're talking about who initially emergency

08  traffic --

09       Q.   Yeah.

10       A.   -- or are you talking about --

11       Q.   I mean, I think that probably is what I'm

12  trying to say.  Who got the backup there?  Who got the

13  people there?

14       A.   I did.

15       Q.   Okay.  Now, somewhere I saw a statement that

16  the fighting was last -- lasted about 45 minutes.  Is

17  that wrong?

18       A.   I don't know how long it lasted.

19       Q.   How long was it before you called backup?

20       A.   I called backup when I immediately seen it.

21       Q.   Okay.  Now, when you called backup, was that

22  because people were getting up off their bunks and

23  making threats?

24       A.   Well, I called backup when it was a

25  disturbance in the dormitory.  So yes, I don't know



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01  exactly when I called backup or how fast I called backup

02  because I don't -- I called backup when I seen a

03  disturbance in the dormitory.

04           I already had backup on standby because it was

05  -- you just kind of -- when you're in the prison system,

06  you know things go on.  So, you have them on standby

07  already.

08           I thought you need to put them on standby just

09  because of the environment that we're in and that's all.

10  I just had them on standby already and when the

11  situation happened, I called emergency traffic.

12      **Q.   And you were already in Dorm 1 at that point,**

13  **right?  When it started?**

14      A.   I was inside the dormitory.  She was on side

15  one.

16      **Q.   Okay.  I see.  So, you were inside the**

17  **Dormitory Wing 2 when it started to happen?**

18      A.   No, I was inside the officer's station.

19      **Q.   Oh, okay.  Officer's station.  You had**

20  **completed the master roster count of Dorm 2 and you were**

21  **inside the master -- you were inside the officer's**

22  **station when the fighting broke out?**

23      A.   Correct.  And she was inside the P1 at the

24  time.

25      **Q.   Okay.  Was she in P1 alone?**



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01      A.   Yes.

02      Q.   Okay.  She can't do master roster count by

03   herself, can she?

04      A.   I'm not sure what you mean.

05      Q.   Well, you said that Sergeant Patterson was

06   over in wing one and by herself.  And my understanding

07   was that she was over there to do master roster count,

08   at least it was time to do that.

09           And my question is, did she have another

10   officer to help her with master roster count or was she

11   doing it by herself?

12      A.   No, so what you do with the master roster is

13   two people.  So, one inside the officer's station while

14   the other one counts, then you switch.  So, it's not

15   really, I guess somebody is conducting a visual security

16   check while she's doing master roster.  So she's not

17   really alone, but she's on the floor alone.

18      Q.   Okay.  So you were the person in the officer's

19   station who was supposed to be helping her with master

20   roster count in Wing 1?

21      A.   Correct.

22      Q.   Okay.  And that's when things broke out.

23      A.   Correct.

24      Q.   So did someone tell you about the fighting or

25   did you just actually see it with your own eyes when you



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01  first realized that it was going on?

02      A.   I was inside the officer's station and you can

03  hear on the side.  So I seen it with my own eyes and I

04  initiated emergency traffic.

05      Q.   Okay.  You can hear it through the glass or is

06  there an intercom that's open?

07      A.   You can hear it because it's a small bubble.

08  It's not really like glass, so --

09      Q.   Like plexiglass?

10      A.   I guess it's not regular glass though.  So

11  like you can hear it, like you can hear noises.

12      Q.   Okay.  So you could hear it going on and

13  obviously you could see it.  And so you called backup

14  and they came and then Sergeant McKinnie came and you

15  did P1 together.  Is that correct?

16      A.   We did both sides together because we had to

17  count P2 over again.

18      Q.   I'm sorry.  You told me that.  Were you ever

19  asked to give a statement to the institutional

20  classification team when they were considering close

21  management for Mr. Currie?

22      A.   I do not recall.

23      Q.   Could you have been?

24      A.   I do not know.

25      Q.   Did Sergeant McKinnie frequently come over and



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01  help with the count, with master roster count?

02      A.   I don't know how often she assisted with

03  count.

04      Q.   Did you recall it ever happening in the past?

05      A.   I don't know it's possible because it's just

06  based of who is available to count.  It's not really

07  assignment or you go count, it's not how it works.

08           It's basically who's available to count the

09  dorm and assist with counting the dorm.

10      Q.   Okay.  So, had you counted the dorm with her

11  before?

12      A.   Yes.

13      Q.   Did she come over that night because of the

14  incident?

15      A.   Yes.

16      Q.   Do you remember what time count cleared that

17  night?

18      A.   No.

19      Q.   I believe that you said that you could not

20  remember seeing Mr. Currie bloody or asking for help.

