UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DEVON CURRIE,

     Plaintiff,

vs.

MICHELLE MCKINNIE, *et al*.

     Defendants.

Case No. 5:23-cv-00183-TKW/MJF

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT GREEN'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Devon Currie responds to Defendant Delisia Green's motion for summary judgment. [ECF No. 119], and would show as follows:

1. Plaintiff Devon Currie responds to Defendant Green's motion for summary judgment. [ECF No. 119].[1] A jury would hear that she could see Mr. Currie's injuries (from the first attack in the bathroom) when both she and Sgt. McKinnie performed their respective counts, that Mr. Currie asked her for protection against inmates who she could hear yelling at Mr. Currie to "check in" during the count, that she had the ability to stop the count to

---

[1] Plaintiff would note that Defendant's Motion for Summary Judgment exceeds the allowed number of words in her Summary Judgment Motion by incorporating by reference the 2,345-word Statement of Fact from the Summary Judgment Motion by Defendant McKinnie, but only by 26 words.

intervene, and that instead she stated to Mr. Currie, "I'm busy. I'm not doing no paperwork." [Currie Deposition at 31:12-21 ("Currie Dep."), ECF No. 78-2]. Because Green denies wrongdoing but the record clearly shows otherwise, these fact issues must be resolved by a jury.

2.   Plaintiff objects to Green's failure to provide pinpoint citations to deposition testimony which blurs exactly which testimony she is depending on to justify the conclusions she draws in the fact section. This is important because there is ambiguous and conflicting testimony as to who in the dorm was gay, who was a member of a particular gang, and who was involved, that cuts against Green's simplified version of the facts.

3.   Green's failure to provide pinpoint citations is compounded by the fact that Defendant's use of a separate cover page results in the record page numbers and the deposition page numbers always being different.[2]

4.   In adopting Defendant McKinnie's Statement of Facts, Green depends on hearsay and double hearsay statements of persons whose basis of knowledge is unclear. This is important because Green sets up a background of shaky second- and third-hand testimony to counter

---

[2] To remain consistent with Plaintiff's Response [ECF No. 92] to Defendant McKinnie's motion for summary judgment, all deposition citations herein reference the court reporter page, not the ECF generated page number. Plaintiff adds the Delisia Green Deposition as ECF 120-1 also using the court reporter transcript page numbers.

eyewitness testimony to events occurring that night.

5.   Plaintiff rejects Defendant's self-assured identification of gays, gang members, and event participants without any foundation for the basis of knowledge as confusing inadmissible hearsay.

6.   Another example of the problem of failing to use pinpoint citations is illustrated by the passage where Defendant states:

> Upon returning to his bunk, Plaintiff began to pack his property and put on his shoes. (Exhibit B at 16, 25; F at 24). Plaintiff performed these actions not because he expected to leave the dorm, but to prepare for further altercations with the Latin Kings.

[ECF No. 78 at 7]. Exhibit B at page 24 states: "I went to start trying to pack my property to leave." [ECF 78-2, Exhibit B, Currie Deposition at 24:2-3]. Plaintiff quotes another inmate, Chad Shaw, as quoting Currie saying he's "not going anywhere." [ECF 78-6, Exhibit F, Chad Shaw deposition at 23:9-14]. But the specific context is Currie saying, "if we're going to leave, all of us are going to leave." [*Id*. at 23:20-21]. When parties fail to use pinpoint citations, it is easy to cherry pick phrases.[3]

7.   In the Statement of Facts incorporated from the McKinnie Summary Judgment Motion, Defendant McKinnie refers to herself and Officer Green as "two female officers." [ECF No. 78 at 7]. The record is clear that the

---

[3] This fits Defendant's theory of the case because it makes Plaintiff look pugnacious, but here it is misleading. He is looking out for his friends.

female officer who went from bunk to bunk identifying inmates and to whom Plaintiff made a plea for help, was identified by Plaintiff as Defendant Ofc. Delisia Green. [Currie Declaration at ¶¶ 5-7 ("Currie Decl."), ECF No. 102]. Defendant McKinnie admits to being present in the Dorm and helping with Master Roster Count prior to the stabbing incident. [*See* McK. Interrogatory response 15-A, ECF No. 90-2]. Defendant Green admits that Plaintiff was "counted" but does not recall that he appeared injured [Deposition of Delisia Green ("Green Dep.") at 38:10-19, ECF No. 120-1], or that he asked for protection. [*Id*. at 40:17-19].

### Plaintiff's Opposing Statement of Facts

*Bathroom*

On the evening of July 20, 2022 Mr. Currie was in a bathroom sink area in P dorm, wing 2 ("P2") brushing his teeth.[4] [*See* Currie Deposition ("Currie Dep.") at 14:24-15:3, 18:3-5, 19:13-21, ECF No. 78-2.][5] That sink area was referred to as "the bird bath." [Ch.-Sm. Dep. at 14:20-23]. The dorm was open bay with multiple bunks. [*See* Def. Ex. D, Photo of dorm, ECF No. 78-4 (under seal)][6].

---

[4] Dorm P has two wings, wing 1 ("P1") and wing 2 ("P2"), separated by an officer station. Mr. Currie resided in P2, where he was attacked.

[6] Defendant's exhibit photos of the dorm were taken in October 2024 by an FDC employee to facilitate the litigation for both parties.

*Bathroom Attack*

The bathroom is directly in front of the officer station. [Currie Dep. at 19:9-11]. The bathroom was open to the bay area, without doors, and directly across from the officer station. [*See* Def. Exs. I, J, dorm photos, ECF Nos. 78-9, 78-10 (under seal)].

An inmate nicknamed "Pace," a member of the Latin Kings gang, was at a sink brushing his teeth, and another inmate was in the shower. [Ch.-Sm. Dep. at 12:1-8, 12:3-25, 12:16-25].

Mr. Currie is openly gay. [Deposition of Brandon Williams ("Will. Dep.") at 62:7-9, ECF No. 90-1]. Gang members did not want any gay people or even gay-friendly people in the dorm. [Deposition of Chad Shaw at 24:17-23, ECF No. 78-6]. Mr. Currie was "all the way out" (i.e., very openly gay). [*Id*. at 24].

