UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DEVON CURRIE,

    Plaintiff,

v.                                           Case No. 5:23-cv-183-TKW-MJF

MICHELLE MCKINNIE, *et al.*,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff alleges that correctional officers violated the Eighth Amendment by failing to protect Plaintiff from attacks by gang-affiliated inmates, which resulted in inmates stabbing Plaintiff. Doc. 52. The two remaining Defendants—Michelle McKinnie and Delisia Green—filed respective motions for summary judgment. Docs. 78, 119. Plaintiff responded in opposition. Docs. 100, 120. The District Court should deny both motions for summary judgment because genuine issues of material fact remain outstanding.

### Procedural Background

On September 24, 2024, Plaintiff filed a second amended complaint pursuant to 42 U.S.C. § 1983. Doc. 52. In his second amended complaint,

Plaintiff asserts two Eighth-Amendment claims against two correctional officers, McKinnie and Green: (1) failure to protect Plaintiff from attacks by fellow inmates; and (2) deliberate indifference to a serious medical need.

On August 18, 2025, the undersigned recommended that the District Court dismiss Plaintiff's medical deliberate indifference claim against both McKinnie and Green. Doc. 125. If the District Court adopts the undersigned's report and recommendation, the only remaining claims would be Plaintiff's individual-capacity claims against McKinnie and Green for failing to protect Plaintiff from a "two-phase attack" at the hands of several gang-affiliated inmates. Doc. 52 at 7–9.

## MATERIAL FACTS

The parties have submitted conflicting evidence. Because Plaintiff is the non-moving party, the undersigned has stated the facts in the light most favorable to Plaintiff. *Swint v. City of Wadley*, 51 F. 3d 988, 992 (11th Cir. 1995).

Around 10:00 p.m. on July 20, 2022, Plaintiff entered the bathroom of the P-Dorm at Apalachee Correctional Institution. Three inmates affiliated with the Latin Kings gang attacked Plaintiff. Doc. 78-2 at 15–

16, 19. Defendants are correctional officers. At the time of the initial attack, Defendants were in the P-Dorm's officer's station, which had a direct view of the bathroom. Doc. 78-2 at 16, 20, 25. When Plaintiff exited the bathroom, he saw both McKinnie and Green "standing on the glass," observing him as he returned to his bunk.[1] Doc. 78-2 at 16, 29.

Shortly thereafter, Green entered the P-Dorm for master roster count—a process conducted by correctional officers to verify the identity of each inmate in the dorm at their respective bunk. Doc. 119-1 at 31–32. As Green conducted the count, McKinnie stood "right outside the officer station" where she could see and hear "everything that's going on." Doc. 78-2 at 29, 30–32. During the count, several gang-affiliated inmates yelled and threatened Plaintiff, saying "You all gays got to get out and get on the door. You all got to get up out of here. You all got to sign into protective custody." Doc. 78-2 at 38, 46.

---

[1] In his deposition, Plaintiff identified a Defendant as "Jane Doe." Later, Plaintiff confirmed that this "Jane Doe" is Defendant Delisia Green. Doc. 41. Plaintiff spells Green's Christian name as "Delisia." Doc. 41 at 2. Defendants also sometimes spell it that way, Doc. 89-1 at 2, as does the notarized oath attached to her deposition. Doc. 119-1 at 73. Other times, however, Defendants spell her name as "Delisha." Docs. 58 at 2; 87 at 1. In one document—a declaration purportedly signed by Green—Green uses both versions. Doc. 89-1 at 1.

When Green approached Plaintiff's bunk as part of the count, Plaintiff told her that he feared for his life and wanted to sign in to protective custody. Doc. 78-2 at 32–34. Plaintiff describes his appearance at this time as bloody with "multiple gashes" in his face, and his clothing was torn and bloody. Doc. 78-2 at 22, 32.

Rather than transfer Plaintiff to protective custody, Defendant Green purportedly responded "I'm busy. I'm not doing no paperwork." Doc. 78-2 at 32. Defendant McKinnie also heard Plaintiff's request to be placed in protective custody and joked, "Oh, he better fuck or fight. Ain't no checking in." Doc. 78-27 at 28.

As Green continued the count and McKinnie observed, gang-affiliated inmates yelled out "You all faggots got to get up out of here." Doc. 78-2 at 17, 45. Defendants ignored the threats and finished the count. Doc. 78-2 at 17, 45–46. After Defendants exited the dorm, six gang-affiliated inmates attacked Plaintiff again and stabbed Plaintiff six times. Doc. 78-2 at 47–49, 53.

## STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "material" if it could affect the outcome of the case. *Id.* When addressing a summary-judgment motion, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009).

## DISCUSSION

"Prison officials have an obligation to protect prisoners from violence inflicted upon them by other prisoners." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). To withstand a motion for summary judgment on a claim that prison officials failed to protect an inmate, a plaintiff must demonstrate the existence of a genuine issue of material fact with respect to the following elements:

    (1) the plaintiff faced a substantial risk of serious harm;

    (2) the defendant was deliberately indifferent to that risk; and

    (3) the defendant's deliberate indifference caused harm to the plaintiff.

*Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014); *see Cox v. Nobles*, 15 F.4th 1350, 1358 (11th Cir. 2021).

## A. Plaintiff Demonstrated the Existence of a Genuine Issue of Material Fact Regarding a Substantial Risk of Serious Harm

As to the first element, a plaintiff must proffer evidence only of "a *substantial risk* of serious harm—not actual harm." *Garrett v. Lumpkin*, 96 F.4th 896, 900 (5th Cir. 2024). The evidence must indicate the existence of "'a strong likelihood, rather than a mere possibility,' of grievous injury." *Nelson v. Tompkins*, 89 F.4th 1289, 1296 (11th Cir. 2024) (quoting *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990)). "An excessive risk of inmate-on-inmate violence creates a substantial risk of serious harm . . . ." *Oliver v. Harden*, 587 F. App'x 618, 620 (11th Cir. 2014); *Purcell ex rel. Estate of Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1320 (11th Cir. 2005) (same).

Specific threats of violence directed at a particular inmate may create a substantial risk of serious harm. *Marbury v. Warden*, 936 F.3d 1227, 1236–37 (11th Cir. 2019); *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 618–19 (11th Cir. 2007). Evidence of an "unjustified serious physical assault against an inmate" also can be sufficient to create a genuine issue of material fact as to this first element. *See McFadden v.*

*Lucas,* 713 F.2d 143, 146 (5th Cir. 1983); *see Caldwell,* 748 F.3d at 1100. Furthermore, threats of violence from inmates who already attacked an inmate can be sufficient for a jury to find that a substantial risk of serious harm existed. *Scott v. Miami Dade Cnty.*, 657 F. App'x 877, 881 (11th Cir. 2016). Evidence that a plaintiff suffered a serious physical injury also may create a genuine issue regarding the existence of a substantial risk of serious harm. *Moreno v. Bosholm,* 2025 WL 2371118, at *20 n.23 (4th Cir. Aug. 15, 2025).

Plaintiff presented evidence that he was severely beaten by inmates in the first round of attacks, and that as a result of the initial attack, he suffered gashes on his face and was bleeding. Doc. 78-2 at 22. Specifically, Plaintiff sustained a cut above his eye, bruising under his eye, a "busted lip," and was bleeding from his upper eye area, nose, and mouth. Docs. 78-6 at 56–57; 78-27 at 20; 90-1 at 22. Furthermore, the initial attack left Plaintiff's clothing torn and bloody. Docs. 78-2 at 22; 78-6 at 64–65.

Plaintiff also offered evidence that after the first round of attacks, the inmates yelled what Plaintiff considered threats: "You all gays got to get out and get on the door," and "You all faggots got to get up out of here." Doc. 78-2 at 17, 34, 38; *see also* Docs. 78-6 at 80; 78-27 at 12.

After their initial attack of Plaintiff, the assailants continued to enjoy access to Plaintiff and the ability to inflict serious harm on him. Docs. 78-2 at 17, 23, 40, 46; 78-27 at 29. Indeed, the assailants subsequently stabbed Plaintiff six times, and the injuries inflicted by the attackers required treatment at a hospital. Doc. 78-2 at 53–54, 57. Taken together, this evidence is sufficient to create a genuine issue of material fact as to the first element of Plaintiff's claim.

## B. Genuine Issues of Material Fact Exist Regarding the Deliberate Indifference Element

To establish that a prison official acted with deliberate indifference, a plaintiff must show that the defendant "(1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) engaged in conduct that amounts to subjective recklessness." *Stalley v. Cumbie*, 124 F.4th 1273, 1283 (11th Cir. 2024). To create a genuine issue of material fact, a plaintiff must submit evidence that the "defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff." *Id.* (quoting *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024)). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to

demonstration in the usual ways, including inference from circumstantial evidence." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

### 1. *Defendants' Actual Knowledge of the Risk to Plaintiff*

Defendants argue that they lacked knowledge of a substantial risk of serious harm. Docs. 78 at 20–22; 119 at 12–15.

