UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DEVON CURRIE,

    Plaintiff,

vs.

MICHELLE MCKINNIE, *et al*.

    Defendants.

Case No. 5:23-cv-00183-TKW/MJF

**PLAINTIFF'S STATEMENT OF FACTS**

Plaintiff Devon Currie, in accordance with this Court's order [ECF No. 136], hereby submits his statement of facts.

*Overview*

This lawsuit involves two inmate-on-inmate assaults. On July 20, 2022 Mr. Currie was a Florida State Prisoner at Apalachee Correctional Institution ("CI"), Dorm P, Wing 2. Dorm P has two wings, wing 1 ("P1") and wing 2 ("P2"), separated by an officer station.

Mr. Currie, who is gay, was taking a "bird bath" at a wash basin in the P2 bathroom because gay inmates were not allowed to shower, when he was violently attacked by Latin King gang members. Other inmates friendly to Mr. Currie came to his defense. As a result of the attack, Mr. Currie's face was clearly bleeding and his shirt was clearly bloody and ripped.

Shortly after this first assault, Defendants, Florida Department of Corrections Officer Delisia Green and Sgt. Michelle McKinnie began Master Roster Count. When Officer Green got to Mr. Currie's bunk, Mr. Currie, clearly bleeding with bloody, torn clothing, asked Green for protective confinement, begging her to "check in," to avoid being attacked by the Latin King gang members, who had just attacked him.

Green heard Latin Kings yelling for Mr. Currie to check in (ask officers to be removed from the Dorm), could see Mr. Currie bleeding, but told him "I'm busy. I'm not doing no paperwork."

Sgt. McKinnie conducted the second part of the count and also refused Mr. Currie's request for protection. After counting P2, McKinnie and Green went to dorm P1 to continue master roster count there—leaving Mr. Currie to be attacked by Latin King gang members a second time. During this second attack, Mr. Currie was repeatedly stabbed, nearly died, and was taken to the hospital.

A more detailed account of facts follows.

*Bathroom Attack*

Mr. Currie resided in P2, where he was attacked. That evening he was in the bathroom sink area in P2 brushing his teeth. That sink area was referred to as "the bird bath." The dorm was open bay with multiple bunks

2

and housed over 50 inmates, many of them with convictions for violent offenses.

The bathroom was open to the bay area, without doors, and directly across from the officer's station.

An inmate nicknamed "Pace," a member of the Latin Kings gang, was at a sink brushing his teeth, and another inmate was in the shower.

Mr. Currie is openly gay, "all the way out." Gang members did not want gay or even gay-friendly inmates in the dorm.

A Latin Kings gang member nicknamed "YG" was talking to Mr. Currie, "putting him down" because of his sexual preference. Mr. Currie responded, "Why? I've been here so long and I'm not bothering nobody." Unprovoked, YG then swung at Currie and missed. YG swung first.

Mr. Currie defended himself. Pace then started assisting YG, and hit Currie over the head with a broomstick. Three to four more Latin Kings ran in with locks, sticks (mop handles and broomsticks), and other weapons, attacking Mr. Currie, who was hit so hard with a broom handle that the handle broke.

*Self-Defense Efforts*

The assault continued in the bathroom. Inmate Charles Gaddis (aka "Mississippi") and three other inmates tried to defend Currie. Gaddis and

3

the others were successful and the attack stopped. Everybody then went to their bunks, and Mr. Gaddis helped Mr. Currie to his bunk.

The attack lasted 8 to 10 minutes, right before Master Roster Count. After this first assault ended, none of the officers came onto the wing. The officers in the officer station during the bathroom attack were Sgt. McKinnie and Ofc. Green.

### *Visibility into Bathroom*

From the officer station, officers could see directly into the bathroom and see sinks and showers. The officers in the booth were in a position to observe the assault in the bathroom. During the 8-10 minutes, officers had clear vision. Photographs will show that officers could see even if inmates got up and blocked them at some points; officers had a clear shot to see everything going on in both day rooms and to see the whole bunk area of both sides. If an assault were taking place near the bird bath sinks and the sheet-curtain was down, someone in the security booth would be able to see it.