21  If he had, what would you have done?

22      A.   If I would have seen him, I would have called

23  my Sergeant and advised her of the situation.  She would

24  have followed up to the next chain of command, which is

25  to the Chief Supervisor and he would have been out of



UNIVERSAL
COURT REPORTING

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01  the dormitory because I know that you cannot deny an

02  inmate protective custody.

03      Q.   Okay.  So, you would have told Sergeant

04  Patterson, correct?

05      A.   Correct.

06      Q.   Who signs off on the paperwork from the master

07  roster count?

08      A.   I don't think I understand your question.

09      Q.   Does somebody have -- when the master roster

10  count is completed and there is a number, does somebody

11  have to sign off on that for the records?

12      A.   I don't think I'm sure of your question.

13           Like, are you talking about inside the

14  dormitory or you talk about in general?  Like, I don't

15  think I'm understanding the question.

16      Q.   Well, two officers, an officer -- two officers

17  conduct master roster count, and they come up with

18  numbers.  And I guess what I'm asking is, does somebody

19  have to certify those numbers?

20      A.   Well, you should have a certified officer

21  counting.  So, they'll just put our name on the count

22  slip, and that's it.

23      Q.   Okay.  So, there's a name on the count slip,

24  so you know who did the count?

25      A.   That's correct.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01      Q.   Okay.  Would that be the sergeant usually?

02      A.   Whoever counted.

03      Q.   Okay.  But you both counted, right?

04      A.   Correct.  So, it would be the two officers who

05 counted.  It doesn't have to be --

06      Q.   Both of them?

07      A.   -- like -- Yes.  it doesn't have to be a

08 sergeant, officer.  If two officers counted, it would be

09 two officers.

10      Q.   They would both sign it?

11      A.   Yes, sir.

12      Q.   Okay.  Now, I think we may have a photograph

13 of the dorm, but about when you go from inmate to

14 inmate, checking IDs and looking at faces, and they give

15 you their name and a DC number.  About how far away from

16 them would you be at that point?

17      A.   You walk by every inmate.  I can't really give

18 you an estimate how it'd be, but you walk by every

19 inmate, like physically walk by, row by row, up and

20 down, round and round, up every inmate in a dormitory.

21      Q.   How far apart are the bunks?

22      A.   I don't know.

23      Q.   Now, you made the statement that during

24 conducting master roster count, I did observe that P2

25 was being very disruptive.  Based on P2 being so



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01  disruptive, I radioed command and indicated that the

02  institution should be on standby because of a potential

03  problem that a perceived may occur.  What kind of

04  behavior were you referring to as being so disruptive?

05      A.   I can't tell you the exact behavior.  I can't

06  tell you exactly what they were doing, because I do not

07  recall exactly what they were doing.  I'm pretty sure

08  they just were causing a disturbance in the dorm.  I

09  can't tell you what they were doing.

10      Q.   Okay.  Now, eventually, I think you said you

11  saw knives.  You saw people being stabbed.

12      A.   Well, that was during the emergency traffic.

13      Q.   Right.  That was later, but what were people

14  doing that you considered disruptive prior to that?

15      A.   I don't know.  Maybe they wasn't sitting down.

16  I can't tell you exactly what was happening in the

17  dormitory.

18      Q.   You heard voices shouting?

19      A.   I don't know what was happening inside the

20  dormitory.  It just was a disturbance inside the

21  dormitory.

22      Q.   But you could see them, right?

23      A.   Yes.

24      Q.   And I think you said that through that

25  plastic, or that it's not glass, but whatever it is, you



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01  can hear through it.  You heard people shouting, right?

02      A.   Well, I don't know what they were doing.  I

03  know they were causing a disturbance inside the

04  dormitory.  Like, I can't recall exactly what they were

05  doing that was causing a disturbance that put the

06  Response Team on standby.

07      Q.   Okay.  But you can't describe what they were

08  doing to cause a disturbance?

09      A.   Yes.  I don't know what it was doing.  I don't

10  know that.

11      Q.   Was that unusual?

12      A.   It's prison, nothing is unusual.

13      Q.   Is that really true?

14      A.   Yes, sir.

15      Q.   Okay.  Could somebody actually even say the

16  N-word?

17      A.   I don't know.

18      Q.   It says here in a response that you gave that,

19  "I remember conducting count in P-dorm and leaving the

20  dorm to conduct count in O-dorm.  While I was conducting

21  the count in O-dorm, the incident began to occur."  Does

22  incident mean the actual attacks and stabbing?

23      A.   I do not recall.  I don't even recall leaving

24  the dormitory.  I don't know what you're talking about.

25      Q.   Okay.  How often did you have to call for



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01  standby during master roster count while you were at

02  Appalachee?

03      A.   I don't know.

04      Q.   Could that night have been the first time?

05      A.   I don't know.

06      Q.   Did you have any particular problems with

07  people -- with some of the people at Appalachee CI?