A Latin Kings gang member nicknamed "YG" was talking to Mr. Currie, "putting him down" because of his sexual preference. [Ch.-Sm. Dep. at 13:5-10]. Mr. Currie responded, "Why? I've been here so long and I'm not bothering nobody." [*Id.* at 13:21-14:2] Unprovoked, YG then swung at Currie and missed. [*Id.* at 14:2-4]. YG swung first. [*Id.* at 14:6-8].

Currie defended himself.[*Id.* at 14:12-14]. Pace then started assisting YG, and hit Currie over the head with a broomstick. [*Id.* at 14:14-18]. Three

to four more Latin Kings ran in with locks, sticks (mop handles and broomsticks), and other weapons, attacking Currie. [*Id.* at 14:18-19, 15:12-17]; [Currie Dep. at 18:18-20, 19:2-5]. Currie was hit so hard with a broom handle that the handle broke. [Currie Dep. at 20:25-21:4, 22:18-23].

### *Breaking Up the Fight*

The fight continued in the bathroom. [Ch.-Sm. Dep. at 15:22-24]. Inmate Charles Gaddis (aka "Mississippi") and three other inmates tried to break up the fight. [*Id.* at 17:2-5, 17:21-25, 18:12-14]. Gaddis and the others were successful and the attack stopped. [*Id.* at 18:15-17]. Everybody then went to their bunks. [*Id.* at 18:18-23, 20:20-24]. Mr. Gaddis helped Mr. Currie to his bunk. [Will. Dep. at 20:22-24].

The attack lasted 8 to 10 minutes [Ch.-Sm. Dep. at 16:21-24] right before Master Roster Count [*Id.* at 18:21-22]. After the first fight ended, none of the officers came onto the wing. [Will. Dep. at 40:7-13]. The officers in the officer station during the bathroom fight were those who conducted Master Roster Count. [*Id.* at 40:14-17]. McKinnie and Green did Master Roster Count that night. [*Id.* at 66:21-67:9]; [Ch.-Sm. Dep. at 22:17-23].

### *Visibility into Bathroom*

From the officer station, one can see directly into the bathroom and showers. [Will. Dep. at 20:13-14]. From the booth, officers can see down to

6

the restroom and can see sinks and showers. [McKinnie Deposition ("McK. Dep.") at 78:8-17, ECF No. 78-28]. The officers (in the booth) could have seen the fight in the bathroom. [Will. Dep. at 39:3-18]. During the 8-10 minutes, officers had clear vision. [Ch.-Sm. Dep. at 47:5-10]. Officers can still see even if inmates get up and block them; the "officer has a clear shot to see everything that's going on in both day rooms and to see the whole bed area of both sides." [*Id*. at 47:10-18]. If a fight were taking place near the bird bath sinks and the sheet was down, someone in the security booth should be able to see it. [McK. Dep. at 79:14-18].

Even if an officer were on the P1 side of the booth, the officer could see from where they were positioned (P1) into P2. [Ch.-Sm. Dep. at 67:9-16]. Chandler-Smith testified that one could see all the way from the P2 bathroom to the P1 bathroom through the officer station: "But if you stand in the bathroom and you look, you could look straight through the officer's station to the other bathroom. So it's a clear view." [*Id*. at 67:19-21].

*Ability to Hear*

Officers inside the booth could hear inmates if they call and yell for someone. [McK. Dep. at 40:1-12]. McKinnie testified If inmates are yelling in the dorm, that's generally something she could hear. [*Id*. at 40:25-41:9].

*Bathroom Injuries*

7

As a result of the attack, Mr. Currie (aka "Boots") was injured, with a busted lip, and was bleeding from his upper eye area. [Ch.-Sm. Dep. at 19:3-4, 19:9-11, 19:12-19].[7] There was blood all over the bathroom. [Currie Dep. at 21:6-8]. Mr. Currie had multiple bruises, cuts and gashes on his face, which was bleeding, and his shirt was bloody and ripped.[8] [*Id*. at 21:19-23, 22:6-11, 23:12]. Mr. Curry was bleeding from his nose and his mouth area. [Will. Dep. at 22:21-23].

### At the Bunks

Back at the bunks, YG and other Latin Kings started grabbing weapons and packing their property. [Ch.-Sm. Dep. at 19:20-24]. The Latin Kings packed their belongings because they knew they were going to "jail" (i.e., confinement) (as a result of their attack). [*Id*. at 19:25-20:7].

Mr. Currie went to his bunk and started to pack his property. [Currie Dep. at 24:4-6, 26:8-10]. The gang members were yelling out, saying, "Gays got to get on the door, got to [...] check in, got to get out of here." [*Id*. at 26:11-17].[9] Being told to "get on the door" means the inmate being told

---

[7] Currie was known as "Boots" [Will. Dep. at 61:1-12], and inmate deponents sometimes referred to Mr. Currie as "Boots."

[8] In his testimony, Mr. Currie preferred the word "gashes" to describe his injuries in this first attack, as he associated the word "cuts" with being stabbed by knives, as during the second attack. [Currie Dep. at 23:12-15].

[9] To "get on the door" is the same as to "check in"—i.e., to seek to leave the dorm for protective confinement.

has to leave the dorm; the inmate is being forced out. [Will. Dep. at 67:10-14] [Green Dep. at 29:12-19]. To "check in," an inmate would have to go to "the police" (corrections officers) and tell them he does not feel safe in the dorm. Officers would send the inmate to confinement or somewhere else. [Will. Dep. at 67:15-19].

Two gay or gay-friendly inmates (Gaddis and Williams) asked Currie if he was okay, trying to figure out what to do. [Currie Dep. at 26:17-27:1]. Meanwhile, gang members were standing around yelling that Currie needed to get out of the dorm. [*Id*. at 27:25-28:3]. Meanwhile Ofc. Green and Sgt. McKinnie were in the officer station, [*Id*. at 28:13-20],[10] where McKinnie said she could hear and see everything [*Id*. at 29:18-23].

*Master Roster Count*

Master Roster Count started at 10 pm. [McK. Dep. at 25:15-17]. The bathroom attack happened right before Master Roster Count. [Ch.-Sm. Dep. at 18:21-22]. Master Roster Count requires two officers to count.