***McKinnie's Presence.*** McKinnie argues that she could not have acted with deliberate indifference because she was only present in the P-Dorm *after* Plaintiff was stabbed. Doc. 78 at 16–18; 78-28 at 85. But there is a factual dispute as to McKinnie's location during the attacks. The following evidence—if believed by the jury—would place McKinnie in the P-Dorm before the inmates stabbed Plaintiff:

- Plaintiff testified to seeing McKinnie "standing on the glass" watching him walk from the bathroom to his bunk after the first round of the attacks. Doc. 78-2 at 16, 29.

- Plaintiff testified that McKinnie observed the master roster count—which preceded the second attack—from within the P-dorm. Doc. 78-2 at 49.

- Inmate Brandon Williams, who was present in P-Dorm on July 20, 2022, Doc. 90-1 at 20, testified that McKinnie was present in P-Dorm during master roster count, which occurred before the first round of the inmate attacks on Plaintiff. Doc. 90-1 at 67, 69–70, 74–75.

- Inmate Howard Chandler-Smith, who also witnessed the incident, Doc. 78-27 at 10, testified that McKinnie conducted master roster

count in P-Dorm and spoke with Plaintiff before the second round of the attacks. Doc. 78-27 at 27–31.

***The Inmates' Initial Attack of Plaintiff in the P-Dorm Bathroom.*** Next, McKinnie and Green argue that they did not observe the attack in the P-Dorm bathroom because a row of bunk beds partially obstructs the area of the bathroom where the attack occurred, and inmates purposefully attempted to conceal the attacks from the officers in the station. *See* Docs. 78 at 3, 22, 24–25, 78-4, 78-7 at 26, 83–84, 78-8–78-10, 119 at 13, 15. But at least the following evidence creates a genuine issue as to Defendants' awareness of the initial attack in the P-Dorm bathroom:

- Plaintiff testified that the attack in P-dorm's bathroom occurred "directly right in front of the office station." Doc. 78-2 at 16, 20.

- Plaintiff further testified that he saw McKinnie and Green "standing on the glass" watching as he exited the bathroom and returned to his bunk. Doc. 78-2 at 16, 29.

- Williams also testified that officers in the station would have been able to see the attack in the P-Dorm bathroom. Doc. 90-1 at 39.

***Plaintiff's Appearance.*** Plaintiff also has submitted evidence that, after the initial attack in the P-Dorm bathroom, Defendants "would have clearly seen that [his] clothes were ripped, and his face and clothing

were already smeared with blood." Doc. 52 at 8. The following evidence is relevant to this point:

- During his deposition, Plaintiff described his appearance as bloody with "multiple gashes" on his face and torn, bloody clothing. Doc. 78-2 at 22.

- Plaintiff further attests that both McKinnie and Green saw his "bloody injured state." Doc. 102 at 3.

- Williams testified that Plaintiff "was bleeding from his nose and mouth area." Doc. 90-1 at 22.

- Chandler-Smith also observed that—after the attack in the P-Dorm bathroom—Plaintiff's obvious injuries included a "busted lip" and a laceration above Plaintiff's eye that was bleeding. Doc. 78-27 at 20.

- Chandler-Smith further testified that he observed Plaintiff showing his injuries to Green. Doc. 78-27 at 75-76.

During master roster count officers walk within three to four feet of each bunk in good lighting with the ability to clearly see each inmate's face. Doc. 119-1 at 58, 62–64. Given the description of Plaintiff's injuries offered by Plaintiff, Williams, and Chandler-Smith—and the reported proximity of Defendants to Plaintiff during master roster count—a genuine issue exists as to whether McKinnie and Green observed Plaintiff's injuries before the second attack.

***Threats against Plaintiff.*** Plaintiff further alleges that McKinnie and Green heard gang-affiliated inmates shouting threats at

Plaintiff and understood what the threats meant.[2] Indeed Plaintiff testified that as Green conducted master roster count and McKinnie observed, gang affiliated inmates yelled out threats such as, "You all gays got to get out and get on the door," Doc. 78-2 at 38, and "You all faggots got to get up out of here," Doc. 78-2 at 17. Plaintiff attests that both McKinnie and Green "heard the gang members" making the threats, which were loud enough to be heard and understood inside the officer's station. Doc. 102 at 3.