Even if an officer were on the P1 side of the booth, the officer could see from where they were positioned (P1) into P2. One could see all the way from the P2 bathroom to the P1 bathroom through the officer station: Standing in one bathroom, one could look straight through the officer's

station to the other bathroom. It's a clear view.

### *Ability to Hear*

Gang members were shouting. Officers inside the booth could hear inmates if they call and yell for someone. McKinnie testified that if inmates are yelling in the dorm, that's generally something she could hear.

Officers' stations are designed to give the officers a clear view of the inmates' activities. Officers in the booth are trained to pay close attention to what's going on in the dorms at all times.

### *Bathroom Injuries*

As a result of the bathroom attack, Mr. Currie (aka "Boots") was injured, with a busted lip, and bleeding from his upper eye area. There was blood all over the bathroom. Mr. Currie had multiple bruises, cuts and gashes on his face, which was bleeding, his shirt was bloody and ripped, and he was bleeding from his nose and mouth area.

Green was in the officer station during this first assault. Neither she nor Sgt. McKinnie testified to doing anything to stop it.

### *At the Bunks*

Back at the bunks, YG and other Latin Kings started grabbing their weapons and packing their property. It can be inferred that Latin Kings packed their belongings because they knew they would be going to "jail"

5

(i.e., confinement) as a result of their attack.

Mr. Currie went to his bunk and started to pack his property. The gang members were yelling out, saying, "Gays got to get on the door, got to […] check in, got to get out of here." To "get on the door" and "check in" mean to ask to leave the dorm for protective confinement. Being told to "get on the door" means the inmate being told has to leave the dorm; the inmate is being forced out. To "check in," an inmate would have to go to "the police" (corrections officers) and tell them he does not feel safe in the dorm. Fulfilling their Constitutional duty to protect inmates against inmate-on-inmate violence, officers would then send the inmate to confinement or somewhere else safe.

Two gay or gay-friendly inmates (Gaddis and Williams) asked Mr. Currie if he was okay, trying to figure out what to do. Meanwhile, gang members were standing around yelling that Mr. Currie needed to get out of the dorm. Meanwhile Ofc. Green and Sgt. McKinnie were in the officer station, where McKinnie testified she had the ability to hear and see everything.

### *Master Roster Count*

The bathroom attack happened right before Master Roster Count, which started at 10 pm.

<span>6</span>

Master Roster Count requires two officers to count. One officer counts the inmates, then a second officer counts them.

The counting officer has a master roster sheet with every bunk number, with every inmate's name. When the officer comes to an inmate's bunk the inmate must show his ID and say his name and DC number. The officer then matches the face with a photo on the master roster sheet. The officer goes from bunk to bunk doing this, from bed to bed, all the way around the entire dorm.

Once both officers complete their respective counts, they compare their numbers for accuracy.

*First Count*

Ofc. Green did the first count that night. She counted the first couple of beds and came to Mr. Currie's bed. Green had to look at Mr. Currie to make sure he was the same inmate as in her list of photos. Green was standing right in Currie's face, talking to him. Green would have seen that Currie was "beat up on bad" and that his wounds were fresh. Mr. Currie stopped Green while she was doing count and spoke with her. He tried to tell her that he wanted to sign into protective custody, that he was in fear for his life. He begged her for protection. But Green told Mr. Currie, "I'm busy. I'm not doing no paperwork." She could see his bruises, blood all

over his ripped clothes, and his property packed right in front of her. But she disregarded all that and just kept doing the count.

"Checking in" meant asking for protection, getting out of the dorm, and involves some paperwork—an incident report, a bunk assignment, property sheet, witness statement. The inmate is moved to a holding cell in another area. The paperwork and process are not onerous, and Green could have asked other officers to assist her with the check-in.

Both Sgt. McKinnie and Ofc. Green could see Mr. Currie's bloody injured state, heard him ask for protection and heard the gang members threaten him if he was not allowed to "check in." The threats by the Latin Kings were not only directed at the gay inmates in the Dorm but also at the officers because they knew Mr. Currie needed the officers' cooperation to actually leave the Dorm, which was the Latin Kings goal.