08      A.   No.

09      Q.   What kind of disciplinary history did you

10  have?

11      A.   I don't know what disciplinary history I have.

12      Q.   Do you have any problems with absenteeism or

13  tardiness?

14      A.   I don't know what was on my disciplinary

15  report.  I don't know.

16      Q.   Okay.  Would you defer to the actual letters

17  of counseling?  Do you have any reason to think they

18  would be false?

19      A.   I can't say that either.  I don't know.

20      Q.   Okay.  How about when you finally resigned

21  from the Department of Corrections, was -- did that have

22  something to do with conflict with your fellow staff

23  people?

24      A.   No.

25           MR. COOK:  If the Court Reporter would permit



UNIVERSAL
COURT REPORTING

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01          me to share my screen, I'd like to put some things
02          up.
03                  THE COURT REPORTER:  This is the Court
04          Reporter.  You should be able to share.
05                  MR. COOK:  Okay.
06                  MR. TARJAN:  By the way, does anybody need a
07          break?  I don't.  I'm just asking.
08                  MR. KVERNE:  I'm okay.
09                  THE WITNESS:  No, I'm fine.
10                  MR. COOK:  Yeah, I think we're kind of on the
11          down slope.  Okay.  Here we go.
12     BY MR. COOK:
13          Q.   Can you see this picture?
14          A.   Yes.
15          Q.   Okay.  So, when you were doing master roster
16     count, would you have been walking in the aisles between
17     those bunks?
18          A.   Walking up and down every aisle, yes.
19          Q.   Okay.  So, would you have -- would you say
20     that you would probably have been within at least three
21     or four-feet of the inmates that you were checking?
22          A.   Yes.
23          Q.   Is that how people are supposed to be, I see
24     everybody sitting on their bunk except one guy who's
25     sweeping.  Is that how they should normally be seated



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01  for master count, master roster count?

02      A.    Protocol is everybody sit in your bunk, face

03  up, feet forward, with your ID cards out.

04      Q.    Okay.  Is that essentially what they're doing

05  there?

06      A.    Looks like it, yes.

07      Q.    Okay.  How about the lighting?  Was the

08  lighting good?

09      A.    Yes, the lights was on.

10      Q.    Okay.  So, you could clearly see the faces,

11  you could see the roster and the IDs?

12      A.    Yes.

13      Q.    Okay.

14          MR. KVERNE:  Mr. Cook, real quick, can we take

15      a very short break, five-minute break?

16          MR. COOK:  Sure.  That's fine.

17          THE COURT REPORTER:  Understood.  Off record.

18          (Thereupon, a short discussion was held off

19      record.)

20          (Deposition resumed.)

21  BY MR. COOK:

22      Q.    Okay.  Let me get back to the questions that I

23  was asking about checking in.  When an inmate asks to

24  check in or asks for protection, I think that you told

25  me that there were certain things that had to be put



**UNIVERSAL**
**Court Reporting**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01  together that property sheet, you get the inmate to do a
02  witness statement, you do an incident report.
03          And then, I think that the inmate moves to
04  another area.  And I don't know whether I failed to make
05  a note or whether you actually told me whose job it
06  would be to move the inmate from the dorm to a temporary
07  holding area.  Would that be something that you would do
08  if someone was checking in with you, a dorm officer?
09      A.   It's anybody that's available.  It's no one
10  set person or one set job.  It's who's available on the
11  compound to move the inmate from one place to another.
12      Q.   So, you might call somebody from a different
13  dorm or a different assignment?
14      A.   It's possible.
15      Q.   Okay.  Would you do that or would your
16  sergeant do that?
17      A.   I'm an officer, so my sergeant over the
18  dormitory, that's my sergeant dormitory, so it would be
19  my sergeant.
20      Q.   Okay.  So, do you get in the course of -- have
21  you ever gone through this process to help an inmate to
22  get protection or have you just seen other people do it?
23      A.   I don't know what you're asking me.  Have I
24  ever seen an inmate check in or have I been --
25      Q.   No, no, no.  I mean, have you ever done the



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01  process, have you ever gotten the property list, gotten

02  the inmate statement form, done the report, all of those

03  things or have you just seen other people do them?

04      A.   I did some.  It doesn't require the person to

05  do all of the things that's tasked.  It could be broken

06  up.  It's just all about who is available, how they're

07  available and what's need to be done.

08      Q.   Okay.  And in your experience, do you

09  sometimes get pushback from the administrators when you

10  give them another inmate to try to find protection for?

11      A.   I don't know.  I don't work with the

12  administrators.  I work on third shift.  No, admin is

13  there.

14      Q.   Right.  You don't get any feeling of a

15  reaction from the people who are, well, let's say the

16  shift supervisor?