---

[10] In his deposition, Mr. Currie was reluctant to identify Defendant/Officer Jane Doe as Officer Delisia Green without seeing a photograph of her. Pursuant to Court order [ECF 80], on January 14 Plaintiff's counsel were able to Zoom conference with Mr. Currie and show him FDC photos of Sgt. McKinnie, Sgt. Patterson and Officer Green. Mr. Currie confirmed that Sgt. McKinnie was the same McKinnie he testified about, and that Jane Doe was Officer Green. *See* Declaration of Joshua Tarjan [ECF No. 90-3]. *See also* Verified Declaration of Devon Currie [ECF No. 102].

[McK. Dep. at 46:25-47:5]. McKinnie and Green did the Master Roster

Count that night. [Ch.-Sm. Dep. at 22:17-23]; [Will. Dep. at 66:21-67:9].

*First Count*

Ofc. Green did the first count. [Ch.-Sm. Dep. at 23:24-24:3]. She

counted the first couple beds and came to Currie's bed. [Currie Dep. at

33:3-6]. Green had to look at Currie to make sure he was the same inmate

in her pictures. [*Id*. at 35:9-7]. Green was standing right in Currie's face,

talking to him. [*Id*. at 38:21-22, 39:1]. Green saw that Currie was "beat up

on bad" and that his wounds were fresh. [*Id*. at 39:8-10]. Currie stopped

Green while she was doing count and spoke with her. [*Id*. at 30:6-8, 32:6-

10]; [Ch.-Sm. Dep. at 25:4-15]. Currie tried to tell her that he wanted to sign

into protective custody, that he was in fear for his life. [Currie Dep. at 31:12-

21]. Green said to Currie, "I'm busy. I'm not doing no paperwork." [*Id*. at

31:22-23]. She could see his bruises, blood all over his ripped clothes, and

his property packed right in front of her. [*Id*. at 31:23-32:1]. But she

disregarded all that and just kept doing the count. [*Id*. at 33:7-14].

Plaintiff recalls that the officer who "I begged for protection," and who

said "I'm busy; I aint doing no paperwork" was Ofc. Delisia Green as she

reached his bunk during Master Roster count and walked away. [Currie

Decl. at 2-3, ¶¶ 5-7, ECF 102]. He stated that both Sgt. McKinnie and Ofc.

Green "would have seen my bloody injured state and heard me ask for protection and heard the gang members threaten me if I was not allowed to 'check in'" (seek protection). [*Id*. at ¶ 8]. He stated that "the threats by the Latin Kings were aimed at the gay inmates in the Dorm but they were also aimed at the officers because they knew we needed their cooperation to actually leave the Dorm, which was the Latin Kings goal." [*Id*. at ¶ 10].

### *Ruckus*

Master Roster Count is the most important count of the day. All inmates know to be quiet. [Currie Dep. at 38:2-4]. An officer would go from bunk to bunk checking photos on the Roster with faces and inmate I.D. cards. [Green Dep. at 30:15-24]. Inmates are supposed to sit on their bunks. [*Id*. at 31:20-32:2]. Standing up and talking is a violation. [Currie Dep. at 34:3-6]. But on this night, inmates were "disrespecting" the count. [*Id*. at 38:4-5]. The scene was tense. [*Id*. at 33:15-25, 39:17-18]. The Latin Kings were yelling, "You all gays got to get out and get on the door. You all got to get up out of here. You all got sign into protective custody." [*Id*. at 37:21-25, 38:1-6]. No one else was yelling. [*Id*. at 38:1-11].

The Latin Kings yelled (their threats) while McKinnie and Green were right there on the floor. [*Id*. at 38:21-25]. McKinnie and Green heard the yelling. [*Id*. at 37:15]. Green saw that rowdiness but kept doing count,

11

acting like she didn't see anything. [*Id*. at 34:7-8]. Green eventually got to Plaintiff's bunk, and stood right in Currie's face, talking to him. [*Id*. at 38:21-22, 39:1]. Green saw Currie was "beat up on bad" and that his wounds were fresh. [*Id*. at 39:8-10]. He had bruises, cuts and bleeding gashes on his face. His shirt was bloody and ripped. [*Id*. at 21:19-23, 22:6-11, 23:12]. He asked Ofc. Green for help, to allow him to "check in," and she replied that she "wasn't doing no paperwork. [Currie Decl. at 2-3, ¶¶ 5-7]. "Checking in" meant asking for protection, getting out of the dorm. [Green Dep. at 29:12-25]. It involves some paperwork—an incident report, a bunk assignment, property sheet, witness statement. [*Id*. at 32:13-33:17]. The inmate is moved to a holding cell in another area. [*Id*. at 33:18-20].

After Green counted, McKinnie also did her count. [Ch.-Sm. Dep. at 24:4-10]. Currie spoke with McKinnie, saying that he was just attacked and that the Latin Kings want him to check in. [*Id*. at 26:5-27:2]. But McKinnie proceeded with count, nonchalant about what Currie had said. [*Id*. at 27:13-16]. McKinnie subsequently said, like a joke, "Oh, he better fuck or fight. Ain't no checking in." [*Id*. at 27:13-24]. McKinnie then went back to the booth. [*Id*. at 28:3-5]. Then, despite the chaotic scene, she and Green went to other side of dorm to count Wing 1. [*Id*. at 28:6-9, 24:12-19].

### Could Have Stopped Count

Ofc. Green has testified to counting Plaintiff but doesn't remember if he had a bloody face or torn and bloody clothing. [Green Dep. at 38:14-19]. Other witnesses did remember. Inmate Howard Chandler-Smith testified that Mr. Currie had a "busted lip," and was bleeding from his upper eye area. [Ch.-Sm. Dep. 19:10-11]. Inmate Brandon Williams observed that Mr. Currie was bleeding from his nose and mouth. [Williams Dep. 22:21-13].

If count is taking place and someone is injured, has blood on them and is asking to check in, the officer probably should be calling emergency traffic and getting people down there (to the dorm). [McK. Dep. at 70:16-21]. Emergency traffic can be called in the middle of count (for help). [*Id*. at 71:2-4]. Stopping count to help an inmate is "not going to be a big problem." [*Id*. at 71:10-20]. Once the inmate is removed officers can go back and do their count again. [*Id*. at 71:16-20]. Where there's violence between inmates and injuries to inmates, count can be stopped, inmates can be moved and then count is redone. [*Id*. at 93:24-94:10].

*Backup on Standby*

Before Currie was later stabbed, Ofc. Green was aware of a disturbance in the dormitory and had backup officers on standby. [Green Dep. at 52:4-7]. She testified:

> I already had backup on standby because it was -- you just kind of -- when you're in the prison system, you know things go on.