From this evidence, a reasonable jury could find that the gang-affiliated inmates' statements constituted threats, these threats were sufficient to alert Defendants that Plaintiff was in substantial danger, and Defendants maliciously or deliberately disregarded the substantial danger Plaintiff faced. Docs. 78-2 at 46, 49; 78-27 at 12.

---

[2] Defendants assert that Plaintiff's testimony regarding the purported threats amount to inadmissible hearsay. In light of the evidence that there was a "ruckus" in the dorm and part of this ruckus entailed evidence that could be construed as threats, Doc. 78-2 at 34, Plaintiff is not attempting to prove the truth of the matters asserted by the threats—assuming that there is even a matter asserted by threating language. Rather, Plaintiff offers the gang members' threatening language to establish that Defendants knew that the gang-affiliated inmates were angry at Plaintiff, wanted Plaintiff gone, and were willing to use violence to ensure that Plaintiff no longer resided there.

***Plaintiff's Request to be Placed in Protective Custody.***
Plaintiff also alleges that he entreated McKinnie and Green by telling them he feared for his life and requesting that they place Plaintiff in protective custody. Doc. 52 at 8; 78-2 at 34. According to Plaintiff, he "begged" Green for protection when she approached his bunk during master roster count, and Plaintiff believes that both McKinnie and Green heard his request for protection. Doc. 102 at 3.

Chandler-Smith similarly testified that as McKinnie and Green conducted master roster count, Plaintiff appeared to plead with Green while pointing to his injuries. Doc. 78-27 at 22–24, 75–76. Chandler-Smith also testified that Plaintiff informed McKinnie that the gang-affiliated inmates wanted him to leave the dorm. Doc. 78-27 at 27–28.

Plaintiff testified that Green responded to his request for protective custody by stating, "I'm busy. I'm not doing no paperwork." Doc. 78-2 at 32. Chandler-Smith also testified that as Plaintiff pleaded with Green, Green shook her head, as if to say "no." Doc. 78-27 at 75–76. Furthermore, Chandler-Smith testified to overhearing McKinnie joke: "Oh, he better fuck or fight. Ain't no checking in." Doc. 78-27 at 28.

With this evidence, Plaintiff has sufficiently demonstrated the existence of a genuine issue regrading Defendants' subjective knowledge of the substantial risk of serious harm.

### 2. *Defendants' Response to the Risk*

"[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *Wade*, 106 F.4th at 1253. A defendant's decision simply must be a "reasonable decision"; it does not have to "be a perfect decision, and it does not require that any potential harm was actually averted." *Stalley*, 124 F.4th at 1287; *Mosley v. Zachery*, 966 F.3d 1265, 1271–72 (11th Cir. 2020). But an official responds to a known risk "in an objectively unreasonable manner" when the official "knew of ways to reduce the harm but knowingly declined to act or if he knew of ways to reduce the harm but recklessly declined to act." *Cox*, 15 F.4th at 1360 (quoting *Rodriguez*, 508 F.3d at 620).

Here, Defendants assert that their response was reasonable because Green immediately called for assistance upon learning of the second attack and—consistent with FDC policy and procedures—waited

in the officer's station for sufficient responding staff before entering the P-Dorm to deescalate the fight to avoid putting herself and the facility at risk. Docs. 78-28 at 91–93, 78-35, 89-1 at 3–4, 191-1 at 52, 69. Plaintiff, however, has pointed to facts in the record that dispute the reasonableness of the Defendants' response:

- Defendants observed the initial attack in the P-Dorm bathroom. Doc. 78-2 at 16, 29.

- Defendants observed bloody gashes on Plaintiff's face and his torn and bloody clothing. Doc. 102 at 3.

- Defendants saw and heard gang-affiliated inmates threatening Plaintiff. Doc. 102 at 3.

- During mater roster count, both Defendants heard Plaintiff's request for protective custody. Doc. 102 at 3.

- Green declined Plaintiff's request for protection and stated: "I'm busy. I'm not doing no paperwork." Doc. 78-2 at 32.

- McKinnie responded to Plaintiff's request to "check in" by joking "Oh, he better fuck or fight. Ain't no checking in." Doc. 78-2 at 27–28.

- McKinnie testified that, if an officer witnesses an inmate that has blood on them, the officer "should be calling emergency traffic" to get other officers down to the dorm. Doc. 78-28 at 71.[3]

---

[3] McKinnie also explained that interrupting the master count to assist an inmate was possible and not particularly difficult. Doc. 78-28 at 72, 94–95.