*Ruckus*

Master Roster Count is the most important count of the day. All inmates know to be quiet. An officer goes from bunk to bunk checking photos on the Roster with faces and inmate I.D. cards. Inmates are supposed to sit on their bunks. Standing up and talking is a violation. But on this night, inmates were "disrespecting" the count. The scene was tense. The Latin Kings were yelling, "You all gays got to get out and get on the

door. You all got to get up out of here. You all got sign into protective custody." No one else was yelling.

The Latin Kings yelled their threats while McKinnie and Green were right there on the dorm floor. McKinnie and Green heard the yelling. Green saw that rowdiness but kept doing count, acting like she didn't see anything.

Many dorms didn't allow "checking in." After Green counted, McKinnie did her own count. Mr. Currie likewise spoke with McKinnie, saying that he was just attacked and that the Latin Kings want him to check in. But McKinnie proceeded with count, nonchalant about what Mr. Currie told her. McKinnie subsequently said, like a joke, "Oh, he better fuck or fight. Ain't no checking in." McKinnie then went back to the booth. Then, despite the chaotic scene, she and Green went to other side of the dorm to count Wing 1.

*Could Have Stopped Count*

If count is taking place and someone is injured, has blood on them and is asking to check in, the officer are not prohibited from calling emergency traffic for assistance and getting additional officers over to the dorm. Emergency traffic can be called in the middle of count. Stopping count to help an inmate would not be a big problem. Once the inmate is

9

removed officers can go back and do their count again. Where there's violence between inmates and injuries to inmates, count can be stopped, inmates can be moved and then count is redone.

*Second Attack*

After count in P2 was completed YG stood up and yelled across the dorm at Currie, "What's up? You, you getting on the door or let's rock out." Other Latin Kings then got up. The Latin Kings had their knives and other weapons out in the open, unconcealed. YG tried to stab Currie, but Gaddis said, "Watch out, Boots." Currie took a step to the left, causing YG to miss. And that's when everything escalated.

After YG missed, the Latin Kings attacked Brandon Williams. Williams, Gaddis and Currie were being chased all over the dorm. The Latin Kings were hitting them with broomsticks, locks in socks, and knives. One inmate testified the scene was like WWE WrestleMania and "looked like a war zone."

Eight to ten Latin Kings attacked at this point. Three (gang members) attacked Currie, four chased Williams around the dorm, and others chased Gaddis. Currie saw four gang members chasing Williams and ran to help him. The Latin Kings encircled Williams and Currie by the officer station.

Despite the warnings that arose during Master Roster Count, and

Plaintiff's pleas for help, it was not until after the Master Roster Count in Dorm P, Wing 2, when Green saw gang members "utilizing weapons and stabbing one another" that Green actually summoned a response team to Dorm P to control the violence.

The second assault ended when Captain Heffner and other officers rushed into the dorm.

Currie, Williams and Gaddis were never armed.

### *Duty*

An officer (in the booth) is supposed to be paying attention to what's going on in the dorms at all times. An officer in the booth focusing on one wing must not ignore the other wing and cannot neglect one side.

FDC staff are required at all times maintain proper security and welfare of inmates. No employee shall willfully or negligently treat an inmate in a cruel or inhuman manner. And every employee has the responsibility to protect and safeguard the person and property of inmates.

### *Injuries after the second assault*

After being stabbed, Mr. Currie fell unconscious and awoke in the medical unit, where he kept going in and out of consciousness. He had been stabbed in the lung, was bleeding internally and found it hard to breathe. He was transported (by ambulance) to the hospital, where he

spent five days, during which his lung was pumped and drained. Mr. Currie flatlined twice on the operating table.

Mr. Currie almost died. In fact, one witness believed Mr. Currie was dead, as much blood was on Mr. Currie's shirt, like the size of a bowling ball.

Latin Kings stabbed Mr. Williams in the left top shoulder and the right back shoulder. Mr. Williams received stitches and staples.

Mr. Gaddis's cheek was slashed from his ear to his mouth, long and deep. Mr. Williams testified he could see into Gaddis's mouth through the slash, which was "flopping."