17      A.   I mean, no, because I'm going to do my job.

18          It doesn't matter about a reaction.  If the

19  inmate asks for protective custody, he would get

20  protective custody.

21      Q.   Okay.  And I think I asked you whether Captain

22  Heffner didn't like to get -- put people in protective

23  custody.  Do you remember whether you ever heard

24  anything about that?

25      A.   No, because every time an inmate asked for



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01 protective custody and I went to Captain Heffner, the

02 inmate was in protective custody, so I don't recall.

03     Q.   Okay.  Do you remember writing anything in

04 response to our discovery request, any interrogatory

05 answers?

06     A.   Correct.

07     Q.   You remember that?

08     A.   Yes.

09     Q.   Did you hand write them?

10     A.   No.

11     Q.   Do you type them?

12     A.   Yes.

13     Q.   Okay.  And as we sit here today, can you

14 confirm that those answers were true and correct to the

15 best of your ability?

16     A.   That's correct.

17     Q.   Okay.  So, if you made admissions at that

18 time, you'd stand by those?

19     A.   Everything I wrote, typed, interrogatories

20 were based solely on the truth --

21     Q.   Okay.

22     A.   -- of what I know.

23         MR. COOK:  Okay.  That's all I've got.  Do you

24        have anything, Erik?

25        MR. KVERNE:  I actually -- hold on.  Let me



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01          just talk to Mr. Cook for one second, please.

02                MR. COOK:  No, no, no, no.  Go ahead, Erik.

03                MR. KVERNE:  Are you sure, Mr. Cook?

04                MR. COOK:  Well, if you've got any questions,

05          I'd like to hear those before I close.

06                MR. KVERNE:  Okay.  I may have questions

07          about, obviously, your closing, if you ask

08          questions, but sure.

09                          CROSS EXAMINATION

10     BY MR. KVERNE:

11          Q.   Ms. Green, who -- who was in the dorm with you

12     that night?

13          A.   Sergeant Patterson was assigned to the dorm

14     with me that night.

15          Q.   Okay.  Was there any other officer with you on

16     the dorm that night?

17          A.   No, sir.

18          Q.   To your knowledge where was Ms. McKinnie when

19     the incident occurred?

20          A.   Counting her dorm.

21          Q.   Okay.  And you don't know what dorm she was in

22     at that point in time?

23          A.   No, sir.

24          Q.   Okay.  How many incidents did you witness that

25     night?

 UNIVERSAL COURT REPORTING

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

```
01        A.   One.
02        Q.   Okay.  And describe that incident for me a
03   little bit.
04        A.   What I witnessed was I seen a group of inmates
05   stabbing each other, and that's it.  That's what was
06   happening.  They were stabbing each other and it was
07   multiple inmates.
08        Q.   Do you know why they were stabbing each other?
09        A.   I do not know why.
10        Q.   Okay.  How many inmates did you see that were
11   involved?
12        A.   It was more than five.  I know that.  It was
13   multiple inmates.
14        Q.   Do you know if any of the inmates were
15   involved in gangs?
16        A.   Yes.
17        Q.   Okay.  Do you know which gangs those were?
18        A.   The Latin Kings and The OKs.
19        Q.   Okay.  One moment.  When you saw the fight,
20   what did you do?
21        A.   Find emergency traffic.
22        Q.   Okay.  What did that entail?  Describe to me.
23        A.   Okay.  So, I said standby emergency traffic,
24   and I described how many inmates possibly were.  I
25   didn't get a real exact number because it was a whole
```



UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01  lot of inmates.

02          I described that blood was visible, and

03  weapons is visible and I need the A-Team response en

04  route, medical en route, and shift OIC en route.

05      **Q.   Okay.  Was there anything else that you did**

06  **that you can remember?**

07      A.   While I was calling it, I was visually trying

08  to just recall of -- trying to get a recollection of

09  what was going on so that way I can provide a report on

10  what happened, but that was it.

11          I was -- Ms. Patterson was on P1 side.  The

12  incident happened behind me.  I turned -- called

13  emergency traffic.  She heard I called emergency

14  traffic.  So, she came to the dormitory, the officer's

15  station, and we had to wait for backup to come because

16  you can't have an officer on the floor during an

17  incident by themselves.

18      **Q.   Okay.  Why?**

19      A.   Scene safety, you put an officer in a harms

20  way, so the only thing we have is a can of gas.  If you

21  have multiple inmates stabbing each other, it's nothing

22  you can really do unless you have other personnel there

23  with you to control the situation.