13

So, you have them on standby already. I thought you need to put them on standby just because of the environment that we're in and that's all. I just had them on standby already and when the situation happened, I called emergency traffic."

[*Id*. at 8-11].

### *Second Attack*

After count in P2 was completed YG stood up and yelled across the dorm at Currie, "What's up? You, you getting on the door or let's rock out." [Ch.-Sm. Dep. at 28:6-29:7]. Other Latin Kings then got up. [*Id*. at 29:8-12]. The Latin Kings had their knives and other weapons "out in the open," unconcealed. [*Id*. at 29:12-14]. YG tried to stab Currie, but Gaddis said, "Watch out, Boots." [Ch.-Sm. Dep. at 30:17-24]. Currie "took a step to the left, causing YG to miss. [*Id*.] And that's when everything escalated." [*Id*.]

After YG missed, the Latin Kings attacked Brandon Williams. [*Id*. at 30:25-31:10]. Williams, Gaddis and Currie were being chased all over the dorm. [*Id*.] The Latin Kings were hitting them with broomsticks, locks in socks, and knives. [*Id*.] Chandler-Smith testified the scene was like WWE WrestleMania and "looked like a war zone." [*Id*. at 31:25-32:3].

Eight to ten Latin Kings attacked at this point. [*Id*. at 32:10-12]. Three (gang members) attacked Currie, four chased Williams around the dorm, and others chased Gaddis. [*Id*. at 32:22-33:2]. Currie saw four gang members chasing Williams and ran to help him. [*Id*. at 38:16-20]. The Latin

Kings encircled Williams and Currie by the officer station. [*Id*. at 40:2-8].

Despite the warnings that arose during Master Roster Count, and Plaintiff's pleas for help, it was not until after the Master Roster Count in Dorm P, Wing 2, when Green saw gang members "utilizing weapons and stabbing one another" that Green actually summoned a response team to Dorm P to control the violence. [ECF No. 89-1, Green Affidavit at ¶ 7).

Williams testified the second fight ended when Captain Heffner and other officers rushed into the dorm. [Will. Dep. at 28:21-29:4, 29:11-16].

Currie, Williams and Gaddis were never armed. [*Id*. at 68:5-10].

*Duty*

An officer (in the booth) is supposed to be paying attention to what's going on in the dorms at all times. [McK. Dep. at 82:9-14]. An officer in the booth focusing on one wing must not ignore the other wing and cannot neglect one side. [*Id*. at 82:15-18, 22-24].

Each Florida Department of Corrections (FDC) employee's conduct "shall at all times maintain proper security and welfare of […] inmates […]." F.A.C. 33-208.002 Rules of Conduct. (eff. 6.3.21), § (3)(a). "No employee shall willfully or negligently treat an inmate in a cruel or inhuman manner […]." *Id*. at § (8). "Every employee has the responsibility to protect and safeguard […] the person and property of inmates […]." *Id*. at § (24).

15

*Injuries after the second fight*

After being stabbed, Mr. Currie fell unconscious [Currie Dep. at 57:16-24] and awoke in the medical unit, where he kept going in and out of consciousness [*Id*. at 17:11-15]. He had been stabbed in the lung, was bleeding internally and couldn't breathe. [*Id*. at 17:17-22]. He was transported (by ambulance) to the hospital, where he spent five days [*Id*. at 17:23-24], during which they pumped and drained his lung [*Id*. at 57:1-6].

Mr. Currie almost died. [*Id*. at 67:8]. And Mr. Chandler-Smith believed Mr. Currie was dead, as much blood was on Mr. Currie's shirt, like the size of a bowling ball. [Ch.-Sm. Dep. at 66:22-24].

Latin Kings stabbed Williams in the left top shoulder and the right back shoulder. [Will. Dep. at 26:14-16, 21-24]. Williams received stitches and staples. [*Id*. at 36:7-11].

Gaddis's cheek was slashed from his ear to his mouth, long and deep. [*Id*. at 30:12-19, 22-25]. Williams testified he could see into Gaddis's mouth through the slash, which was "flopping." [*Id*. at 31:1-3].

*Close Management*

When he returned from the hospital, Mr. Currie was unfairly placed on Close Management for fighting during the July 20 incident, even though he always acted in self-defense. [Currie Dep. at 62:12-19]. Gaddis and

16

Williams suffered the same treatment. It is documented that prison officials had video of the incident and it would have been easy enough to pinpoint the source of the violence and spare the victims this punishment.

*Video Spoliation*

Video from the incident was viewed by FDC staff [Ch.-Sm. Dep. 71:13-16] and downloaded by Capt. Heffner and Inspector Winterburn and documented as being sent to the Office of the Inspector General ("OIG") [*See* MINS Incident Report 7/22/22 (redacted), ECF No. 91-1]. But FDC could not find the video in response to Plaintiff's subpoena. The disc turned over to the OIG's office was blank. [ECF Nos. 120-2, Roberts E-mail; 120-3, MINS report 7/21/22]. Officer Green remembers reviewing the video after the event. [Green Dep. at 43:2-8]. Other witnesses remember seeing or hearing reference to the video. For example, Howard Chandler-Smith testified that staff went to the officer's station, watched a video and then (based on the video) started pulling inmates involved in the incident. [Ch.-Sm. Dep. 44:14-17, 71:13-22].

Defendant Green later saw video clips of the incident on the video monitoring screen in the officer's station. [Green Dep. at 43:2-8]. She does not recall being interviewed by Captain Heffner. [*Id*. at 43:20-22]. When asked if she downloaded the video, she stated, "I didn't burn it. Someone

else did." [*Id*. at 45:16-17]. She thinks she filled out a witness statement. [*Id*. at 44:10-12]. No statement by her was produced in discovery, although requested. Important evidence existed and then, suddenly, it didn't.

## Memorandum of Law

Summary judgment may be granted only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court considering a summary judgment motion must "draw all reasonable inferences in favor of the party opposing summary judgment." *Glasscox v. Argo*, 903 F.3d 1207, 1212 (11th Cir. 2018). Even when the parties agree on a set of facts, a court should deny summary judgment if "reasonable minds might differ on the inferences arising from undisputed facts." *Id*. (quotation omitted). If a factfinder could draw more than one inference from a set of facts, and those multiple inferences create a genuine issue of material fact, summary judgment must be denied. *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1315 (11th Cir. 2007). Credibility determinations, weighing of evidence, and drawing of legitimate inferences are reserved for the jury, and a judge should not appropriate those functions when ruling on a motion for summary judgment. *Id*.