- Defendants exited the dorm without any further response to Plaintiff's need for help, and six inmates subsequently attacked and stabbed Plaintiff. Doc. 78-27 at 29–31, 42.

Taking the disputed facts in the light most favorable to Plaintiff, a jury could find that Defendants were aware of the substantial risk of harm, knew of ways to avoid that risk of harm, and knowingly—or recklessly—declined to act. Furthermore, when there is a dispute as to a defendant's knowledge or mental state, summary judgment for such a defendant usually is inappropriate, because a defendant's knowledge and state of mind typically can be proven only with circumstantial evidence. *Rogers v. Evans*, 792 F.2d 1052, 1059 (11th Cir. 1986); *P.H. Glatfelter Co. v. Voith, Inc.*, 784 F.2d 770, 774 (7th Cir. 1986).

## C.   Defendants are Not Entitled to Qualified Immunity

McKinnie and Green argue that they are entitled to qualified immunity because they did not violate Plaintiff's constitutional rights or any clearly established law. Doc. 78 at 27–32; 119 at 19–23.

A government official sued under 42 U.S.C. § 1983 enjoys qualified immunity from suit "unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "To be

entitled to qualified immunity, the defendant must first establish that he was acting within the scope of his discretionary authority." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (citing *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013)). Then the burden "shifts to the plaintiff to establish that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

In resolving questions of qualified immunity, courts engage in a two-pronged inquiry. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (resolving question of qualified immunity at summary judgment stage) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Upon one party moving for summary judgment, a court first must ask "whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right." *Id.* Then the court must ask "whether the right in question was 'clearly established' at the time of the violation." *Id.*

"If a government official moves for summary judgment asserting entitlement to qualified immunity, then the relevant facts are construed in the light most favorable to the non-movant—*i.e.*, the plaintiff—and the

court should decide the issue based on those facts." *Simmons v. Bradshaw*, 879 F.3d 1157, 1163–64 (11th Cir. 2018).

As set forth above, Plaintiff presented sufficient evidence to create genuine disputes of material facts. Taking those facts in the light most favorable to Plaintiff, Plaintiff has established Defendants violated the Eighth Amendment by failing to protect Plaintiff from inmate attacks. Thus, the question is whether that right was clearly established.

"In determining whether a right is clearly established, the relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Caldwell*, 748 F.3d at 1102 (internal quotation marks omitted). Materially similar case law is sufficient to clearly establish a right and can be used to defeat a qualified immunity defense. *See Patel v. Lanier County Georgia*, 969 F.3d. 1173, 1186 (11th Cir. 2020). "The prior case law need not be directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal quotation marks omitted). A right also can be clearly established by a broader principle that should govern the novel facts of a situation, or when "the conduct at

issue so obviously violate[s] the Constitution that prior case law is unnecessary." *Id.* (internal quotation marks omitted).

At the time Plaintiff was attacked, it was well established that prison officials had a duty to protect prisoners from attacks at the hands of other prisoners. *Farmer*, 511 U.S. at 833. Specifically, "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 828. Deliberate indifference is shown when a prison official knows of and disregards an "excessive risk to inmate health or safety." *Id.* at 837. Furthermore, at the time of the attacks, the law was clearly established that if prison officials actually knew about a condition that posed a substantial risk of serious harm and did nothing to address it, they violated the Eighth Amendment. *Patel*, 969 F.3d at 1190.

Because the evidence—when taken in the light most favorable to Plaintiff—is sufficient to establish that Defendants knew of the substantial risk of serious harm to Plaintiff, and Defendants were deliberately indifferent to that risk, they violated clearly established law. Green and McKinnie, therefore, are not entitled to qualified immunity.

## CONCLUSION

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that the District Court:

1. **DENY** McKinnie's motion for summary judgment. Doc. 78.

2. **DENY** Green's motion for summary judgment. Doc. 119.

3. **REMAND** this civil action to the undersigned to prepare the case for trial.

At Pensacola, Florida, this <u>28th</u> day of August, 2025.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

### NOTICE TO THE PARTIES

**The District Court referred this case to the magistrate judge to make recommendations regarding dispositive matters.** *See* **N.D. Fla. Loc. R. 72.2(C);** *see also* **28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b). Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the report and recommendation.** <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> **An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions.** *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636.**