*Backup on Standby*

Before Currie was stabbed, Ofc. Green was aware of a disturbance in the dormitory, knew "things [were] going on" and there was a risk of danger, and had backup officers on standby. She testified:

> I already had backup on standby because it was -- you just kind of -- when you're in the prison system, you know things go on. So, you have them on standby already. I thought you need to put them on standby just because of the environment that we're in and that's all. I just had them on standby already and when the situation happened, I called emergency traffic."

McKinnie testified that once emergency traffic is called, officers must wait for enough officers before going into the dorm, which might be three minutes, but could be up to five minutes.

12

Here, between the two assaults, with inmates yelling for Currie—who was already bleeding and wearing a torn shirt—to leave the dorm, Green put backup on standby and then left with McKinnie to count Wing 1.

But officers could take 3-5 minutes to respond to the dorm had Green called in an emergency.

It was obvious this 3-5 minute gap could be sufficient time for a near-fatal stabbing, which is what happened.

Green created an inherent delay when—knowing of an ongoing risk of life-threatening harm—she left Wing 2 with a looming emergency. Minutes later, the attack started. A delay of 3-5 minutes for emergency officers to arrive was then inevitable.

Green and McKinnie took no steps to move Mr. Currie to protective confinement, and each—deliberately indifferent to the clear and imminent danger to Mr. Currie—left him exposed to the Latin Kings, with ample time to attack and stab Mr. Currie.

*Close Management*

When he returned from the hospital, Mr. Currie was unfairly placed on Close Management for fighting during the July 20 incident, even though he always acted in self-defense. Gaddis and Williams suffered the same treatment. Prison officials had video of the incident and could have

pinpointed the source of the violence and spared the victims this punishment.

*Video Spoliation*

Video from the incident was viewed by FDC staff and downloaded by Capt. Heffner and Inspector Winterburn and documented as being sent to the Office of the Inspector General ("OIG"). But FDC could not find the video in response to Plaintiff's subpoena. The disc turned over to the OIG's office was blank. Green remembers reviewing the video after the event. Other witnesses remember seeing or hearing reference to the video.

Defendant Green later saw video clips of the incident on the video monitoring screen in the officer's station. She did not recall being interviewed by Captain Heffner. When asked if she downloaded the video, she stated, "I didn't burn it. Someone else did." She thought she filled out a witness statement. No statement by her was produced in discovery, although requested. Important evidence existed and then, suddenly, it didn't.

Devon Curry spent several days in the hospital in Tallahassee while the blood was drained from his lung. He later had to go back to the hospital to have additional work done. At one point, medical providers thought they had lost him. His recovery was slow and painful. He still has scars from the

knife attack. He also suffers mental distress from the callous and dismissive unfair treatment after the near-death experience.

Although Currie had never intentionally instigated the assault or sought to do more than defend himself, and although he never got a disciplinary charge for anything he did that day, he was railroaded into an enhanced level of supervision called Close Management. Although the video would have showed that his actions were only defensive and that the assault was started by Latin King gang members, the video disappeared and he was unable to mount a defense against his new, more restrictive, inmate classification. The same thing happened to the inmates who tried to help him. Currie was seen as a "writ-writer" someone who writes grievances against official misconduct.

Mr. Currie will testify to any ongoing symptoms he has continued to experience from the attacks.

Respectfully submitted on November 13, 2025,

>*/s/ James V. Cook*
>JAMES V. COOK, ESQ.
>Florida Bar Number 966843
>Law Office of James Cook
>314 West Jefferson Street
>Tallahassee, FL 32301
>(850) 222-8080; 561-0836 fax
>cookjv@gmail.com

*/s/ Joshua Tarjan*
Joshua Tarjan (FBN 107092)
THE TARJAN LAW FIRM P.A.
12372 SW 82 Avenue
Pinecrest, FL 33156
(305) 423-8747
(323) 243-3186 (cell)
(786) 842-4430 (fax)
josh@tarjanlawfirm.com

*Attorneys for Plaintiff*

I CERTIFY a true copy hereof was filed and served by CM/ECF on 1/13/25.

*s/James V. Cook*

16