24          MR. KVERNE:  Okay.  No further questions.

25          MR. COOK:  Okay.  I need to take about five



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

```
01        minutes if that's okay.
02             MR. KVERNE:  That's fine.
03             THE COURT REPORTER:  Okay.  Off record.
04             (Thereupon, a short discussion was held off
05        record.)
06             (Deposition resumed.)
07             THE COURT REPORTER:  Okay.  Back on record.
08             MR. COOK:  Okay.  Yeah, I don't have anything
09        else.  I think we're going to go ahead and order
10        this.
11             THE COURT REPORTER:  Okay.  And read or waive?
12             MR. KVERNE:  She's going to read, and we'll
13        order a copy as well.  We just need an electronic
14        copy.  We don't need a hard copy.
15             THE COURT REPORTER:  Okay.
16             MR. COOK:  Same here, just electronic.
17             THE COURT REPORTER:  It will be same, standard
18        delivery?
19             MR. COOK:  Yeah.
20             MR. KVERNE:  Yes.
21             THE COURT REPORTER:  Okay.  And she could read
22        through your office, is that --
23             MR. KVERNE:  Yes.  We'll arrange for her to
24        read.
25             THE COURT REPORTER:  Okay.  Perfect.  We can
```



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01          go off record then.

02                  (Deposition concluded at 12:06 P.M.)

03                  (Reading and signing of the deposition by the

04          witness has been reserved.)

05

06

07

08

09

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01     CERTIFICATE OF REPORTER

02   STATE OF FLORIDA

03   COUNTY OF LEE

04        I, KEVIN ARBOLEDA, Court Reporter and Notary

05   Public for the State of Florida, do hereby certify that

06   I was authorized to and did digitally report and

07   transcribe the foregoing proceedings, and that the

08   transcript is a true and complete record of my notes.

09        I further certify that I am not a relative,

10   employee, attorney or counsel of any of the parties,

11   nor am I a relative or employee of any of the parties'

12   attorneys or counsel connected with the action, nor am

13   I financially interested in the action.

14

15        Witness my hand this 21st day of May, 2025.

16

17

18

19

20   _____

21   KEVIN ARBOLEDA, CER, COURT REPORTER
     NOTARY PUBLIC, STATE OF FLORIDA
22   Commission No.:  HH 575134
     Commission Exp:  07/25/2028
23

24

25



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01                  CERTIFICATE OF OATH

02  STATE OF FLORIDA

03  COUNTY OF LEE

04

05      I, KEVIN ARBOLEDA, the undersigned authority,

06  certify that DELISIA GREEN, appeared before me remotely

07  pursuant to Florida Supreme Court Order AOSC20-23 and

08  was duly sworn on the 13th day of May, 2025.

09

10      Witness my hand this 21st day of May, 2025.

11

12

13

14

15  _____
    KEVIN ARBOLEDA, CER, COURT REPORTER
16  NOTARY PUBLIC, STATE OF FLORIDA
    Commission No.:  HH 575134
17  Commission Exp:  07/25/2028

18

19

20

21

22

23

24

25



```
01   DATE:      MAY 22, 2025
     TO:        DELISIA GREEN
02              C/O
                ERIK KVERNE, ESQUIRE
03              FLORIDA OFFICE OF THE ATTORNEY GENERAL
                PL-01 THE CAPITOL TALLAHASSEE
04              FLORIDA 32399-4120
     IN RE:     DEVON CURRIE v. MICHELLE MCKINNIE, et al.
05   CASE NO:   5:23-cv-183-TKW/MJF

06   Dear MS. GREEN,

07          Please take notice that on the 13th day of May
     2025, you gave your deposition in the above-referenced
08   matter. At that time, you did not waive signature.  It
     is now necessary that you sign your deposition.  You
09   may do so by contacting your own attorney or the
     attorney who took your deposition and make an
10   appointment to do so at their office.  You may also
     contact our office at the below number, Monday -
11   Friday, 9:00 AM - 5:00 PM, for further information and
     assistance.
12          If you do not read and sign your deposition
                within
13   thirty (30) days, the original, which has already been
     forwarded to the ordering attorney, may be filed with
14   the Clerk of the Court.

15          If you wish to waive your signature, sign your
     name in the blank at the bottom of this letter and
16   promptly return it to us.

17   Very truly yours,

18

     _____
19   KEVIN ARBOLEDA, CER, Court Reporter
     Universal Court Reporting
20   (954)712-2600

21   I do hereby waive my signature.

22

23
     _____
     DELISIA GREEN
24   CC: VIA TRANSCRIPT:                JAMES V. COOK, ESQUIRE
                                        ERIK KVERNE, ESQUIRE

25
```



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

```
1    Errata Sheet

2

3    NAME OF CASE: Devon Currie vs Michelle Mckinnie

4    DATE OF DEPOSITION: 05/13/2025

5    NAME OF WITNESS: Delisia Green

6    Reason Codes:

7         1. To clarify the record.

8         2. To conform to the facts.

9         3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                          _____
```