**I.    A reasonable jury could conclude that Ofc. Green failed to intervene and protect Mr. Currie during count in violation of the**

**Eighth Amendment.**

### A. Eighth Amendment standard.

To establish a claim under 42 U.S.C. § 1983, Mr. Currie must establish (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under color of state law. *Holmes v. Crosby*, 418 F. 3d 1256, 1258 (11th Cir. 2005).

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828–29 (1994). Accordingly, prison officials have a duty to protect prisoners from each other. *Id*. at 833; *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir.1986) (inmates have "a constitutional right to be protected from the constant threat of violence and from physical assault by other inmates"). In order to constitute "deliberate indifference," the prison official must have subjective knowledge of the risk of serious harm, and must nevertheless fail to reasonably respond to the risk. *Farmer*, 511 U.S. at 837–38. A prison official must also have a sufficiently culpable state of mind to be deliberately indifferent. *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir.2003). Plaintiff must allege an affirmative causal connection between each specific Defendant's conduct and the alleged deprivation of his constitutional rights. *Zatler*, 802 F.2d at 401.

To survive summary judgment on his section 1983, Eighth Amendment claim, the inmate is "required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995) (quoting *Farmer*, 114 S.Ct. at 1974). Causation is "a causal connection between the defendants' conduct and the Eighth Amendment violation." *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015).

One test for "deliberate indifference" under the Eighth Amendment is "subjective recklessness" as used in the criminal law. *Farmer*, 511 U.S. at 839-40; *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024). A prisoner must establish "'both that [1] the defendant actually (subjectively) knew that an inmate faced a substantial risk of serious harm and that [2] the defendant disregarded that known risk by failing to respond to it in an (objectively) reasonable manner.'" *Cox v. Nobles*, 15 F.4th 1350, 1358 (11th Cir. 2021) (quoting *Mosley*, 966 F.3d at 1270).

"Prison correctional officers may be held directly liable under § 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence. However, in order for liability to attach, the officers must have been in a position to intervene." *Terry v. Bailey*, 376 F. App'x 894, 896

20

(11th Cir. 2010) (citations omitted).

The Supreme Court has held that a "prison official's 'deliberate indifference to the serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.'" *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976). In other words, because an inmate "must rely on prison authorities to treat his medical needs," prison officials have an "obligation to provide medical care" and failure to meet that obligation can constitute a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 103; *see West v. Atkins*, 487 U.S. 42, 56 (1988) (noting that a state has "an affirmative obligation to provide adequate medical care" to prisoners).[11] "Analyzing an inmate's deliberate indifference claim involves two components: whether the inmate had a serious medical need, and whether the defendant's response to that need was deliberately indifferent." *Id*. This is a fact issue for a jury.

### B. Crediting Mr. Currie, Ofc. Green's failure to protect was deliberately indifferent.

#### 1. Mr. Currie faced substantial risk of serious harm.

---

[11] It should be kept in mind that although Defendant Green denies seeing the results of the first attack or the open threats of further harm from gang members, she did not take protective action until she saw inmates stabbing each other. [ECF No. 89-1, Green Affidavit at ¶ 7]

"Prisons and jails are inherently dangerous places." *Nelson v. Tompkins*, 89 F.4th 1289, 1306 (11th Cir. 2024), *cert. denied sub nom. Sellers v. Nelson*, No. 23-1374, 2024 WL 4426712 (U.S. Oct. 7, 2024) (citing *Farmer*, 511 U.S. 825 at 858, (Thomas, J., concurring in the judgment) ("Prisons are necessarily dangerous places ....")); *Kincaid v. Williams*, 600 U.S. ——, 143 S. Ct. 2414 (2023) (Alito, J., dissenting) (referring to "the uniquely dangerous context of prison"); *United States v. Prevo*, 435 F.3d 1343, 1346 (11th Cir. 2006) ("Because of the character of prisoners and the nature of imprisonment, corrections facilities are volatile places, brimming with peril, places where security is not just an operational nicety but a matter of life or death importance.")

The events described by multiple witnesses show Dorm P wing 2 as dangerous that day. Many of the inmates involved here had convictions for violent crimes, including murder. See, e.g., FDC online profiles for:

- Rascual M Rentas (aka "Pace"), 2nd degree murder (sentenced to life), ECF 78-20, Def. Ex. T;

- Luis M Rodriguez (aka "Peru"), 2nd degree murder, kidnapping, robbery with gun or deadly weapon (20-year sentence), ECF 78-21, Def. Ex. U;

- Wilson A Rodriquez (aka "YG"), robbery with gun or deadly weapon (35-year sentence), ECF 78-22, Def. Ex. V;

- Cody Parker, aggravated battery (more than 5-year sentence), ECF 78-24, Def. Ex. X;

- Chad Shaw, "violent career criminal in possession of gun (sentenced to life), aggravated assault with intent to commit a felony (5-year sentence), robbery with gun or deadly weapon (15-year sentence) [ECF No. 90-5];

- Michael Marceau, kidnapping and armed burglary (30-year sentence) [ECF No. 90-6].

Dorm P2 housed over 50 inmates. [*See* Def. Ex. D, Photo of dorm, ECF No. 78-4 (under seal)]. Presumably many of those not listed above were also convicted of violent crimes. Given (i) the number of violent criminals in the dorm, some with homicidal histories; (ii) the loud, repeated, aggressive verbal threats by the Latin Kings to Mr. Currie to "check in"— which were heard by McKinnie and Green [Currie Dep. at 37:15]—and (iii) the fact that during count the officers could see that Mr. Currie had already been injured, Mr. Currie clearly faced a substantial risk of serious harm, as underscored by the subsequent attack in which he was chased by multiple Latin Kings with knives and nearly died as he was repeatedly, viciously stabbed to the point of unconsciousness, suffered a punctured lung, and required a five-day hospital stay. Nothing in the record indicates that Mr. Currie did not face a substantial risk of serious harm.