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



 UNIVERSAL COURT REPORTING

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

false

<empty />





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com





**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Devon Currie vs Michelle Mckinnie
Green, Delisia on 05/13/2025

**time**
7:3,20 8:7,23
11:23 12:4,10
13:10,24 14:6,10,
22 15:3 16:5 17:12
20:11 28:14 31:21
35:17 39:9 45:3
52:24 53:8 55:16
60:4 64:25 65:18
66:22

**timeframe**
15:3

**times**
35:10

**today**
12:2 49:12 65:13

**together**
27:11 28:1 54:15,
16 63:1

**told**
12:9 54:18 56:3
62:24 63:5

**took**
19:21 35:22 43:10

**torn**
40:11 48:5

**total**
17:3

**touch**
49:20

**toward**
22:25 28:25

**tracking**
41:12

**traffic**
39:16 42:23 51:8
52:11 54:4 58:12
67:21,23 68:13,14

**trainee**
11:6

**training**
10:16,18 11:9,17

**transferred**
20:15

**true**
19:9 59:13 65:14

**truth**
65:20

**truthful**
8:6

**try**
27:4,6 64:10

**trying**
18:19 20:17 51:12
68:7,8

**turned**
68:12

**twice**
40:3

**two**
10:17 16:9 27:10
28:1 31:4,5 32:3
36:2,19 37:1,2,3
44:24 47:12 53:13
56:16 57:4,8,9

**type**
33:11 65:11

**typed**
33:13 65:19

**typical**
46:16

**typically**
14:13 50:6

---

**U**

**U.S.**
10:8

**uh-huh**

7:16

**uh-uh**
7:16

**unclear**
8:5

**understand**
11:23 16:8 17:8
20:17,18 29:3 36:5
56:8

**understanding**
17:10 26:9,12 32:6
42:2,10 44:13 53:6
56:15

**understood**
48:1 62:17

**unit**
18:9

**university**
8:20 9:4,5,6,11,15,
17

**unless**
15:21 68:22

**unprofessional**
24:4,8 25:5,9

**until**
7:22,24 16:19
45:14

**unusual**
59:11,12

**up**
7:20 8:23 16:10
19:19 24:10,24
31:22 33:11,14,22
34:22 37:15 42:19
46:12 50:17 51:22
55:24 56:17 57:19,
20 61:2,18 62:3
64:6

**us**
7:8 12:7 45:25

**use**
22:20 23:10 25:19
31:16 33:1

**used**
21:12 25:22 30:6
34:15

**usual**
50:2

**usually**
14:5 15:5 44:17
57:1

---

**V**

**Valter**
17:21

**vary**
45:4

**verifies**
31:8

**verify**
30:11,15 50:7

**victims**
28:18 34:6

**video**
43:3,4,17 45:16
46:19,20

**video's**
43:7

**violence**
28:3

**visible**
68:2,3

**visual**
53:15

**visually**
68:7

**voices**
58:18



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Devon Currie vs Michelle Mckinnie
Green, Delisia on 05/13/2025

## W

**wait**
7:22,24 16:19
68:15

**waive**
69:11

**walk**
57:17,18,19

**walking**
61:16,18

**want**
7:3,12 9:8 22:12

**wanted**
22:7,9 40:17 50:23

**wanting**
32:22 50:25

**wasn't**
19:13,15 21:23
38:3,23 41:13,14
42:5 50:9 58:15

**watching**
35:5

**water**
7:9

**way**
23:6 29:20 36:8
61:6 68:9,20

**we**
7:8,13,21 12:2
15:1,20 16:13,21,
23 18:11 19:21
21:2,3 24:9 27:19
28:4,11 30:11,15
34:21 37:9,12,13,
14,18 38:3,4,9,22,
23,24,25 39:3,9,15
41:7,12 45:12
49:11 54:16 57:12
61:11 62:14 65:13

68:15,20 69:13,14,
25

**we'll**
7:11 34:23 48:11
69:12,23

**we're**
11:22 14:24 18:12
52:9 61:10 69:9

**weapons**
68:3

**wearing**
19:2

**Wednesday**
11:24

**weekday**
14:24 15:3,4,16

**weight**
28:2,14

**went**
8:21 9:2,4,10
10:16,18 41:17,19
65:1

**were**
12:24 13:10 14:5
17:12 19:2 21:21
22:1 23:22,24
24:2,12,16 34:6,7
35:14,17 37:23
38:4,20 39:3,6,9
41:16 43:5,9,16,20
47:12,18,21 49:14
51:22 52:12,16,20,
21 53:18 54:18,20
58:4,6,7,8,9,13
59:2,3,4,7 60:1
61:15,21 62:25
65:14,20 67:6,8,
10,14,17,24