### 2. Ofc. Green was deliberately indifferent to the risk of harm to Mr. Currie.

With respect to the bathroom attack, a reasonable jury could draw the inference that given the 8 to 10 minute length of the attack, Green

observed the fight, given (i) the visibility of the bathroom from the officer station, (ii) the noise that must have occurred during the fight, and (iii) the fact that officers in the booth are trained to pay close attention to what's going on in the dorms at all times, [McK. Dep. at 82:9-14]. Green (then referred to as "Jane Doe," later Green) was in the officer station during the first "fight." [Currie Dep. at 29:13-20], [Will. Dep. at 40:14-17, 66:21-67:9]. Neither she nor Sgt. McKinnie did anything to stop it. Given the spectacle of the first attack and the ferocity of the threats of harm voiced by gang members afterwards, a reasonable jury could draw the inference that she was deliberately indifferent to the risk to Mr. Currie during that initial fight.

Defendant Green admits she counted Currie. [Green Dep. at 40:6-15]. She would have heard the Latin Kings yelling for Mr. Currie to check in. [Currie Dep. at 37:15, 21-25]. Green was standing right there talking to him. [*Id*. at 38:21-22, 39:1]. She had to look at Mr. Currie and his photo to match him with the photo on her roster. [Green Dep. 30:18-25].[12] A reasonable jury could believe that she was close enough to see his wounds, the blood

---

[12] Inmate Chad Shaw described Master Roster Count: The officer has a master roster sheet with every bunk number, with every inmate's name. When the officer comes to your bunk you have to show your ID and say your name and DC number. The officer then matches that with the master roster sheet. The officer goes from bunk to bunk doing this, from bed to bed, all the way around the whole dorm. [*See* Shaw Dep. at 102:17-103:3].

on his face, and his bloody and ripped shirt.[13]

McKinnie admitted that count could be stopped to move an injured inmate seeking to check in. [McK. Dep. at 93:24-94:10]. Here, the officers could have stopped the Master Roster Count to move Mr. Currie to safety (e.g., protective confinement) and obtain medical treatment for him. Here, however, Green deliberately ignored the Latin Kings' shouted threats; deliberately ignored the fact that the Latin Kings were violating the rules and standing and yelling during the count (i.e. disrespecting the count procedures) [*see* Currie Dep. at 33:15-25, 36:21-25, 37:1-6, 39:17-18]; and deliberately proceeded nonchalantly with the count, ignoring Mr. Currie's plea for help. [Ch.-Sm. Dep. at 27:13-16].

Green knew there was a risk of danger. She knew "things [were] going on" and had emergency backup on standby. [Green Dep. at 52:4-11]. This shows she knew there was a risk to Mr. Currie, who had directly told Green he was in fear of his life, asked for protective custody, and bore fresh wounds (blood on his face) and wore a bloody, torn shirt. [Currie Dep. 38:21-22, 39:1, 39:8-10, 30:6-8, 32:6-10, 31:12-21]. Yet after finishing count in Wing 2, she went over to Wing 1 to conduct count there—leaving

---

[13] It should be remembered that the gang threats were addressed as much to the officers as to the gay inmates because the officers had to cooperate in removing the gays from the Dorm. (ECF 102 at ¶ 10).

Mr. Currie to be stabbed. Her statement to Currie, "I'm busy. I'm not doing no paperwork," [*Id.* at 31:22-23], demonstrates callous and reckless indifference. A jury could reasonably find Green's putting backup on standby acknowledged she drew an inference of risk, although it could take several minutes for officers to arrive at the Dorm for an emergency, enough time for Currie to be stabbed once the knives came out.

A delay of five minutes in such cases may be unreasonable. *See Woodyard v. Alabama Dep't of Corr.*, 700 Fed. Appx. 927, 934 (11th Cir. 2017) ("[T]he Constitution requires that prison officials take reasonable measures to protect inmate safety. Any reasonable officer should have known that he could not, in keeping with that standard, delay for five minutes taking any action while one inmate assaulted another one.").[14]

A reasonable jury could find three to five minutes enough time for an inmate to be attacked and stabbed, and that it was unreasonable for Green to leave Currie vulnerable to attackers, knowing that it could take up to five minutes for backup to arrive once she called them.

The reality is that Green did not want to be bothered with paperwork. Nothing in the record shows Green ever attempted to help Mr. Currie leave

---

[14]McKinnie testified that once emergency traffic is called, officers must wait for enough officers before going into the dorm, which might be three minutes, but could be up to five minutes. [McK. Depo at 99:23-101:2].

for safety or obtain medical treatment for him. A reasonable jury could find

that Green was deliberately indifferent to the risk of harm to Mr. Currie.

### 3. With respect to causation, Ofc. Green's deliberate indifference directly resulted in Mr. Currie's life-threatening injuries.

"A causal connection may be established by proving that the official

was personally involved in the acts that resulted in the constitutional

deprivation." *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986).

Personal participation is only one of several ways to establish the requisite

causal connection. *Id*. For purposes of determining whether an officer

caused the Eighth Amendment violation the "critical" question is whether

the officer was "in a position to take steps that could have averted the

stabbing incident ... but, through [deliberate] indifference, failed to do so."

*Rodriguez v. Sec'y for Dept. of Corr.*, 508 F.3d 611, 622 (11th Cir. 2007).

The Court looks to the officer's "duties, discretion and means." *Id*. Here

Green was in a position to protect Mr. Currie.

Green had a duty to protect Currie under *Farmer*. Moreover, FDC

regulations required Green to protect him per FDC Rules of Conduct

(F.A.C. 33-208.002, eff. 6.3.21): Each FDC employee "shall at all times

maintain proper security and welfare of […] inmates […]." § (3)(a). "No

employee shall willfully or negligently treat an inmate in a cruel or inhuman

manner [...]." *Id*. at § (8). "Every employee has the responsibility to protect and safeguard [...] the person and property of inmates [...]." § 24.

Green's violation of FDC policies—her failure to protect Mr. Currie—is evidence of deliberate indifference. *See Stewart v. Johnson*, No. 5:18-CV-37, 2021 WL 3081882, at *3 (S.D. Ga. July 21, 2021) ("evidence of a policy violation may be evidence of deliberate indifference"); *Hope v. Pelzer*, 536 U.S. 730, 743-44 (2002) (holding that a disregard of prison regulations "provides equally strong support for the conclusion that [officials] were fully aware of the wrongful nature of their conduct.").