**weren't**
13:11

**west**
18:9

**what**
6:17,22 7:25 8:4
9:5 13:10 14:14,22
15:3 16:20 17:8,14
19:2,14,18 20:25
21:5,18 22:2 23:7,
16,24 24:6,7,8,14
25:4,16 26:5,8
28:10,24 29:3,9,
12,15 30:2,3,11,21
31:5,20 32:13
34:23 35:3 36:5
38:17 39:10 41:23
42:21 44:4 45:10,
25 46:14 48:8,9,12
49:22 51:11 53:4,
12 55:16,21 56:18
58:3,6,7,9,13,16,
19 59:2,4,7,9,24
60:9,11,14 62:4
63:23 65:22 66:21
67:4,5,20,22 68:9,
10

**what's**
6:14 64:7

**whatever**
7:18 58:25

**when**
7:14 8:18 10:17
11:14,15 14:3
15:9,19 17:12
19:18 20:5 27:10,
25 29:10,12 30:3
35:21 37:10 38:16
39:2,24 41:3,7
42:13,23 43:16,19
44:6 46:6,15 47:18
49:14 51:20,21,24
52:1,2,5,10,13,17,
22 53:22,25 54:20
56:9 57:13 60:20
61:15 62:23 64:9

66:18 67:19

**where**
8:18 20:8 21:8,14
22:11 23:17,23
25:6 27:25 29:17
32:25 35:8 36:3,7
46:11 66:18

**wherever**
36:9

**whether**
12:18 17:23 19:9
27:11,12 39:17
63:4,5 64:21,23

**which**
7:22 15:6 30:12
36:25 39:14 42:4
55:24 67:17

**while**
8:21 9:1 24:2,16,
21 35:3,13 38:20
53:13,16 59:20
60:1 68:7

**who**
12:17 16:9 17:25
18:14 20:20 24:19,
20 25:13,22 29:5,6
31:17 33:21 34:1,6
35:13,15,22 37:19
41:17,19 43:10,16,
18 45:18 46:23
47:12 49:1,6,8,10,
13 51:2,5,7,12
53:19 55:6 56:6,24
57:4 64:6,15 66:11

**who's**
30:25 55:8 61:24
63:10

**Whoever**
57:2

**whole**
19:24 67:25



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Devon Currie vs Michelle Mckinnie
Green, Delisia on 05/13/2025

| | | | |
|---|---|---|---|
| **whose**<br>63:5<br><br>**why**<br>27:1 32:18 41:9<br>49:18 50:24 67:8,9<br>68:18<br><br>**will**<br>8:3,4 12:9 17:1<br>18:22 28:10 41:8<br>48:12 69:17<br><br>**Williams**<br>47:14<br><br>**wind**<br>9:19<br><br>**wing**<br>36:20 39:14,21<br>44:25 52:17 53:6,<br>20<br><br>**wings**<br>36:19 44:24<br><br>**Winter**<br>9:6,11<br><br>**Winterburn**<br>19:4 48:24<br><br>**with**<br>6:12 7:15 8:17 9:3,<br>9,12,18 10:3,8,14,<br>16,20,21,22,23<br>11:2,13,25 12:17<br>14:15 16:10 19:1,<br>4,23 21:6 24:9<br>25:12 27:1,4,16,18<br>28:10,22 30:16<br>34:4 36:20,23<br>37:1,2,6 38:9 39:6,<br>8,13,24,25 40:3<br>41:10,17,21 42:7<br>43:16 44:5,20 45:2<br>46:16,20 47:5<br>48:22 49:16,20<br>50:3,11 53:10,12,<br>19,25 54:3 55:1,2, | 9,10 56:17 60:6,7,<br>12,22 62:3 63:8<br>64:11 66:11,14,15<br>68:23<br><br>**within**<br>16:21 18:10 37:25<br>61:20<br><br>**without**<br>31:12 32:11<br><br>**witness**<br>32:16,17,20 33:6,<br>15 44:3,7,8,10,13<br>61:9 63:2 66:24<br>70:4<br><br>**witnessed**<br>23:8 67:4<br><br>**witnesses**<br>46:16<br><br>**word**<br>7:15 22:21<br><br>**words**<br>7:19<br><br>**work**<br>6:12 14:9,15 20:18<br>22:11 50:16 64:11,<br>12<br><br>**worked**<br>14:7 22:11 23:17<br>50:21<br><br>**working**<br>10:20,21,22,23<br>11:1,15 13:5,23<br>14:5,13,14<br><br>**works**<br>55:7<br><br>**would**<br>10:13 12:7 14:15<br>15:5,16 16:5 20:2<br>23:10 27:5,6,14<br>28:9 29:20 36:19<br>37:4,6 40:8 41:20, | 21 42:4,6,7 45:6,<br>20 50:2,6 55:21,<br>22,23,25 56:3<br>57:1,4,8,10,16<br>60:16,18,25 61:16,<br>19,20 63:6,7,15,18<br>64:19<br><br>**wouldn't**<br>42:8<br><br>**wounds**<br>48:5<br><br>**writ**<br>25:16,20<br><br>**write**<br>32:21 65:9<br><br>**writer**<br>25:16,20<br><br>**writing**<br>7:20 65:3<br><br>**wrong**<br>51:17<br><br>**wrote**<br>25:14 65:19<br><br>---<br><br>**Y**<br><br>---<br><br>**Yeah**<br>8:11 24:8 26:7<br>27:25 34:15 38:2<br>51:9 61:10 69:8,19<br><br>**year**<br>10:23<br><br>**years**<br>10:22<br><br>**yelling**<br>42:19<br><br>**yes**<br>6:21 7:5,16 8:19<br>9:20,23 10:2,5,10<br>11:10,19 12:1,6, | 11,13,23 13:1,6,9,<br>12,22 14:3,11,17,<br>19 15:8,14,19,24<br>16:2,7,12 17:11,13<br>19:10,17,21 20:1,<br>13,24 21:20 22:2<br>23:7 24:5,18<br>26:10,14 27:8<br>28:4,19 29:10,14,<br>19,22 31:25 32:12<br>33:10,20 35:9,19,<br>23 38:15 42:12,16<br>43:1,4 44:9,12<br>45:9 46:17 47:3,<br>17,20 48:17 49:17<br>50:1,21,23 51:25<br>53:1 55:12,15<br>57:7,11 58:23<br>59:9,14 61:14,18,<br>22 62:6,9,12 65:8,<br>12 67:16 69:20,23<br><br>**yet**<br>40:9<br><br>**you**<br>6:3,7,10,20,24 7:3,<br>6,13,14,15,17,22,<br>23,24,25 8:2,4,9,<br>12,14,16,18 9:14,<br>21 10:8,13 11:2,3,<br>15,16,18,23 12:2,<br>3,7,8,9,10,12,24<br>13:20 14:2,5,9,10,<br>13,15,20 15:13<br>16:9,16,18 17:12,<br>14,22 18:3,4,9,16,<br>18,20 19:1,3,8,16,<br>18 20:5,6,8,14,16,<br>19 21:21,25 22:1,<br>6,10,11,13,14,17,<br>19,20 23:1,4,5,15,<br>17,24 24:2,3,7,12,<br>14,16,19 25:2,6,7,<br>9,12,16,25 26:5,23<br>27:2,3,7,9,10,14,<br>15,21 28:5,7,24 |