Had Green done what she was required to do and had the means to do—intervene, stop count, and help Mr. Currie check in to protective confinement—Mr. Currie would have been away from Dorm P2—as both the Latin Kings and Mr. Currie sought—and the Latin Kings would not then have attacked and stabbed Mr. Currie. A reasonable jury could find that but for Green's deliberate indifference, Mr. Currie would not have ended up in the hospital with life-threatening injuries.[15]

---

[15] The fact that Green, instead of offering Plaintiff protection, merely alerted response teams, at least shows she drew an inference of risk. But it was not until the knives were out and inmates were being stabbed that she called backup.

## C. Defendant is not entitled to qualified immunity.

Defendant asserts that the allegations do not show any violations of clearly established law. She is wrong.[16]

A plaintiff may establish that a right is clearly established if he shows: (1) "that a materially similar case has already been decided, giving notice to the police;" (2) "that a broader, clearly established principle should control the novel facts in this situation;" or (3) "this case fits within the exception of conduct which so obviously violates [the] constitution that prior case law is unnecessary." *Mercado v. City of Orlando*, 407 F. 3d 1152, 1159 (11th Cir. 2005). While these facts are hardly novel, the "relevant facts are construed in the light most favorable to the non-movant—*i.e.*, the plaintiff—and the court should decide the issue based on those facts." *Simmons v. Bradshaw*, 879 F.3d 1157, 1163–64 (11th Cir. 2018).

The Supreme Court has stressed that the qualified-immunity cases "illustrate the importance of drawing inferences in favor of the nonmovant."

---

[16] As the U.S. Supreme Court held in *Farmer v. Brennan*, holding as unconstitutional the exposure of a transgenger inmate to harm from inmates with a known violent intolerance for transgender inmates: "In particular, as the lower courts have uniformly held, and as we have assumed, 'prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners.'" *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1976 (1994). Green was aware of the risk of harm, evidenced by her calling in a standby alert, yet she did not take protective action until the knives actually came out and gay inmates were already being stabbed.

*Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

Qualified immunity is the Defendant's initial burden. *Singleton v. Dep't of Corr.*, 277 F. App'x 921, 923 (11th Cir. 2008) ("the burden of establishing an affirmative defense lies on the defendant, not on the plaintiff").

Application of qualified immunity involves a two-part test. *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983). First, to show his or her actions were within the scope of discretionary authority, the government official must demonstrate "objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988). Once the government official has satisfied this burden, the burden shifts to the plaintiff to show lack of good faith on the part of the government official by demonstrating that the official's actions clearly violated constitutional law. *Zeigler*, 716 F.2d at 849.

Because Defendant presents no argument to "demonstrate 'objective circumstances which would compel the conclusion that [her] actions were undertaken pursuant to the performance of [her] duties and within the scope of [her] authority,'" *Rich*, 841 F.2d at 1558, the Court should decline to consider Defendant's invocation of qualified immunity.

Even so, Defendant's efforts to hide behind qualified immunity should

be rejected for two reasons. First, the law was clearly established at the time that her conduct violated the Eighth Amendment. Second, the text of the 1871 Civil Rights Act expressly excludes common-law immunity.

It was clearly established at the time that if any officer actually knew of a condition that posed a substantial risk of harm, and failed to address it, they violated the Constitution. *See Patel v. Lanier County Georgia*, 969 F.3d 1173, 1190 (11th Cir. 2020); *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) ("[I]t is well settled that a prison inmate has a constitutional right to be protected ... from physical assault by other inmates."); *Cottone v. Jenne*, 326 F.3d, 1352 at 1358–60 (11th Cir. 2003); *Farmer*, 511 U.S. at 832. Because the record shows the Defendant knew of the serious risk and failed to protect Plaintiff and failed to intervene to remove him to protective confinement, the Defendant violated clearly established law.

In *Woodyard v. Alabama Dep't of Corr.*, 700 Fed. Appx. 927, 934 (11th Cir. 2017) no qualified immunity attached where the officer should have known that he could not delay for five minutes taking any action while one inmate assaulted another inmate. Here, with inmates yelling for Currie—bleeding and wearing a torn shirt—to leave the dorm, Green put backup on standby and then left to count Wing 1. But officers could take 3-5 minutes to respond to the dorm had she called in an emergency. [McK.

31

Depo at 99:23-101:2]. A reasonable jury could find that she knew or should have known this 3-5 minute gap could be sufficient time for a near-fatal stabbing. In other words, Green created an inherent delay when—knowing of an ongoing risk of substantial harm—she left Wing 2 with a looming emergency. Minutes later, the attack started. A delay of 3-5 minutes was then inevitable. On this basis, no qualified immunity should attach.

However, Plaintiff need not find a factually identical case describing a corrections officer's failure to interrupt count to protect an injured, bloody inmate against loud, verbal threats by other inmates, and where the officer knows that the outcome is possible death, because "a broader, clearly established principle should control the novel facts," *Mercado*, 407 F. 3d at 1159, and the Eleventh Circuit and Supreme Court have held that the right is broadly clearly established when there are circumstances showing that nothing is done to address a serious risk of harm to which an officer is deliberately indifferent. *See*, *e.g.*, *De Veloz v. Miami-Dade Cnty.*, 756 Fed. Appx. 869, 880 (11th Cir. 2018) (every reasonable prison officer and medical personnel would have known that wrongfully misclassifying a biological female as a male inmate and placing that female in the male population of a detention facility was unlawful; "the unlawfulness of placing a female detainee within the male population was readily apparent to any

prison officer or medical personnel").

"[T]he Eighth Amendment imposes duties on prison officials to, *inter alia*, "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832. *Farmer* imposed a duty on Green to protect Mr. Currie from violence at the hands of other prisoners. *Id*. at 833. Here, there was an objective and subjective basis for the belief that Plaintiff faced a substantial risk of harm, as Mr. Currie was in a large dorm with historically homicidal and violent criminals, in an inherently dangerous place. Inmates were shouting at Mr. Currie to leave, which Green could hear. Green had to go to Mr. Currie's bunk to check his ID for count, and had to look at his face, on which she had to see his blood and busted lip. She was also close enough to see the blood on his ripped shirt. Moreover, he asked her to "check in," so she knew he was seeking safety.

Green acted contrary to her duty to protect Mr. Currie against inmate-on-inmate violence as clearly established by *Farmer* and its progeny. *See, e.g.*, *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) ("[I]t is well settled that a prison inmate has a constitutional right to be protected ... from physical assault by other inmates.").