Devon Currie vs Michelle Mckinnie
Green, Delisia on 05/13/2025

29:3,9,12 30:1,2,
18,21 32:7,17,20,
25 33:5,8,9,11
34:14,17,24 35:13,
17,21,22,25 36:9,
19,23 37:2,4,7,10,
16,23,24,25 38:6,
11,14,16,20,25
39:5,6,16,18,20,
21,24 40:7,10,13,
17,20,22,23,25
41:1,2,3,8,9,10,16,
23 42:1,6,14,18,25
43:2,6,9,13,16,17,
20,23 44:6,10,17,
21,24,25 45:3,7,
10,16,18 46:3,11,
17,23 47:4,7,10,
14,18,21,24 48:2,
4,12,18,21,24
49:2,4,8,11,14,16,
18,20,22 50:7,13,
14,16,19 51:2,5,
10,19,21 52:5,6,8,
12,16,19,20,21
53:4,5,12,14,18,
24,25 54:2,5,7,11,
12,13,14,18,23
55:4,7,10,16,19,21
56:1,3,13,14,20,24
57:3,13,15,16,17,
18,23 58:4,5,6,9,
10,11,14,16,18,22,
24,25 59:1,7,18,25
60:1,6,9,12,16,17,
20 61:4,13,15,16,
19,20,21 62:10,11,
24 63:1,2,5,7,8,12,
15,20,21,22,25
64:1,3,8,9,14,21,
23 65:3,7,9,11,13,
17,23 66:3,7,11,
15,21,24 67:8,10,
14,17,19,20 68:5,
6,16,19,20,22,23

**you'd**
40:2 65:18
**you're**
8:5 10:2 12:18
22:18 23:7,8 34:11
36:5 41:23 42:3
44:7 45:2 48:8,9
51:7 52:5 59:24
63:23
**you've**
12:4 25:19 29:2
32:24 33:24 36:16
66:4
**your**
6:7,25 7:23 8:7,12,
16 9:24,25 10:13,
14 11:3,8,25 12:8
17:10 20:5,11,12,
25 23:5 34:16
35:22 36:17 38:10,
12 40:23 42:2,10
44:13 45:6 48:4,6
53:25 56:8,12
60:22 62:2,3 63:15
64:8 65:15 66:7,18
69:22



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com