Also, given both her duty to safeguard the welfare of inmates and the bloody, injured state Mr. Currie was in after being attacked in the bathroom,

it was also obvious that she should have obtained medical treatment for him. But she never at any point took the initiative to get him such help.

As a parting note, Plaintiff questions the availability of common-law immunity in this context. The plain text of the 1871 Civil Rights Act, which was codified into section 1983 (which is only prima facie evidence of the law), expressly precludes qualified immunity. *See Sosa v. Martin Cnty.*, Fla., 57 F.4th 1297, 1303 (11th Cir. 2023) (Jordan, J., concurring); *Rogers v. Jarrett*, 2023 WL 2706752, at *7 (5th Cir. Mar. 30, 2023) (Willett, J., concurring) ("All to say, the Supreme Court's original justification for qualified immunity—that Congress wouldn't have abrogated common-law immunities absent explicit language—is faulty because the 1871 Civil Rights Act *expressly included such language*.") (emphasis in original), cert. denied sub nom. *Rogers v. Jarrett*, 2023 WL 6378558 (U.S. Oct. 2, 2023). The Court should deny Defendant's invocation of immunity because it is contradicted by the statutory text of the 1871 Civil Rights Act.

### D. Defendant is not entitled to dismissal of Plaintiff's request for punitive damages.

Defendant relies on a previously filed Motion to Dismiss to quash Plaintiff's request for punitive damages. [ECF No. 58 at 12]. Plaintiff previously responded [ECF No. 64] and reiterates his arguments:

Defendant's argument that punitive damages as barred by 18 U.S.C.

§ 3626(a)(1)(A) lacks merit for reasons explained in many opinions. *See*

*Smith v. Williams*, 3:23CV5661/TKW/ZCB, 2024 WL 4438320, at *5 (N.D.

Fla. Sept. 9, 2024), *report and recommendation adopted*, 3:23-CV-5661-

TKW/ZCB, 2024 WL 4434798 (N.D. Fla. Oct. 7, 2024) (citing *Blake v.*

*Ortega*, No. 3:23-cv-8553/LC/HTC, 2024 WL 2000107, at *4 (N.D. Fla. Mar.

18, 2024), *adopted by* 2024 WL 1996014 (May 6, 2024); *Santiago v.*

*Walden*, No. 3:23cv741/MMH/JBT, 2024 WL 2895319, at *9 (M.D. Fla.

June 10, 2024); *Walker v. Bailey*, No. 3:23-cv-511/MMH/MCR, 2024 WL

3520868, at *8 (M.D. Fla. July 24, 2024)).

As Judge Hope Thai Cannon reasoned in *Blake v. Ortega*, at *4,

Defendant's argument is that Plaintiff's request for punitive damages is

barred by section 3626 of the PLRA, which states as follows:

> Prospective relief in any civil action with respect to prison
> conditions shall extend no further than necessary to correct the
> violation of the Federal right of a particular plaintiff or plaintiffs.
> The court shall not grant or approve any prospective relief
> unless the court finds that such relief is narrowly drawn,
> extends no further than necessary to correct the violation of the
> Federal right, and is the least intrusive means necessary to
> correct the violation of the Federal right. The court shall give
> substantial weight to any adverse impact on public safety or the
> operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A). But, as Judge Cannon opined, "Punitive

damages are included within the definition of 'prospective relief' used in the

statute." *Blake* at*4 (citing *Johnson v. Breeden*, 280 F.3d 1308, 1325 (11th

Cir. 2002), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389, 395 (2015)).

Here, as in *Blake* at *4, Defendant attempts to argue punitive damages categorically cannot satisfy the requirements of 18 U.S.C. § 3626(a)(1)(A) because: (1) " 'correction' of [a] violation [of a federal right] is accomplished through compensatory damages and punitive damages are, by their nature, never corrective" [ECF No. 58 at 13]; and (2) punitive damages cannot be "narrowly drawn," "extend no further than necessary," or be the "least intrusive means," to correct the violation of a federal right [*Id*. at 13]. However, as in *Blake*, Defendant cites "no binding precedent which holds that section 3626 prohibits the assessment of punitive damages in prison conditions cases." *Blake* at *4 (quoting J. Cannon). And the Eleventh Circuit case Defendant does cite, *Johnson*, indicates punitive damages are permitted in prison conditions cases. *See Blake* at *4 (citing 280 F.3d at 1325 (finding section 3626's "requirements mean that a punitive damages award must be no larger than reasonably necessary to deter the kind of violations of the federal right that occurred in the case" and "that such awards should be imposed against no more defendants than necessary to serve that deterrent function and that they are the least intrusive way of doing so")). As Judge Cannon concluded: "Thus, the

36

current state of the law does not support the conclusion that section 3626 imposes a categorical prohibition on an award of punitive damages." *Blake* at \*4 (citing *Benton v. Rousseau*, 940 F. Supp. 2d 1370, 1379–80 (M.D. Fla. 2013) (finding prisoner was entitled to $15,000 in punitive damages for violations of his First and Fourteenth Amendment rights)).

Here, because the current state of the law does not support the conclusion that section 3626 imposes a categorical prohibition on an award of punitive damages, Defendant's motion to dismiss Plaintiff's request for punitive damages must be denied.

## II.    Conclusion

Mr. Currie's claims must be resolved by a jury, and his request for punitive damages must not be dismissed.

Respectfully submitted on July 7, 2025,

/s/ James V. Cook
JAMES V. COOK, ESQ.
Florida Bar Number 966843
Law Office of James Cook
314 West Jefferson Street
Tallahassee, FL 32301
(850) 222-8080; 561-0836 fax
cookjv@gmail.com

/s/ Joshua Tarjan
Joshua Tarjan (FBN 107092)
THE TARJAN LAW FIRM P.A.
12372 SW 82 Avenue
Pinecrest, FL 33156

(305) 423-8747
(323) 243-3186 (cell)
(786) 842-4430 (fax)
josh@tarjanlawfirm.com
*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT TO L.R. 7.1(F)

Pursuant to Local Rule 7.1(F), I hereby certify that the foregoing document contains 7,874 words, inclusive of headings, footnotes, and quotations, but exclusive of the case style, signature block and certificates.

*/s/ Joshua Tarjan*